IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JAMES W. NICHOLSON,

                            Plaintiff,              Civil Action No.
                                             9:13-CV-0748 (TJM/DEP)

    v.

M. HAMMOND, *et al.*,

                            Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

JAMES W. NICHOLSON, *Pro Se*
1311 3rd Street
Rensselear, NY 12144

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        LOUIS JIM, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

### REPORT AND RECOMMENDATION

     *Pro se* plaintiff James W. Nicholson has commenced this action

asserting claims arising out of his confinement in the custody of the New

York State Department of Corrections and Community Supervision

("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights by destroying his legal mail, retaliating against him, and denying him equal protection, in violation of his rights under the First and Fourteenth Amendments.

Currently pending before the court are cross-motions for summary judgment. For the reasons set forth below, I recommend that plaintiff's motion for summary judgment be denied and that defendants' motion be granted.

I.    BACKGROUND[1]

A.    Underlying Facts

From January 24, 2013 through July 23, 2014, plaintiff was a prison inmate held in DOCCS custody at the Greene Correctional Facility ("Greene").[2] Dkt. No. 69-5 at 2.[3] At the relevant times, defendant Marie Hammond ("Hammond") was the Deputy Superintendent for Program Services at Greene. Dkt. No. 69-2 at 1. Hammond was responsible for investigating and responding to inmate complaints related to the mailroom. *Id*. Defendants Captain Linda Goppert ("Goppert") and Corrections Officer Snide ("Snide") were also employed at Greene. Dkt. No. 69-3; Dkt. No. 69-4.

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court. Ordinarily, when a motion for summary judgment is made, the record before the court is construed with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions for summary judgment, the court draws "all factual inferences . . . against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist*., 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

[2]    In July 2014, plaintiff was released from DOCCS custody. Dkt. No. 69-5 at 2. In October 2014, he was incarcerated due to a parole violation. Dkt. No. 69-8 at 13. On October 20, 2015, plaintiff was again released from DOCCS custody. *See* http://nysdoccslookup.doccs.ny.gov (last visited May 9, 2016).

[3]    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

Prior to his incarceration at Greene, plaintiff was confined at the Bare Hill Correctional Facility ("Bare Hill"). Dkt. No. 69-8 at 22-23. While confined at Bare Hill, plaintiff filed a grievance against Sgt. Miller ("Miller"), an officer at that facility. *Id*. at 22. Plaintiff did not come into contact with Hammond or Goppert while he was incarcerated at Bare Hill. Dkt. No. 69-8 at 24. Plaintiff never encountered Miller while he was incarcerated at Greene. *Id*. at 28.

On March 12, 2013, plaintiff filed a complaint in the United States District Court for the Northern District of New York against Miller. *Nicholson v. Miller*, No. 9:13-CV-0277 (LEK/ATB) ("Nicholson I"). In *Nicholson I*, plaintiff alleged that Miller threatened him, retaliated against him and used excessive force. Dkt. No. 1 at 4, 6; *Nicholson I*, Dkt. Nos. 1, 11.[4]

On or about March 27, 2013, plaintiff received a letter from his attorney, Eugene Grimmick, Esq. ("Grimmick").[5] Dkt. No. 69-8 at 35; Dkt. No. 1-1 at 7-8. In the letter, Grimmick indicated that he enclosed copies of plaintiff's "Appellant's Brief and Appendix" and plaintiff's "Record on

---

[4]     The court may properly rely upon the *Nicholson I* docket because docket sheets are public records, "of which the court could take judicial notice." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (citations omitted).

[5]     Grimmick is not a defendant in this action.

Appeal." Dkt. No. 1-1 at 7. Plaintiff, however, did not receive the referenced enclosures. Dkt. No. 69-8 at 36-37. Plaintiff did not see Hammond or Goppert destroy his legal mail, nor was he told that Hammond or Goppert had destroyed his legal mail. *Id.* at 25.

B.    <u>Grievance Related to Legal Mail</u>

On June 18, 2013, plaintiff filed a grievance (GNE-7830-13) claiming that his legal mail was "destroyed" or "not given to [him] for some reason."[6] Dkt. No. 69-9 at 6-8. Plaintiff alleged that his mail was destroyed in "retaliation for filing a federal lawsuit against Sgt. Miller." *Id.* at 8. Plaintiff did not name or identify Hammond or Goppert in the grievance. Dkt. No. 69-8 at 28; Dkt. No. 69-9 at 6-8.

On July 8, 2013, Mr. Black, the Inmate Grievance Program ("IGP") Supervisor, forwarded a memorandum to plaintiff advising that an investigation into plaintiff's grievance was ongoing.[7] Dkt. No. 69-9 at 13. Hammond conducted the investigation and determined that a package was received from Grimmick on April 3, 2013 and April 12, 2013, but that

---

[6]    During his deposition, plaintiff testified that his legal mail was destroyed on April 2, 2013, April 3, 2013 and April 12, 2013. Dkt. No. 69-8 at 20-21.

[7]    Mr. Black is not a defendant in this action.

plaintiff did not sign for the legal mail. *Id*. at 14. Hammond concluded that plaintiff's mail was lost and that his grievance "has merit." *Id*.

On July 31, 2013, the Inmate Grievance Review Committee ("IGRC") issued a response accepting the grievance, in part. Dkt. No. 69-9 at 10. The committee found that packages were received from plaintiff's attorney on April 3, 2013 and April 12, 2013. *Id*. However, plaintiff did not sign for any legal mail on, or immediately after, those dates. The committee concluded that plaintiff's mail was lost. *Id*.

On August 14, 2013, plaintiff appealed the IGRC decision to the superintendent. Dkt. No. 69-9 at 10. Plaintiff did not mention Hammond or Goppert in that appeal. Dkt. No. 69-8 at 31. On August 15, 2013, Acting Superintendent Arthur Dirie ("Dirie"), issued a decision accepting the grievance, to the extent that plaintiff's mail was lost.[8] Dkt. No. 69-9 at 9.

On August 19, 2013, plaintiff appealed the superintendent's decision to the Central Office Review Committee ("CORC"). Dkt. No. 69-9 at 9. Plaintiff did not mention Hammond or Goppert in the appeal. Dkt. No. 69-8 at 33. On January 15, 2014, the CORC upheld the superintendent's decision. Dkt. No. 69-9 at 3. The committee determined that plaintiff did not

---

[8]     Dirie is not a defendant herein.

6

present sufficient evidence to substantiate retaliation or malfeasance by staff. *Id.*

C.     Grievance Related to Freedom of Information Law ("FOIL") Request

On July 11, 2013, plaintiff filed a grievance (GNE 7846-13) regarding a "FOIL Issue." Dkt. No. 69-10 at 12. Plaintiff complained that he did not receive a response to his June 16, 2013 FOIL request seeking the names of individuals who signed for packages containing his legal documents. *Id*.; Dkt. No. 74 at 2. On August 15, 2013, Dirie accepted plaintiff's grievance "in part" and concluded that while plaintiff did not receive the requested items pursuant to FOIL, copies of plaintiff's request "have since been forwarded to him." *Id*. Plaintiff was directed to submit future FOIL requests to the facility FOIL officer, T. Johnson, in community supervision, and not to administrative staff, to avoid potential delays. Dkt. No 69-10 at 12.

On August 19, 2013, plaintiff appealed the superintendent's decision to the CORC. Dkt. No. 69-10 at 12. On January 2, 2014, the CORC upheld Dirie's decision, finding that on July 22, 2013, plaintiff received copies of the log book for "4/4/13 - 4/20/13." Dkt. No. 69-10 at 24.

D.    <u>Grievance Related to Snide</u>

On July 24, 2013, plaintiff was summoned to the grievance office. Dkt. No. 1 at 6; Dkt. No. 69-10 at 8. Snide was present and asked plaintiff what he "would like to do with GNE 7830-13." *Id*. Plaintiff responded that the grievance should have been appealed to the superintendent in accordance with grievance time limits. *Id*. at 9. Snide threatened plaintiff with confinement at a "max prison" and directed plaintiff to "stop filing grievances." *Id*.

On August 1, 2013, plaintiff filed a grievance (GNE-7857-13) related to Snide's threats. Dkt. No. 69-10 at 7-9. Plaintiff also complained that his prior grievance was not timely processed and that he suffered from "violation[s] of grievance procedure[s]." *Id*. at 8.

On August 23, 2013, the superintendent issued a decision denying the grievance.[9] Dkt. No. 69-10 at 10. The superintendent noted that Snide denied making any threats to plaintiff. *Id*. at 10, 15.

On August 27, 2013, plaintiff appealed the superintendent's decision to the CORC. Dkt. No. 69-10 at 10. On January 15, 2014, the CORC upheld the superintendent's decision. Dkt. No. 69-10 at 3. The committee

---

[9]    The name of the superintendent who issued that decision is not legible.

determined that plaintiff did not present sufficient evidence to substantiate retaliation or malfeasance by staff. *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint and an accompanying application to proceed in forma pauperis ("IFP"). Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, Senior District Judge Thomas J. McAvoy issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of all claims asserted against Dirie. *See generally* Dkt. No. 11.

On July 24, 2015, defendants filed a motion for summary judgment seeking dismissal of the complaint on multiple grounds, including (1) the lack of personal involvement of defendants Hammond and Goppert; (2) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether Snide retaliated against plaintiff in violation of his First Amendment constitutional right; (3) Eleventh Amendment immunity; and (4) qualified immunity. *See generally* Dkt. No. 69. Plaintiff responded with the filing of his response in opposition to the defendants' motion and a cross-motion for summary judgment. Dkt. No. 74. Defendants have

submitted a reply in further support of their motion. Dkt. No. 77. The

parties' cross-motions, which are now fully briefed and ripe for

determination, have been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Legal Standard Governing Motions for Summary Judgment

        Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material facts and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry, if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.  Eleventh Amendment Immunity

Defendants maintain that, to the extent that plaintiff has sued them for damages in their official capacities, his complaint is subject to dismissal. Dkt. No. 69-12 at 11. Plaintiff has not responded to defendants' argument.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. *See, e.g., Daisernia v. State of N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an

individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of N.Y.App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing, *inter alia*, *Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action asserted against the named defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that the damage claims raised in plaintiff's complaint are asserted against any of the named defendants in their official capacities, those claims be dismissed.

C.  <u>Personal Involvement</u>

Plaintiff alleges that defendants Hammond and Goppert are responsible for his lost or destroyed legal mail because, as commanding officers, they had knowledge of the illegal actions of their subordinates and failed to address the violations. Dkt. No. 74 at 2, 8. Defendants Hammond and Goppert argue that the record before the court fails to establish their involvement in any alleged constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To

be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).[10]

With respect to individuals who, like defendants Hammond and Goppert, are sued in their capacities as supervisors, it is well-established that they cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability . . . cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143,

---

[10]     All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

152–53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

The record before the court firmly establishes that Goppert was not involved in any of the alleged constitutional violations. Plaintiff did not observe Goppert tamper or otherwise interfere with plaintiff's legal mail, and concedes that he was never told that Goppert interfered with his mail. Dkt. No. 69-8 at 25. Plaintiff admitted that he never encountered Goppert while he was confined at Bare Hill. *Id*. at 23. Plaintiff testified that he identified Goppert in his complaint because "officers" told him that Goppert was in charge of the mailroom. *Id*. at 33-34. This notwithstanding, the record does not support that assertion. In support of defendants' summary judgment motion, Goppert has provided a declaration in which she avers that her responsibilities included supervising lieutenants, sergeants, and officers, and serving as a hearing officer. Dkt. No. 69-3 at 1. Goppert was not responsible for the handling of incoming or outgoing mail, and the record lacks any evidence suggesting that Goppert participated in the investigation related to plaintiff's grievance regarding the mail issue. *Id*.

In opposition to defendants' motion, plaintiff contends that he did not receive a response to his FOIL request seeking the names of the

individuals who "signed for" the package containing his legal documents. Dkt. No. 74 at 2. The undisputed record does not support this claim. On June 16, 2013, plaintiff submitted the FOIL request to administrative staff. Dkt. No. 69-10 at 12, 24. On July 22, 2013, plaintiff received a copy of the log book for April 4, 2013 through April 20, 2013. Dkt. No. 69-10 at 24. Any delay in receiving the requested information was due to plaintiff's error in submitting the FOIL request to administrative staff rather than the facility FOIL officer. *Id*.

In sum, I find that plaintiff has failed to establish a basis for finding personal involvement on the part of Goppert for the alleged constitutional deprivations. Accordingly, I recommend that this portion of defendants' motion seeking dismissal of plaintiff's claims against defendant Goppert's be granted.

The court reaches a different conclusion with respect to defendant Hammond. In July 2013, Hammond conducted an investigation of plaintiff's grievance related to his legal mail. Dkt. No. 69-9 at 14. The participation of Hammond in the administrative grievance process sufficiently implicates her personal involvement in the constitutional violations alleged to survive summary judgment. *See Keitt v. NYS Dep't of Corrs. and Cmty.*

*Supervision*, No. 11-CV-0855, 2015 WL 2383687, at *15 (W.D.N.Y. May 19, 2015) (finding sufficient personal involvement where the defendant investigated the plaintiff's claims) (citing *Watson v. Wright*, 2013 WL 1791079, *9 (W.D.N.Y. 2013), *adopted* 2013 WL 1789578 (Arcara, J.) ("A supervisor's detailed, specific response to a plaintiff's complaint may suffice to establish personal involvement.")). The facts before the court disclose the existence of a genuine, triable issue of material fact surrounding Hammond's personal involvement with plaintiff's legal mail.

In summary, I recommend that defendants' motion for summary judgment on the basis of lack of personal involvement be granted with respect to defendant Goppert, but denied as it relates to defendant Hammond.

D. <u>Merits of Plaintiff's Claims Against Defendant Hammond</u>[11]

Plaintiff contends that, as a result of the destruction of his legal mail, he was denied access to courts and deprived of equal protection. Dkt. No. 69-1 at 1. Plaintiff also alleges that Hammond destroyed his legal mail in retaliation for plaintiff filing a lawsuit against Miller. Dkt. No. 69-8 at 27.

1. <u>Access to Courts</u>

Undeniably, prisoners have a constitutional right to meaningfully access the courts. *Bounds v. Smith*, 430 U.S. 817, 824 (1977); *accord, Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of *access to the courts*." (emphasis in original)). This right is implicated when prison officials

---

[11] Defendants moved for summary judgment on the basis of lack of personal involvement and did not address the merits of plaintiff's claims against Hammond. "Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court and those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law, a district court does not err in sua sponte granting summary judgment against the plaintiff." *Parks v. Town of Greenburgh*, 344 F. App'x 654, 655 (2d Cir. 2009) (citing *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir.1996)). In this instance, plaintiff was given notice of the court's consideration of summary judgment and had the opportunity to submit evidence in opposition to defendants' motion. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000). Plaintiff did not raise any notice objection, and has not only submitted opposition to the motion, but has gone further and filed a cross-motion for summary judgment in his favor, on the merits. Thus, the court will address the merits of plaintiff's claims against Hammond.

"actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]" *Lewis*, 518 U.S. at 350 (citations omitted). A plaintiff asserting a denial of access to courts claim must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks omitted).

Plaintiff claims that he "missed court imposed deadlines" as a result of defendants' "failure to turn over [his] legal mail." Dkt. No. 1 at 8. Plaintiff has failed to offer any specifics regarding those claims and to adduce proof from which a reasonable factfinder could conclude that he did indeed experience prejudice by virtue of defendants' failure to provide him his legal materials, leaving instead only his conclusory allegations without underlying evidentiary support. *Collins v. Goord*, 438 F. Supp. 2d 399, 418 (S.D.N.Y. 2006) (holding that vague allegations do not "substitute for the required showing of an 'actual injury' in a specific legal action resulting from the alleged deprivation"). Moreover, the docket in *Nicholson I* belies plaintiff's claims. On April 1, 2013, plaintiff filed a motion for leave to proceed *in forma pauperis* and an inmate authorization form in *Nicholson I*. Dkt. No. 4. From June 2013 through July 2014, when he was transferred

out of Greene, the records show that plaintiff actively litigated the case, including by filing motions for the appointment of counsel, motions to reconsider prior rulings, and various discovery motions. These submissions do not suggest that any defendant tampered with plaintiff's legal mail, on a continuous and regular basis, resulting in any prejudice or injury.

The record now before the court does not support plaintiff's claim that he was denied access to the courts, nor does it establish the existence of prejudice suffered as a result of any such deprivation, if indeed it did occur. Accordingly, I recommend dismissal of plaintiff's court access claims as a matter of law.

### 2. Equal Protection

Plaintiff claims that he was treated differently from "other offenders who receive legal mail and of whom file grievances." Dkt. No. 1 at 8. The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an

identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995).

Plaintiff's complaint contains no specifics, nor does the record provide any amplification regarding this claim. Absent such specifics, I conclude that no reasonable factfinder could find that plaintiff was discriminated against on the basis of a suspect class or otherwise subject to invidious discrimination and therefore recommend dismissal of his equal protection claims. *See Jackson v. Burke*, 256 F.3d 93, 96-97 (2d Cir. 2001).

### 3.    Retaliation

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N .Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with

skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a

deprivation of a constitutionally protected right."). Here, it is undisputed that plaintiff filed a grievance and lawsuit against Miller.

With respect to the second element, the undisputed record establishes that plaintiff's legal mail was "lost" on two occasions. As was discussed above, plaintiff failed to prove that he suffered any injury as a result of the tampering. Thus, plaintiff has failed to establish that the alleged conduct would deter an ordinary individual from exercising his constitutional rights. *See Islam v. Goord*, No. 05-CV-7502, 2006 WL 2819651, at *7 (S.D.N.Y. Sept. 29, 2006).

Even assuming that the loss of legal mail constitutes an adverse action, plaintiff must establish the third element of the retaliation analysis, causation. Here, plaintiff relies upon the temporal proximity between the protected conduct and the retaliatory act to establish this third required element. Dkt. No. 1 at 8. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. In the case of an allegedly false, retaliatory misbehavior report issued to an inmate, the analysis is informed by such factors as (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii)

vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872-73). In any case, the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville*, 224 F. Supp. 2d at 732.

In March 2013, plaintiff filed his complaint in *Nicholson I.* One month later, in April 2013, plaintiff's legal mail was lost. While the chronology of events favors a finding of causal connection, plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). To this end, plaintiff has not cited any evidence aside from temporal proximity that supports the requisite nexus. The record does not contain any proof from which a reasonable factfinder could conclude that any action by Hammond was motivated by plaintiff's filing of grievances or a lawsuit against Miller. Hammond is not named as a defendant in *Nicholson I*, and is not referenced anywhere in the complaint in that action. *See Nicholson I* (Dkt. No. 1). Plaintiff did not encounter

Hammond while he was confined at Bare Hill. Dkt. No. 69-8 at 24.

Similarly, plaintiff did not encounter Miller while he was confined at Greene.

Dkt. No. 69-8 at 28. There is no evidence of any connection between Miller

and Hammond and, indeed, no evidence that Hammond was even aware

that plaintiff filed grievances or a lawsuit against Miller. Plaintiff did not

mention Hammond or Miller in the June 2013 grievance. Dkt. No. 69-8 at

28. The evidence now in the record fails to establish a connection between

Hammond and plaintiff's grievance and lawsuit against Miller. The record is

barren of any evidence from which a reasonable factfinder could conclude

that Hammond retaliated against plaintiff for grievances and a lawsuit

against Miller. In view of these facts, I conclude that plaintiff has not shown

a cognizable retaliation claim against Hammond.

     E.   <u>Merits of Plaintiff's Claims Against Snide</u>

     Defendants move for summary judgment and dismissal of all claims

against defendant Snide, arguing that plaintiff does not have a

constitutional right to file grievances. Defendants also contend that

plaintiff's retaliation claim is subject to dismissal because verbal threats do

not constitute adverse actions. Dkt. No. 69-12 at 8-11. Plaintiff did not

respond to defendants' arguments. *See generally* Dkt. No. 74.

1. <u>Grievance Procedures</u>

Prison inmates have no constitutionally protected right of access to an administrative grievance process at a prison facility. *Rhodes v. Hoy*, No. 05-CV-836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi*, No. 01-CV-0285, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."). Claims that arise under state law and regulation are not cognizable under section 1983. *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("[A] violation of state law is not cognizable under § 1983."). For this reason internal regulations governing prison grievance procedures do not give rise to federally protected liberty interests, and the alleged failure of prison officials to follow prescribed procedures associated with an established grievance process does not support a civil rights claim under section 1983, absent the independent deprivation of a right protected under the Constitution, or by federal statute. *See Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently

allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."); *Aho v. Hughes*, No. 03-CV-1552, 2005 WL 2452573, at *7 (D.Conn. Sept. 30, 2005) (noting that the "failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right"); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (internal citations omitted); *see also Hunnicutt v. Armstrong*, 305 F. Supp. 2d 175, 188 (D. Conn. 2004), *vacated on other grounds*, 152 F. App'x 24 (2d Cir. 2005).

Accordingly, based upon my finding that plaintiff did not suffer a constitutional deprivation in this regard, I recommend that Snide's motion seeking dismissal of this claim be granted.

## 2.    Retaliation Based Upon Verbal Harassment

Section 1983 was not designed to rectify harassment or verbal abuse. *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996). As such, the mere allegation by a prison inmate that he or she has experienced verbal abuse from prison workers does not rise to the level of a constitutional violation, and is not independently cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck*, No. 97-CV-0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983); *Carpio v. Walker*, No. 95-CV-1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation.").

Plaintiff's claims regarding verbal harassment extend beyond merely asserting that it represents a constitutional violation in and of itself. Plaintiff's claims against Snide are directly tied to grievances against his fellow workers. Plaintiff alleges, for example, that Snide verbally threatened

him "in response to plaintiff's filing of grievances against Hammond and Goppert." Dkt. No. 69-1 at 3.

While in some instances verbal threats may suffice to constitute adverse action for purposes of a retaliation claim, whether they do in a particular case is dependent upon the specificity of the threat and the context in which it was made. *Compare Hepworth v. Suffolk Cnty.*, No. 02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate) *with Bartley v. Collins*, No. 05-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); *Alicea*, 387 F. Supp. 2d at 237 ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially when the threat was never carried out).

Considered against this backdrop, I conclude that plaintiff's allegations against Snide, even if true, claim nothing more than simple

verbal harassment which does not rise to a level of constitutional significance. Snide's alleged verbal threat never came to fruition and is patently insufficient to establish adverse action and support a plausible retaliation claim. Plaintiff's failure to allege any other specific adverse action taken by Snide is further fatal to this cause of action.

Because plaintiff has failed to adduce any evidence of adverse action taken against him by Snide as a result of the grievances he filed, I have concluded that he has failed to come forward with sufficient facts to support a plausible claim for retaliation, and I therefore recommend that defendants' motion for summary judgment dismissing that cause of action be granted.

## IV.    SUMMARY AND RECOMMENDATION

Neither plaintiff's complaint nor the record before the court discloses any basis for finding personal involvement on the part of Goppert in the constitutional deprivations alleged. Turning to the merits of the claims advanced by the plaintiff against Hammond, I conclude that plaintiff's complaint is deficient insofar as it alleges a denial of court access based upon the fact that plaintiff has not established the existence of any injury or prejudice resulting from the loss of his legal mail. I further find that no

reasonable factfinder could return a verdict in plaintiff's favor with regard to his equal protection claim. I also find that the record lacks any evidence from which a reasonable factfinder could conclude that Hammond retaliated against plaintiff based upon the lack of showing of any connection between plaintiff's grievance and lawsuit against Miller and any action by Hammond. I also recommend dismissal of plaintiff's claims against Snide based upon plaintiff's failure to establish the existence of a federally protected right of access to the grievance process at Greene, and the lack of any evidence in the record to support a claim for retaliation. Finally, I find that all claims against the defendants for damages in their official capacities are subject to dismissal on the basis of the Eleventh Amendment.[12]

It is therefore hereby respectfully

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 74) be DENIED; and it is further

_____

[12]    In light of my recommendations that defendants' motion be granted in its entirety based on the merits, I find it unnecessary to address defendants' alternative qualified immunity argument.

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 69) dismissing all claims in this action be GRANTED, and judgment be entered dismissing plaintiff's complaint in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     May 19, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER
McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale Hendrickson ("Plaintiff" or "Hendrickson"), an inmate then in confinement at the Federal Correctional Institution in Otisville, New York ("Otisville"), filed this action for injunctive relief and damages based upon alleged violations of his rights under the United States Constitution, Amendments I, IV, V, VI, IX, and XIII, and upon violations of various laws and/or regulations governing prison administration.FN1 The Complaint named as defendants G.L. Hershberger ("Hershberger"), the United States Attorney General ("Attorney General"), Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"), Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the Bureau of Prisons ("BOP"), and the Otisville Medical Department ("OTV Medical Department") (collectively "Defendants"). Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set out below, Defendants' Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are employed for dismissing a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a Rule 12(c) motion to dismiss for failure to state a claim upon which relief can be granted. *See Ad–Hoc Comm. of the Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987); *see also Viacom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375 n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R. Miller, *Federal Practice and Procedure* ¶ 1367, at 515–16 (1990). Thus, the Court must read the Complaint generously, drawing all reasonable inferences from the complainant's allegations. *See California Motor Transp. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972). Moreover, "consideration is limited to the factual allegations in [the] amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142 (2d Cir.1993); *accord Allen v. Westpoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). Defendants, therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

### II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

### III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 2383687
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Devin KEITT, Plaintiff,
v.
NYS DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, et al., Defendants.

No. 11–CV–0855.
|
Signed May 19, 2015.

**Attorneys and Law Firms**

Devin Keitt, Stormville, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The instant case, involving various civil rights claims by *pro se* plaintiff arising from his incarceration at Elmira Correctional Facility, was referred to Magistrate Judge Jeremiah J. McCarthy for supervision of all pre-trial proceeding pursuant to 28 U.S.C. § 636(b)(1). Defendants moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(c) and plaintiff cross-moved for partial summary judgment. On January 6, 2015, Magistrate Judge McCarthy issued a Report and Recommendation recommending that defendants' motion be granted in part and denied in part, and that plaintiff's cross-motion be denied. Both plaintiff and defendant filed objections to the Report and Recommendation. [1] Responses to the respective objections were filed by plaintiff and defendants, and the Court deemed the matter submitted without oral argument. For the following reasons, and for the reasons set forth in the Report and Recommendation, the Court adopts the Magistrate Judge's recommendation to grant in part and deny in part defendants' motion to dismiss, and to deny plaintiff's motion for partial summary judgment.

*Background and Prior Proceedings*

Plaintiff initially commenced this action in the Southern District of New York. After being granted *in forma pauperis* status, plaintiff filed an Amended Complaint on July 8, 2010. The gravamen of plaintiff's complaint is that he has suffered from dyslexia all of his life and that he was denied accommodation for this condition while incarcerated at the New York State Department of Corrections and Community Supervision ("DOCCS"). While pending in the Southern District of New York, defendants moved for partial dismissal of the complaint, and for transfer of the remaining claims to the Western District of New York. Plaintiff opposed the motion and cross-moved for leave to file a Second Amended Complaint. The Southern District of New York granted defendants' motion to dismiss in part, and for transfer of, to this District, the remaining claims arising from plaintiff's incarceration at Elmira Correctional Facility. [2]

The causes of action transferred to this Court included claims pursuant to Sections 1983, 1985 and 1986 of Title 42 of the United States Code, the Americans with Disabilities Act, and the Rehabilitation Act. Following other motions and proceedings before the Magistrate Judge, and a text order by Magistrate Judge McCarthy which clarified the identity of defendants, defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c). [3] Defendants argue, primarily, that all of plaintiff's claims are barred by the doctrine of collateral estoppel. Defendants point to the fact that approximately four months after the instant case was filed, plaintiff commenced a similar action in the Northern District of New York, *Keitt v. Annetts, et al.*, 10–cv–157. There, the Northern District of New York granted defendants' motion for summary judgment on the basis that a rational factfinder would not find that plaintiff's alleged dyslexia was an impairment substantially limiting a major life activity. Defendants now argue that, in light of the Northern District of New York's finding that plaintiff was not disabled as a result of his dyslexia, plaintiff is collaterally estopped from litigating, in this action, that he suffers from dyslexia. Because all of plaintiff's claims are based upon failure to accommodate his dyslexia, such a finding would serve as a bar to plaintiff's entire action. In the alternative, defendants argue that plaintiff's claims are facially insufficient and must be dismissed pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff then cross-moved for partial summary judgment.

*Report and Recommendation*

**\*2** The Magistrate Judge notes that plaintiff does not identify which claims he seeks summary judgment on but instead focuses on opposing defendants' motion to dismiss. Magistrate Judge McCarthy recommends dismissal of plaintiff's cross-motion for partial summary judgment, and treats the "motion" as plaintiff's response to defendants' motion to dismiss. [4]

With respect to defendants' motion to dismiss, Magistrate Judge McCarthy finds that plaintiff is not collaterally estopped from bringing the instant action because plaintiff did not have a full and fair opportunity to litigate his claim of dyslexia before the Northern District of New York. The Magistrate Judge then proceeds to analyze the sufficiency of the allegations contained in the Amended Complaint, and recommends the following: (1) dismissal of all claims pursuant to Sections 1985 and 1986; (2) dismissal of all Section 1983 claims involving Fifth and Eighth Amendment violations; (3) dismissal of claims involving denial of access to the courts in violation of the First Amendment; (4) dismissal of retaliation claims in violation of the First Amendment against defendant Reynolds; (5) denial of Fourteenth Amendment due process claims arising from plaintiff's May 2010 disciplinary hearing; (6) dismissal of Fourteenth Amendment due process claim against defendant Livermore arising from alleged violations of New York Correction Law § 136; (7) dismissal of Fourteenth Amendment Equal Protection Claims; (8) dismissal of all claims against New York State and the individual defendants in their official capacities under the Americans with Disabilities Act and Rehabilitation Act; and (9) dismissal of plaintiff's reasonable accommodation claim arising from the alleged denial of access to courts. Magistrate Judge McCarthy recommends that defendants' motion to dismiss be denied in all other respects.

### Plaintiff's Objections

Plaintiff appears to object to Magistrate Judge McCarthy's Report and Recommendation in so far as it recommends dismissal of plaintiff's claims alleging denial of access to the courts. Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those dispositive portions of the Report and Recommendation to which objections have been made.

Plaintiff alleges that defendants' failure to accommodate his dyslexia resulted in a denial of his access to the courts. The Magistrate Judge found that plaintiff's access to court claims

failed because plaintiff did not identify any specific lawsuit or claim which was hindered or compromised by defendants' conduct. In his objections, plaintiff points to a number of his prior lawsuits and argues that defendants' failure to provide him adequate assistance in making legal claims resulted in his inability to perfect a number of appeals. However, as noted by defendants, plaintiff was not incarcerated at Elmira Correctional Facility at the time these decisions were rendered, and therefore none of the defendants named herein could have denied plaintiff the opportunity to appeal those decisions.

**\*3** For these reasons, and for the reasons set forth by Magistrate Judge McCarthy in his Report and Recommendation, the Court adopts the recommendation to dismiss plaintiff's reasonable accommodation and First Amendment claims arising from the alleged denial of access to courts.

### Defendants' Objections

Defendants object to the Magistrate Judge's finding that plaintiff's claims are not barred by collateral estoppel. Defendants argue that the Magistrate Judge erroneously found that since there was an issue of fact as to whether plaintiff was denied access to a report supporting his diagnosis of dyslexia, plaintiff is not collaterally estopped from relitigating his claim that defendants failed to accommodate his dyslexia.

"Collateral estoppel ... means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Leather v. Ten Eyck,* 180 F.3d 420, 424 (2d. Cir.1999) As correctly stated by the Magistrate Judge, collateral estoppel or issue preclusion applies where: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 146 (2d. Cir.2005). The Second Circuit has noted that "the party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d. Cir.1991).

At issue here is whether plaintiff had a full and fair opportunity to litigate his claim that he suffers from dyslexia. [5] Plaintiff contends that he was denied documentary evidence supporting a finding that he is dyslexic, specifically, a psychological report prepared by Dr. John E. Jannes when plaintiff was 13 years old which indicates that plaintiff suffers from cognitive deficits attributable to a developmental reading disorder. Plaintiff claims that although he knew this record was in his mental health folder since 2011, he was only recently able to obtain the report from DOCCS and that it was not available to him during the Northern District of New York litigation. Defendants argue that it cannot be said that plaintiff was denied a full and fair opportunity to litigate the issue of his alleged impairment, since plaintiff was aware of the report during the prior lawsuit and failed to request it.

The Supreme Court has indicated that "full and fair" includes the question of whether the party against whom collateral estoppel has sought "was deprived of crucial evidence or witnesses in the first litigation." *Blonder–Tongue Labs, Inc. v. University of Ill. Found.,* 402 U.S. 313, 334, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Also significantly, collateral estoppel is an equitable doctrine rather than an absolute right. *PenneCom B.V. v. Merrill Lynch & Co.,* 372 F.3d 488, 493 (2d. Cir.2004); *Montana v. United States,* 440 U.S. 147, 163–64, 99 S.Ct. 970, 59 L.Ed.2d 210 ("In the context of collateral estoppel, preclusive effect may be refused when there is a compelling showing of unfairness or inadequacy in the prior litigation.")

**\*4** Plaintiff avers, and the record reflects, that he filed a motion in the prior Northern District of New York lawsuit for "release of mental health records pertaining to all educational records from a educational psychologist." It appears that motion was denied by the Magistrate Judge in the case because "plaintiff [had] not served defendant with any discovery demands, and that defendants [had] complied with the obligations of the pretrial order." The record does not reflect what other attempts, if any, plaintiff made to obtain the report. In opposition to the motion to dismiss, plaintiff submits a declaration from his father stating that he is in the process of obtaining his son's "evaluation report" from Dr. Jannes.

Defendants strongly argue that plaintiff did indeed have a "full and fair" opportunity to litigate the issue of his dyslexia, given the facts that the prior lawsuit lasted three years, a full opportunity was provided for discovery, and plaintiff never properly served discovery requests. While it may be the case

that plaintiff was given a full and fair opportunity to litigate the issue of his dyslexia, such a finding cannot be made at this stage of the litigation. As recognized by Magistrate Judge McCarthy, there appears to be a number of issues of fact with respect to the discovery conducted in the prior proceeding including whether plaintiff had access to the report, whether it was properly requested by plaintiff and, if so, whether plaintiff's requests were properly denied by defendants.

It is quite possible that any failure to obtain the report was the fault of plaintiff's and as a result he is collaterally estopped from relitigating this issue. However, in light of plaintiff's *pro se* status and the Court's obligation to consider all of plaintiff's factual allegations as true and draw all reasonable inferences in plaintiff's favor, dismissal is not appropriate. Indeed, the Northern District of New York's consideration of plaintiff's *pro se* status as well as plaintiff's ability and efforts to procure discovery, both of which involve disputed issues of fact, may likely be relevant to whether plaintiff has a full and fair opportunity to litigate his prior claim. *See Cruz v. Root,* 932 F.Supp. 66 69 (W.D.N.Y.1996) ("A plaintiff's status as a *pro se* litigant does not, by itself, preclude barring a claim under the doctrine of collateral estoppel, but it is relevant to a determination of the fairness of his prior opportunity to be heard."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d. Cir.2006) (a *pro se* plaintiff is entitled to a liberal reading of their complaint and courts are to interpret them "to raise the strongest arguments they suggest").

For these reasons, and for the reasons stated in Magistrate Judge McCarthy's Report and Recommendation, defendants' motion to dismiss on the basis of collateral estoppel is denied. Defendants are not prohibited, however, from continuing to raise this defense during the course of the litigation.

### Conclusion

**\*5** The Court adopts the Magistrate Judge's findings in their entirety. [6] Plaintiff's cross-motion for summary judgment is denied, and defendants' motion to dismiss is granted in part and denied in part as set forth in detail in the Report and Recommendation.

The matter is referred back to Magistrate Judge McCarthy for further proceedings.

SO ORDERED.

**REPORT AND RECOMMENDATION**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This action has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings [105]. [1] Before me is defendants' motion [126] pursuant to Fed.R.Civ.P. ("Rule") 12(c) to dismiss the Amended Complaint, and plaintiff's cross-motion [128] for partial summary judgment. Oral argument was held on May 21, 2014[133]. For the following reasons, I recommend that defendants' motion be granted in part and denied in part, and that plaintiff's cross-motion be denied.

**BACKGROUND**

This action was commenced in the Southern District of New York by *pro se* Complaint filed October 7, 2009[2]. Plaintiff commenced a similar action in the Northern District of New York (*Keitt v. Annetts, et al.,* (10–CV–157)) approximately four months after the commencement of this action. In connection with being granted *in forma pauperis status* while his case was venued in the Southern District of New York, plaintiff was directed to file an Amended Complaint [3], which after several extensions was filed on July 8, 2010[10].

The Amended Complaint [10] alleges that in plaintiff's "third year of school ... his mother took him to a clinical psychologist and he was diagnosed with dyslexia" (*id.,* ¶ 33), and that while incarcerated at New York State Department of Corrections and Community Supervision ("DOCCS") he "has been trying to receive accommodations, and has been told that there is no proof he is dyslexic [and] denied accommodations" (*id.,* ¶ 164).

Defendants moved for partial dismissal of the Amended Complaint, and to sever and transfer to this District the remaining claims arising from his incarceration at Elmira Correctional Facility [35]. Plaintiff opposed that motion [52] and cross-moved for leave to file a Second Amended Complaint [49]. By decision dated September 29, 2011[74], District Judge George B. Daniels granted defendants' motion to dismiss in part, denied plaintiff's motion for leave to file a Second Amended Complaint, which sought to add claims arising from his incarceration at Attica Correctional Facility, without prejudice to renewal in this District, and transferred

the following remaining claims arising from his incarceration at Elmira to this District:

— claims pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 "arising out of his incarceration at Elmira ... to the extent he seeks damages, including punitive damages, from defendants Fischer, Fusco, Reynolds, Bradt, Livermore and Lepkowski, in their personal capacities"; and

— claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* and the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.,* arising out of his incarceration at Elmira ... to the extent he seeks compensatory ... damages, against the State of New York and DOCS, as well as defendants Fischer, Fusco, Reynolds, Bradt, Livermore and Lepkowski, in their official capacities". *Keitt v. New York City,* 882 F.Supp.2d 412, 462 (S.D.N.Y.2011) ("Keitt I").

**\*6** Upon the transfer of plaintiff's remaining claims to this District, I held a preliminary pretrial conference on December 7, 2011[81]. At that time, the parties agreed to the deadlines of a Case Management Order [82], which required all motions to amend pleadings and join other parties to be filed by January 23, 2012. A day after the deadline to amend pleadings expired, defendants moved to amend the caption of the Amended Complaint to include only those defendants remaining in the case, and for an extension of time to respond to the Amended Complaint [84]. On January 30, 2012, I received a proposed Second Amended Complaint from plaintiff, and at the February 9, 2012 conference, I advised plaintiff that any amended pleading must be accompanied by a motion for leave to amend.

On March 22, 2012, I appointed James Greco, Esq. to represent plaintiff [90]. At the May 2, 2012 conference defendants withdrew their motion to amend the caption [84], without prejudice, and the parties agreed that plaintiff would file a Second Amended Complaint, with defendants reserving their right to answer or otherwise move against it [94]. After several extensions [95, 96, 98, 99, 100], the last of which lapsed without any request for an extension or Second Amended Complaint being filed, defendants moved [101] to dismiss the Amended Complaint for failure to prosecute. My Report and Recommendation dated November 8, 2013[115] recommending that motion be denied, was adopted by Judge Arcara [117]. *See Keitt v. Doe,* 2013 WL 6328147 (W.D.N.Y.2013). I also granted Mr. Greco's motion to withdraw as counsel [111].

Following the resolution of defendants' motion to dismiss for failure to prosecute, I held another conference with the parties on December 10, 2013, at which plaintiff stated that he intended to proceed with his Amended Complaint, rather than to seek leave to file a Second Amended Complaint [119]. At that conference, the parties disagreed as to the identity of the defendants. To resolve this issue, I issued the following Text Order on December 12, 2013 [120]:

> "From my review of Hon. George B. Daniels' September 29, 2011 Memorandum Decision and Order [74] addressing defendants' motions to dismiss the Amended Complaint [10], the current docket appears to correctly identify the remaining defendants in this case as being the New York State Department of Correctional Services (now known as the New York State Department of Corrections and Community Supervision), Brian Fischer, the State of New York, Mark Bradt, Douglas C. Reynolds, Denise Fusco, Virginia Livermore–Johnson, and Thomas E. Lepkowski. If either party disagrees, they may file an appropriate motion."

Neither party filed a motion, and these defendants filed an Answer to the Amended Complaint on December 31, 2013 [121]. At a conference with the parties on January 3, 2014, defendants advised that they would be moving to dismiss the Amended Complaint, and a briefing schedule was set requiring plaintiff's response and cross-motion for summary judgment (if any) to be filed and served by February 28, 2014. January 6, 2014 Text Order [122].

**\*7** When no response to defendants' motion to dismiss was filed, I cancelled oral argument and advised the parties that I would deem defendants' motion [126] under advisement. However, on March 19, 2014 plaintiff's cross-motion for partial judgment [128] was docketed, which included his opposition to defendants' motion to dismiss, and I set a briefing schedule for that motion, including a deadline for defendants' reply in further support of their motion to dismiss. March 20, 2014 Text Order [129].

## ANALYSIS

### A. Plaintiff's Cross–Motion for Summary Judgment

Although plaintiff's Notice of Motion states that it is a "motion for partial summary judgment", he does not identify which claims are the subject of his motion and his papers supporting the motion are directed at opposing defendants' motion to dismiss. For example, he submits a "Statement of *Disputed* Factual Issues" ( [128], p. 26 of 50 (emphasis added)) and a "Brief in *Opposition* to Defendants Summary Judgment" (*id.,* p. 27 of 50 (emphasis added)). Also, rather than seeking judgment in his favor, his supporting Declaration seeks to be "permitted to proceed" with his claims (*id.,* p. 25 of 50, "Conclusion" paragraph). Therefore, I recommend that the motion be denied.

### B. Defendants' Motion for Dismissal

Rule 12(c) provides that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings". "Courts faced with motions under Rule 12(c) apply the same standard used to decide motions brought under Rule 12(b)(6)." *Matwijko v. Board of Trustees of Global Concepts Charter School,* 2006 WL 2466868, \*2 (W.D.N.Y.2006) (Arcara, J./ Schroeder, M.J.).

Defendants first argue that plaintiff is collaterally estopped from re-litigating whether he is dyslexic, which is fatal to all of his claims. Alternatively, defendants challenge the facial sufficiency of plaintiff's allegations.

### 1. Does Collateral Estoppel Bar Plaintiff from Litigating Any of his Claims?

"Collateral estoppel bars a party from raising an issue of law or fact in a second suit that the party had a full and fair opportunity to litigate in a prior proceeding and where the decision of the issue was necessary to support a valid and final judgment on the merits in the first action." *Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998). "The doctrine represents a policy choice in favor of judicial efficiency sometimes at the expense of correctness." *Tufamerica, Inc. v. Hammond,* 2002 WL 1058059, \*4 (S.D.N.Y.2002) (*citing Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 44 (2d Cir.1986)).

"Rule 12(b)(6) empowers courts to dismiss a claim if it is barred by ... collateral estoppel". *Careccia v. MaCrae,* 2005 WL 1711156, \*2 (E.D.N.Y.2005). "[E]ven though

the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in Plaintiff's favor, issue preclusion will nonetheless bar a plaintiff's claim when a plaintiff's factual allegations have been decided otherwise in a previous litigation." *Lefkowitz v. McGraw–Hill Global Educ. Holdings, LLC,* ––– F.Supp .2d ––––, 2014 WL 2481904, \*12 (S.D.N.Y.2014).

**\*8** "Dismissal under [Rule] 12(b)(6) is appropriate when a defendant raises claim preclusion ... as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll International,* 231 F.3d 82, 86–87 (2d Cir.2000). *See Nealy v. Berger,* 2009 WL 704804, \*9 (E.D.N.Y.2009) ("the relevant facts for this motion, namely the judgment in the Southern District of New York action, are public documents subject to judicial notice, and are not in dispute"); *Gertskis v. U.S. E.E.O.C.,* 2013 WL 1148924, \*1 (S.D.N.Y.2013) ("A district court reviewing a motion to dismiss may also consider documents of which it may take judicial notice, including pleadings and prior decisions in related lawsuits").

Defendants' Answer [121] raises collateral estoppel as an affirmative defense (*id.,* ¶ 27, Sixteenth Defense). Defendants argue that "[e]very claim raised by plaintiff ... if stated at all-has, at its core, plaintiff's assertion that he is dyslexic and that defendants failed to recognize and accommodate his purported dyslexia". Defendants' Memorandum of Law [116–1], p. 17. Relying on the summary judgment decision in *Annetts,* they argue that plaintiff is collaterally estopped from litigating that he suffers from dyslexia, which prevents him from "sustain[ing] any of his claims" (*id.*).

Similar to the claims alleged here, in *Annetts* plaintiff alleged "that, before the age of fourteen, he was diagnosed with dyslexia, which 'limits his ability to read, write, comprehend, work, or perform.' " *Keitt v. Annetts,* 2012 WL 7151333, \*1 (N.D.N.Y.2012), *adopted* 2013 WL 599942 (N.D.N.Y.2013), *appeal dismissed,* Mandate, No. 13–972 (2d Cir. August 7, 2013). While incarcerated at Clinton and Upstate Correctional Facilities he alleged that his "(1) ADA right to receive reasonable accommodation was violated when he was denied inmate assistants for his disciplinary hearings and (2) Fourteenth Amendment Due Process rights were violated when he was denied adequate assistance during the same disciplinary proceedings." *Id.,* \*4.

In granting the defendants' motion for summary judgment in *Annetts,* the court concluded that a rational fact finder would not find that plaintiff has an impairment that substantially limits a major life activity:

> "The record belies Keitts assertion that his alleged impairments limit his ability to hear, read, think, or communicate in a substantial manner. A number of witnesses testified at Keitt's disciplinary hearings that they never experienced difficulty in conversing with Keitt concerning orders, directions, and transfers. Morever, Keitt's hearing officer ... supported by witness testimony, observed the same when Keitt successfully engaged in a discussion concerning his level changes and personal property. Further, Keitt demonstrated throughout the disciplinary proceedings that he could hear, think, and communicate by selecting inmate assistants, requesting specific types of evidence, and asking and responding to questions .... Keitt conceded that he can read within a certain, though unknown, grade level. Finally, the record neither contains a documented history of Keitt's alleged impairments nor that Keitt was regarded by others as having such impairments .... In fact, during the time in question, Keitt's [Test of Adult Basic Education ("TABE") ] scores indicate that he could read proficiently." *Annetts,* 2012 WL 7151333 at \*6.

**\*9** In so holding, the court rejected plaintiff's allegations that he cheated on his TABE exams, which indicated that he could read proficiently, and disregarded his "low TABE score dated February 2011" since it "occurred subsequent to the nucleus of facts underlying this action". *Id.* at \*6, n. 9. Plaintiff appealed this decision to the Second Circuit, which dismissed the appeal, concluding that it "lack[ed] an arguable basis in law or fact". Mandate, No. 13–972 (2d Cir. August 7, 2013).

"The preclusive effect of a federal court's judgment issued pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion." *Wyly v. Weiss,* 697 F.3d 131, 140 (2d Cir.2012). "Collateral estoppel, or issue preclusion, applies where: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 146 (2d Cir.2005).

Plaintiff's challenge appears to be whether he had a full and fair opportunity to litigate the issue of his alleged dyslexia in *Annetts*. "Under federal law, the party moving for the application of collateral estoppel bears the burden of demonstrating that the opposing party had a full and fair opportunity to litigate the issues". *U.S. S.E.C. v. Steinberg,* 2007 WL 922257, *4 (E.D.N.Y.2007)*. "In the end, decision will necessarily rest on the trial courts' sense of justice and equity." *Blonder–Tongue Laboratories, Inc. v. University of Illinois,* 402 U.S. 313, 333–34, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Among the considerations in making this determination is "whether without fault of his own the [plaintiff] was deprived of crucial evidence or witnesses in the first litigation." *Blonder Tongue,* 402 U.S. at 33. Moreover, while "[a] plaintiff's status as a *pro se* litigant does not, by itself, preclude barring a claim under the doctrine of collateral estoppel ... it is relevant to a determination of the fairness of his prior opportunity to be heard." *Bonilla v. Brancato,* 2002 WL 31093614, *5 (S.D.N.Y.2002)* (citations omitted). Thus, "[i]f a *pro se* plaintiff is unfamiliar with the law and is unable to present evidence on his claim or if he fails to do so, collateral estoppel may be inappropriate." *Id.*

Here, plaintiff challenges whether he had a full and fair opportunity to litigate this issue in *Annetts* by arguing that "defendants denied documentary evidence concerning his Dyslexic report from John E. Jannes, PhD." Plaintiff's Declaration [128], ¶ 11. Dr. Jannes' Psychological Report, which was prepared when plaintiff was 13 years old, states that "it appears reasonable to conclude that a very strong element that negatively impacts upon Devin's capacity to read is difficulty he has visually processing letters. He clearly reverses individual letters. This deficit undermines his other abilities as he does not appear to actually see the letters that he is supposed to be reading .... Cognitive deficits appear to be attributable to a developmental reading disorder." [128], pp. 33–35 of 50.

**\*10** Plaintiff alleges that this report was in DOCCS' possession since 2002. Plaintiff's Statement of Disputed Facts [128], p. 26 of 50, ¶ 5. At oral argument, plaintiff conceded that "I knew where my records was around 2011 when I found out they were in ... my mental health folder". [2] However, plaintiff explained that he was only recently able to obtain Dr. Jannes' Report from DOCCS. Consistent with these representations, plaintiff filed a motion in *Annetts* in October 2011 for the "release of the mental health records pertaining to all educational records from a educational psychologist". Plaintiff's Affirmation [77], ¶ 2 (*Annetts,* 10–cv–000157

(N.D.N.Y)). In support of that motion, plaintiff stated that he had "reviewed these records and they are in his mental health records". *Id.* That motion was denied by Magistrate Judge David Homer "based on defendants' letter response ... whereby the defendants state that plaintiff has not served defendant with any discovery demands, and that defendants have complied with the obligations of the pretrial scheduling order. Further, plaintiff's motion failed to include copies or substantiation of any discovery demands purportedly served on defendants". Text Order dated November 7, 2011. The docket from *Annetts* does not indicate what other attempts, if any, plaintiff made to attempt to obtain these records before the defendants' motion for summary judgment was filed on August 6, 2012 [88].

In opposition to defendants' motion to dismiss, plaintiff also submits the undated Declaration of his father, Oneal Keitt ( [132], p. 7 of 7), stating that he had a "lengthy discussion with Dr. John E. Jannes, Ph.D." and was informed that he diagnosed plaintiff with dyslexia (*id.,* ¶¶ 1–2). At oral argument plaintiff stated that this was known since he was 13 years old. His father's Declaration also states that he spoke to Kimberly Cary, a psychologist at Coxsackie Correctional Facility and that she informed him that "she was able to get the school psychologist report from Dr. John E. Jannes by having [plaintiff] sign an Authorization for Release of Information Form" (*id.,* ¶ 3). He also states, "I am in the process of obtaining my son's evaluation report from Dr. John E. Jannes, Ph.D." (*id.,* ¶ 5).

"If significant new evidence is uncovered subsequent to the proceeding said to result in an estoppel of the present action, then it cannot be found that a party was afforded a full and fair opportunity to present his case in the absence of that evidence." *Khandhar v. Elfenbein,* 943 F.2d 244, 249 (2d Cir.1991). [3] Rather than challenging whether Dr. Jannes report constitutes new evidence, defendants argue that Dr. Jannes' report is not significant evidence since plaintiff alleges that he suffers from dyslexia, rather than a developmental reading disorder. Defendants' Opposing Memorandum of Law [131, p. 3 n. 6]. This argument is unavailing, since dyslexia is a type of developmental reading disorder. *See Polesky v. Labor & Industry Review Commission,* 1999 WL 308749, *1 (Wis.App.1999); G.N. v. Board of Education of Township of Livingston,* 309 Fed.Appx. 542, 543 (3d Cir.2009).

**\*11** Although the record demonstrates that plaintiff was aware of the existence of Dr. Jannes' report while he

litigated the *Annetts* matter, if the report was in the defendants' possession, properly requested by plaintiff, and the defendants denied the existence of the report as plaintiff appears to allege (all questions that cannot be determined at this stage), collateral estoppel would not bar plaintiff from litigating the issue of his alleged disability in this case. *See PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 493 (2d Cir.2004)* ("PenneCom must be allowed discovery to collect evidence which might support a finding either that PenneCom was not afforded a full and fair opportunity to prove its loss in the arbitration, or that Merrill Lynch should be precluded by its own (alleged) misconduct from asserting the equitable doctrine of collateral estoppel"); *Charter Oak Fire Insurance Co. v. Electrolux Home Products, Inc.,* 882 F.Supp.2d 396, 398 (E.D.N.Y.2012)* ( "[T]his Court denies summary judgment and finds that plaintiff did not have a full and fair opportunity to litigate in the *Newcomb* case, and thus, plaintiff is not collaterally estopped from bringing this action. In particular, plaintiff was deprived of a full and fair opportunity to litigate its claim in the *Newcomb* case because (1) crucial evidence supporting plaintiff's claim was not produced by the defendant in the *Newcomb* case even though it was responsive to plaintiff's discovery requests; (2) plaintiff did not learn of the failure to produce the information until after the *Newcomb* trial; and (3) the evidence, if it had been produced by the defendant in the *Newcomb* case, could have altered the outcome of that trial"). Therefore, I recommend that defendants' motion to dismiss be denied to the extent it relies upon collateral estoppel.

### 2. 42 U.S.C. § 1983 Claims Against the Individual Defendants

The Amended Complaint [10] alleges the following against the individual defendants:

— **Defendant Douglas C. Reynolds,** the Deputy Superintendent of Program Services, is alleged to have denied plaintiff reasonable accommodations and failed to assist him in obtaining a dyslexia diagnosis or to do anything other than reviewing plaintiff's 1995 Individualized Education Plan ("IEP") in determining whether he was dyslexic. Amended Complaint [10], ¶¶ 249–258. The Amended Complaint attaches a February 2, 2010 Request for Reasonable Accommodation from plaintiff seeking large print books and other testing modifications (*id.,* Ex. 2).[4] By Memorandum dated February 9, 2010 defendant Reynolds responded to that request by stating that "Elmira ... is unable to determine if you are dyslexia [sic] or not. Your records indicate in 1995 your

were determined by IEP test to need special education. After reaching the age of 21, you are no longer eligible for special education. Your physical appearance and claimed condition of dyslexia are not evident to our Medical Department on your previous request for Reasonable Accommodations. I would like to meet with you and discuss any options available to you and the procedure that you may take to resolve your issues" (*id.*).

**\*12** — **Defendant T. Lepkowski,** the Educational Supervisor, is alleged to have failed to "adhere to the requirements of ... § 136 which provides each inmate with the educational program which seem most likely to further the inmate's progress of socialization and rehabilitation". Amended Complaint [10], ¶ 262. The Amended Complaint attaches a November 2, 2009 Memorandum from defendant Lepkowski to plaintiff informing him that his request for accommodations was denied (*id.,* Ex. 4).

— **Defendant B. Fusco,** a teacher at Elmira, is alleged to have "instructed plaintiff to quit requesting [auxiliary] aids and accommodations because the prison do[es] not provide such to learning disabled (dyslexic) inmates" (*id.,* ¶ 268). Plaintiff also alleges that "[w]hen [he] was unable to complete/perform class assignments, defendant [Fusco] became upset. Plaintiff again stated he needed accommodations and the defendant threatened to issue him a misbehavior report for not doing class assignments, disturbances, interruptions, and offenses he never committed" (*id.,* ¶ 269).

— **Defendant V. Livermore,** a member of the Program Committee, is alleged to have refused "to allow plaintiff to attend a strength and fitness class/program because he refuses to attend school where he is denied reasonable accommodations" (*id.,* ¶ 274).

— **Defendant Brian Fischer,** the Commissioner of DOCCS, is alleged to have been aware of the various violations through his grievances and complaints (*id.,* ¶¶ 192–95). In *Keitt I,* the court rejected the defendants' motion to dismiss defendant Fischer for lack of personal involvement. *See Keitt,* 882 F.Supp .2d at 424 ("Keitt alleges that (1) he repeatedly gave Fischer complete details of the failures at Elmira to accommodate Keitt's disability; (2) Fischer had 'full knowledge' of the refusal to accommodate from both grievances and disciplinary appeals; (3) Fischer has upheld every decision denying plaintiff accommodation; and (4) Fischer failed to take action to remedy the ongoing violation. Thus, Keitt sufficiently pled that Fischer was

personally involved in the alleged ongoing violation of Keitt's constitutional rights").

— **Defendant Mark Bradt,** the Superintendent of Elmira Correctional Facility, is alleged to have to have denied "every grievance plaintiff filed asking and complaining about accommodations" (*id.,* ¶ 229).

Plaintiff asserts Eighth, and Fourteenth Amendment violations against each of the individual defendants. (*id.,* ¶¶ 187, 218, 249, 266, 273). Additionally, plaintiff asserts a Fifth Amendment violation against defendant Bradt (*id.,* ¶ 218) and First Amendment violations against all defendants other than defendants Lepkowski and Livermore (*id.,* ¶¶ 260, 273).

### a. Fourteenth Amendment: Due Process

### i. Disciplinary Hearing

Plaintiff alleges that on May 28, 2010 he was issued a "false ticket", and at his disciplinary hearing on this ticket he objected to the hearing on the grounds that he was "dyslexic and could not defend himself without an assistant or accommodations". Amended Complaint [10], ¶ 245. He also alleges that the hearing officer "failed to consider his intellectual capacity as required by DOCCS' regulations (*id.*). Attached to the Amended Complaint as an exhibit is the documentation from the June 2, 2010 disciplinary hearing (*id.,* Ex. 3), which indicates that he received a sentence of 21 days of keeplock confinement, with 14 days of that penalty suspended, resulting in him serving seven days of keeplock confinement (*id.,* Ex. 3, p. 6).

**\*13** Defendants argue, *inter alia,* that plaintiff has "not pleaded facts suggesting that defendants denied him a property or liberty interest as a result of his Tier hearings". Defendants' Memorandum of Law [126–1], p. 21. "[T]o state a claim for a violation of due process, a prisoner first must identify a liberty interest protected by the Due Process Clause of which he was deprived". *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (*citing Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "[S]uch interests are generally limited to 'freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (*quoting Sandin* ). In determining whether the plaintiff endured an "atypical and significant hardship" factors include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary

confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

Defendants argue that the seven days of keeplock confinement plaintiff served "is neither atypical nor sufficient to state a claim". Defendants' Memorandum of Law [126–1], p. 21. I agree. "While there is no bright line below which the Court need not consider the circumstances of the punishment, the decisions in the Second Circuit are unanimous that keeplock of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin." Walsh v. Goord,* 2007 WL 1572146, \*4 (W.D.N.Y.2007) (internal quotations omitted) (*citing* cases, including *Garcia v. Miller,* 201 F.3d 431 (2d Cir.1999) (Summary Order) ("Since plaintiff's complaint contains no allegation that would indicate that either his seven-day or thirty-day confinement was 'atypical' or 'significant,' he has failed to state a due process claim. Accordingly, the district court properly dismissed this claim under Rule 12(b)(6)")). Even "[i]n the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in SITU was exceedingly short-less than the 30 days that the *Sandin* plaintiff spent in SITU-and there was no indication that the plaintiff endured unusual SITU conditions." *Palmer v. Richards,* 364 F.3d 60, 65–66 (2d Cir.2004).

The Amended Complaint contains no allegations suggesting that the seven days of keeplock confinement plaintiff served was atypical or significant. Therefore, I recommend that his due process claim be dismissed. *See Delgado v. Dembar,* 2014 WL 4792068, \*3 (S.D.N.Y.2014) ("[T]here is no indication in the limited amount of information plaintiff put forth in the pleading that he endured unusual conditions during his nine days in the SHU. His nine days in the SHU is less than that which was insufficient for a valid claim in *Sandin,* and does not create a liberty interest indicative of 'atypical and significant hardship' ").

### ii. New York Correction Law § 136

**\*14** Plaintiff alleges that defendant Lepkowski, as the Educational Supervisor, failed to "adhere to the requirements of ... § 136 which provides each inmate with the educational program which seem most likely to further the inmate's progress of socialization and rehabilitation". Amended Complaint [10], ¶ 262. *Keitt I* characterized this claim as alleging that plaintiff's "right to procedural due process was violated because he received no education or one wholly

unsuited to the goal of rehabilitation". *Keitt,* 882 F.Supp.2d at 446. [5]

New York Correction Law § 136 provides, in relevant part, that "each inmate shall be given a program of education which, on the basis of available data, seems most likely to further the process of socialization and rehabilitation". "It is well-settled that public education is not a substantive fundamental right protected under the Fourteenth Amendment of the U.S. Constitution." *Jouvert v. New York,* 2012 WL 6964386, *7 (N.D.N.Y.2012),* adopted, 2013 WL 372331 (N.D.N.Y.2013). However, as defendants recognize, "a property interest is only triggered when there is 'no *education at all* or education that was *wholly unsuited* to the goals of a particular inmate's socialization and rehabilitation' ." Defendants' Memorandum of Law [126–1], p. 22 (emphasis added) (*quoting Handberry v. Thompson,* 446 F.3d 335, 354 (2d Cir.2006)). *Compare with Shaw v. New York State Department of Correctional Services,* 2010 WL 2143672, *3 n. 4 (S.D.N.Y.2010), rev'd on other grounds, 451 Fed. Appx. 18 (2011)* (Summary Order) ("Courts have 'uniformly rejected,' ... 'arguments that section 136 gives rise to protected property interests' ").

Pointing to the fact that "his pleadings and judicial admissions show that plaintiff admittedly dropped out of the program afforded him, allegedly cheated on the TABE to show that he could read at an Eighth Grade level, was told that he could request reasonable accommodations, was invited to meet with facility personnel to discuss his circumstances, and was also welcome to sign back into school", defendants argue that "plaintiffs claims that he was afforded no education or an unsuitable one because of his purported dyslexia are spurious". Defendants' Memorandum of Law [126–1], pp. 22–23.

While plaintiff concedes that he withdrew from adult basic education, he alleges that he was compelled to do so because the defendants were indifferent to his disability, and that he was being threatened with false misbehavior reports for requesting accommodations. Amended Complaint [10], ¶ 270. He also alleges that "because he is over the age of twenty-one, he is no longer eligible for special education, D.O.C.S. only offers Adult Basic Education ... and G.E.D. programs" (*id.,* ¶ 256). He further alleges that as a dyslexic, "[w]ithout accommodations he will never have a fair opportunity at a G.E.D" (*id.,* ¶ 258), and that until the policy of denying dyslexics reasonable accommodations

is corrected, the "goals of education, socialization and rehabilitation will not be reached" (*id.,* ¶ 263).

**\*15** At this stage, these allegations are sufficient to state a due process claim. *See Clarkson v. Coughlin,* 898 F.Supp. 1019, 1048 (S.D.N.Y.1995) ( "Although the submissions of the parties indicate that some class members [who were hearing-impaired inmates] may have received some education and vocational training, the record indicates that no qualified sign language interpreters were made available to any class members for educational purposes. Thus no class member received educational programming sufficient to satisfy the state statutory mandate, that is they effectively received no education or education grossly unsuited to the goals of socialization and rehabilitation. No triable issue of fact is presented by this question and summary judgment will issue in favor of Plaintiffs as to a violation of their due process rights regarding accommodations in educational programs").

Without identifying any specific defendants, defendants generally also argue that "plaintiff has not stated a claim against each individual under th[is] theor[y]". Defendants' Memorandum of Law [126–1], p. 30. This claim is only expressly alleged against defendant Lepkowski, as the Education Supervisor, and plaintiff alleges that he "voiced his needs to Lepkowski to no avail". Amended Complaint [10], ¶ 264. As recognized in *Keitt I,* "personal involvement is sufficiently pled where the grievant alleges an ongoing constitutional violation such that the supervisory official who reviews the grievance can remedy it directly." *Keitt,* 882 F.Supp.2d at 424. At this stage, this allegation is sufficient to establish the personal involvement of defendant Lepkowski. *See generally McKenna v. Wright,* 386 F.3d 432, 438 (2d Cir.2004) ("When allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility").

Liberally interpreting the Amended Complaint, it can also be read as asserting this claim against defendants Fischer and Bradt in their supervisory capacities. As discussed above, in *Keitt I,* the court rejected the defendants' motion to dismiss defendant Fischer for lack of personal involvement. *See Keitt,* 882 F.Supp .2d at 424. With respect to defendant Bradt, the Amended Complaint attaches a grievance dated December 23, 2009 from plaintiff complaining of a variety of conduct related to the lack of accommodations, including

that he "has been denied necessary accommodations to participate in Adult Basic Education ... program. As such he has been deprived of opportunity to acquire a GED". Amended Complaint [10], Ex. 4. That grievance has EL 36.600–10 handwritten on the top of the page. Corresponding to this grievance number, the Amended Complaint attaches a response dated January 27, 2010 from defendant Bradt denying the grievance. *Id.* At this stage, defendant Bradt's response to the grievance, which demonstrates that he investigated plaintiff's claims, is also sufficient to establish Bradt's personal involvement. " 'The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983.' ... Nevertheless, '[a] supervisor's detailed, specific response to a plaintiff's complaint' may suffice to establish personal involvement." *Watson v. Wright,* 2013 WL 1791079, *9 (W.D.N.Y.2013), *adopted* 2013 WL 1789578 (Arcara, J.); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint").

**\*16** Moreover, liberally interpreting the Amended Complaint, to the extent it is alleges that defendants Reynolds' and Fusco's conduct may have contributed to the alleged deprivation of an education, I likewise recommend that the claim against these defendants not be dismissed. However, since defendant Livermore's alleged conduct is unrelated to the education services provided to plaintiff, I recommend that this claim be dismissed as against him.

**b. Fourteenth Amendment: Equal Protection**

Defendants argue that "it is unclear against who the claim is asserted or on what grounds". Defendants' Memorandum of Law [126–1], p. 30. Among his allegations against defendant Bradt, plaintiff alleges that "he is not equally protected because other disabled individuals have accommodations". Amended Complaint [10], ¶ 228. Likewise, he alleges that defendant Fischer "knew or should have known ... that severe learning disabilities such as dyslexia exist, and need more than the accommodations provided for [other disabilities]" (*id.,* ¶ 193). He further alleges that inmates are not permitted to attend a strength and fitness program if they do not have a GED or are not attending school, and that defendant Livermore "refuses to allow [him] to attend a strength and fitness class/program because he refuses to attend school where he is denied reasonable

accommodations" (*id.,* ¶¶ 274–75). He alleges that this constitutes a "[c]lear Equal Protection ... Violation[ ]" (*id.,* ¶ 276). Therefore, liberally construing his Amended Complaint, I conclude that plaintiff alleges equal protection claims against defendants Bradt, Fischer and Livermore.

Defendants argue that plaintiff's equal protection claim fails because "dyslexia ... is not a protected class". Defendants' Memorandum of Law [126–1], p. 30. However, this does not prevent plaintiff from alleging a "class of one" equal protection claim. *See Scruggs v. Meriden Board of Education,* 2006 WL 2715388, *3 (D.Conn.2006) ("Because disabled students are not a protected class and there is no fundamental right to education, Plaintiff must make a 'class of one' equal protection claim. To do so, Plaintiff must allege that J.D. was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"); *Nelson v. City of New York,* 2013 WL 4437224, *14 (S.D.N.Y.2013) ("because disabled persons-or persons who are perceived to be disabled-are not a protected class, Plaintiff must also show that this disparate treatment was not reasonably related to any legitimate government interest").

In a class of one equal protection claim it is alleged that the plaintiff has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment". *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Board for Town of Skaneateles,* 610 F.3d 55, 59–60 (2d Cir.), *cert. denied,* ––– U.S. ––– 131 S.Ct. 824 (2010).

**\*17** Defendants argue that plaintiff does not allege that he was "treated differently from others similarly situated". Defendants' Memorandum of Law [126–1], p. 30. I agree. Plaintiff does not allege that he is being singled out for differential treatment from other similarly situated dyslexic inmates, but rather that dyslexic inmates as a whole are not receiving the level of accommodations or testing afforded to other disabled individuals. *See,*

*e.g.,* Amended Complaint [10], ¶ 219 ("The defendant in discriminatory acts against plaintiff and individuals with learning disability (i.e.dyslexia), fail to allow or provide reasonable accommodations"); ¶ 212 ("Plaintiff ... is being denied an adequate education because he is dyslexic and the State's Department of Correctional Services fails to recognize that this condition ... needs and should be accommodated for. Accommodations for the 'Severe' learning disabled, like the accommodations provided for those with Sensorial Disabilities"). Plaintiff also fails to identify any specific similarly situated inmate. *See Camac v. Long Beach City School District,* 2011 WL 3030345, *16 (E.D.N.Y.2011) ("[T]here is no question that Plaintiffs have failed to allege the existence of similarly situated comparators. After each allegation of wrongdoing done to Charles, the Complaint simply avers, in wholly conclusory fashion, that 'similarly situated' non-disabled students and/or 'similarly situated' students whose parents did not complain to the District about its failure to accommodate their disabilities were not subjected to the same mistreatment. Aside from assigning these unnamed students the title of 'similarly situated,' the Complaint contains no other allegations showing how 'another person's circumstances ... are prima facie identical' to Charles's"). Therefore I recommend that plaintiff's equal protection claims be dismissed.

### c. First Amendment

### i. Access to Courts

Plaintiff alleges that the denial of accommodations in receiving legal and library assistance has led to a denial of access to courts. Amended Complaint [10], ¶ 237. Defendants argue that "plaintiff's bare bones allegations that he was denied meaningful access to court fail to state a claim against any defendant. Other than concluding that he was denied access, plaintiff provides no particularity of any deadline missed or any injury that resulted .... He fails to state when he requested accommodations, when the alleged denials occurred, under what circumstances, who was involved, and what, if any injury occurred". Defendants' Memorandum of Law [126–1], p. 20. I agree.

To establish a First Amendment access to courts claim, "a plaintiff must show that the defendants (1) engaged in deliberate and malicious conduct that (2) resulted in actual injury, *i.e.,* that hindered the plaintiff's effort to pursue a legal claim". *DeMeo v. Tucker,* 509 Fed.Appx. 16, 18 (2d Cir.2013) ( Summary Order). *See Pontervio v. Kaye,* 2007 WL 141053, *9 (S.D.N.Y.), *recon. denied,* 2007 WL 1029901

(S.D.N.Y.2007), *aff'd,* 328 Fed.Appx. 671 (2d Cir.2009) (Summary Order) ("The essence of a denial of access claim is that a plaintiff must have effectively lost (or was severely hampered in) the ability to file a lawsuit, typically by egregious or systemic violations of due process"). "[T]he requirement of actual injury 'derives ultimately from the doctrine of standing.' " *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998) (*quoting Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

**\*18** While plaintiff alleges that his "attempts to present his case to the court has been frustrated and/or impeded constantly" (Amended Complaint [10], ¶ 239), he fails to identify any specific lawsuit or claim that was hindered by defendants' alleged conduct, which is fatal to this claim. *See Walker v. Snyder,* 2007 WL 2454194, *8 (N.D.N.Y.2007) ("To the extent that plaintiff is alleging a denial of access to courts in this claim, he has not specified one file or one case that was actually affected by defendant Snyder's alleged actions. Thus, plaintiff's access to courts claim may be dismissed as against all defendants ... for failure to establish actual injury to any of his pending lawsuits") . [6]

Therefore I recommend that plaintiff's First Amendment access to courts claim be dismissed.

### ii. Retaliation

Plaintiff alleges that defendant Fusco "instructed [him] to quit requesting ... accommodations" (Amended Complaint [10], ¶ 268), and that when plaintiff again requested an accommodation, he "threatened to issue him a misbehavior report for not doing class assignments, disturbances, interruptions, and offenses he never committed" (*id.,* ¶ 269).

"To pursue such a claim, a prisoner must adduce evidence of (1) protected speech or conduct, (2) adverse action by defendant, and (3) a causal connection between the protected speech and the adverse action." *Bilal v. White,* 494 Fed.Appx. 143, 146 (2d Cir.2012) (Summary Order). [7] "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits". *Id.*

Defendants argue that "plaintiff's allegation that Fusco *threatened* to issue misbehavior reports [do not] amount to adverse action because neither threats, nor threats of a false behavior report amount to adverse action". Defendants' Memorandum of Law [126–1], p. 28 (emphasis in original). Generally, "threats are ... held not to rise to the level of adverse action that will support a First Amendment retaliation claim". *Marrero v. Kirkpatrick,* 2012 WL 2685143, *7 (W.D.N.Y.2012). However, "verbal threats may constitute an adverse action if they are sufficiently specific and direct". *Mateo v. Bristow,* 2013 WL 3863865, *5 (S.D.N.Y.2013). *See Hill v. Laird,* 2014 WL 1315226, *8 (E.D.N.Y.2014) ("Although non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim, ... some verbal threats, depending on the specificity and context, can constitute an adverse action"). I conclude that the allegations of the Amended Complaint, which must be taken as true for purposes of this motion, plausibly establish that the threats would have deterred a similarly situated inmate of ordinary firmness from exercising his First Amendment right to request accommodations. *See Pierce v. Monell,* 2007 WL 2847317, *8 (N.D.N.Y.2007).

**\*19** Defendants also argue that these threats did not "quell his speech", as plaintiff filed a grievance and was directed to file a request for reasonable accommodations. Defendants' Memorandum of Law [126–1], p. 28. However, as discussed above, the test for an adverse action is based on an objective individual of ordinary firmness. Thus, it "applies even where a particular plaintiff was not himself subjectively deterred". *Gill,* 389 F.3d at 381.

Plaintiff also alleges First Amendment claims against defendants Fischer (Amended Complaint [10], ¶ 187), Reynolds (*id.,* ¶ 249), and Bradt (*id.,* ¶ 218). [8] Defendants argue that these claims cannot be construed as "touching remotely on speech or alleged retaliation". Defendants' Memorandum of Law [126–1], p. 27. I agree with respect to defendants Reynolds, and recommend that the retaliation claims against him be dismissed, but disagree as to defendants Bradt and Fischer.

The Amended Complaint [10] alleges that in addition to being threatened with tier tickets for requesting accommodations, plaintiff has been "given false tier tickets because staff is aware that he is asking the court for redress, and hopes to install fear by the tactic of retaliation" (*id.,* ¶ 244). He also alleges that the fact that he is "being harassed, and

being issued false misbehavior reports are well know by [defendant Bradt]" (*id.,* ¶ 243). Likewise, he alleges that defendant Fischer "knew or should have known that because of complaints, plaintiff suffered and suffers retaliation an ongoing condition" (*id.,* ¶ 195). Therefore, I recommend that the retaliation claims against defendants Fischer and Bradt not be dismissed. [9]

### d. Eighth Amendment

Plaintiff alleges that all of the individual defendants violated his Eighth Amendment rights. Amended Complaint [10], ¶ 187, 218, 249, 260, 266, 273. These claims appear to arise from his allegation that these defendants "showe[ed] deliberate indifference ... to his disability" (*id.,* ¶¶ 258, 270). Defendants argue that these claims must dismissed because there is no Eighth Amendment right to educational opportunities for inmates. Defendants' Memorandum of Law [126–1], p. 29. I agree.

"Prisoners and detainees have constitutionally protected rights to receive adequate food, clothing, shelter, medical care, and security. However, Plaintiffs have no eighth amendment right to educational activities." *Mallgren v. Burkholder,* —— F.Supp.3d ——, 2014 WL 5025900, *4 (E.D.N.Y.2014) (internal quotations and citations omitted); *Giano v. Cuomo,* 1998 WL 760262, *6 (N.D.N.Y.1998) ("The lack of specialized educational and rehabilitative programs particularized to plaintiff's needs do not give rise to a deprivation of his Eighth Amendment rights"); *Griffin v. Coughlin,* 743 F.Supp. 1006, 1017 (N.D.N.Y.1990) ("Plaintiffs have no eighth amendment right to ... educational activities"). Therefore, I recommend that plaintiff's Eighth Amendment claims be dismissed.

### e. Fifth Amendment

**\*20** Plaintiff alleges Fifth Amendment violations against defendant Bradt. Amended Complaint [10], ¶ 218. As defendants argue (defendants' Memorandum of Law [126–1], p. 26, n. 64), "the Fifth Amendment is applicable to federal actors, not state actors". *Rosado v. Schneiderman,* 2014 WL 2763622, *8 (N.D.N.Y.2014). Since the claims here are only against "state actors to whom the Fifth Amendment is applicable only through the Fourteenth Amendment", I will construe plaintiff's claims as brought under the Fourteenth Amendment, and recommend that the Fifth Amendment claims be dismissed. *Dellate v. Great Neck Union Free School District,* 2010 WL 3924863, *5 (E.D.N.Y.2010).

### 3. 42 U.S.C. §§ 1985 and 1986

In *Keitt* I, the court interpreted the Amended Complaint as alleging claims pursuant to 42 U.S.C. §§ 1985 and 1986. *See Keitt,* 882 F.Supp.2d at 44 ("The State Defendants do not seek to dismiss, on the merits, the Section 1985 and 1986 claims against them"). However, as defendants note and plaintiff does not dispute, the Amended Complaint states "plaintiff will not renew conspiracy claims herein due to the high threshold". Amended Complaint [10], ¶ 233. Moreover, no such claims are specifically alleged against the individual defendants. Therefore, I recommend that these claims be dismissed.

### 4. Plaintiff's ADA and Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. [10] "The ADA applies to inmates in state prisons ." *Annetts,* 2012 WL 7151333, *6.

"Similarly, the Rehabilitation Act, which has been similarly held to apply to state prisoners ... protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability." *Harrington v. Vadlamudi,* 2014 WL 4829483, *3 (N.D.N.Y.2014) (*quoting* 29 U.S.C. § 749(a)).

"In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are qualified individuals with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1662, 158 L.Ed.2d 356 (2004). *Graham v. Watertown City School District,* 2011 WL 1344149, *9 (N.D.N.Y.2011) ("The ADA and Rehabilitation Act causes of action for failure to accommodate will be considered together"). "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."

*Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009). [11] It appears here that plaintiff is alleging ADA and Rehabilitation Act claims on the theories of disparate treatment and failure to make reasonable accommodations.

#### a. Claims against New York State

**\*21** Defendants argue that plaintiff's claims against New York State are "wholly redundant" of his claims against DOCCS and should be dismissed. Defendants' Memorandum of Law [126–1], p. 24. Plaintiff does not dispute this. Therefore, I recommend that the claims against New York State be dismissed.

#### b. Claims against the Individual Defendants

To the extent plaintiff asserts violations of the ADA and Rehabilitation Act against the individual defendants for monetary damages, defendants argue that these claims must be dismissed. Defendants' Opposing Memorandum of Law [131], p. 12.

Courts have held that "individual defendants may not be held personally liable for alleged violations of the ADA ... or the Rehabilitation Act .... Nor can individuals be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities." *Sutherland v. New York State Department of Law,* 1999 WL 314186, *7 (S.D.N.Y.1999). *See Carver v. Patterson,* 11–cv–0032 (WMS)(HBS), January 14, 2014 Decision and Order [6], p. 7 ("It is well-established that Title ll of the ADA does not authorize suits against state officials in their individual or official capacities"); *Maus v. Wappingers Central School District,* 688 F.Supp.2d 282, 302 n. 10 (S.D.N.Y.2010) ("[I]ndividuals cannot be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities"); *Fox v. State University of New York,* 497 F.Supp.2d 446, 451 (E.D.N.Y.2007) ( "[T]his Court and others have held that official capacity claims are not viable under the ADA"); *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) ("Individuals cannot be named as defendants in ADA suits in either their official or representative capacities."); *Myers v. New York–Department of Motor Vehicles,* 2013 WL 3990770, *9 (E.D.N.Y.2013) ("numerous district courts in this circuit have persuasively held that there is no individual liability under Title I or Title II of the ADA, regardless of whether the claim is brought in an individual or official capacity"); *Ford v. Conway,* 2004 WL 1071171, *2 (W.D.N.Y.2004) ("the ADA does not provide for liability against individual defendants in either their individual or official capacities"); *Kearney v.*

*N.Y.S.,* 2011 WL 344755, *1 (W.D.N.Y.2011)* ("Claims for monetary damages under § 1983 may only be brought against individuals based on their personal involvement, while claims under the ADA and The Rehabilitation Act may not generally be brought against individuals").

There is also contrary authority, including *Keitt I,* which held that "individuals can be sued in their official capacities under [the ADA and Rehabilitation Act]". *Keitt,* 882 F.Supp.2d at 456–57. However, even under that holding, the official capacity claims against the individual defendants would be redundant of the claims against DOCCS. *See Cabassa v. Oshier,* 2013 WL 1183296, *10 (N.D.N.Y.2013)* ("the Court grants Defendants' motion to dismiss Plaintiff's ADA and RA claims against Defendant Miller and Johnson in their official capacities as redundant of the claims against Defendant DOCCS"). Therefore, I recommend that the ADA and Rehabilitation Act claims against the individual defendants in their official capacities be dismissed.

**c. Reasonable Accommodation**

**\*22** Plaintiff appears to characterize his ADA and Rehabilitation Act claims as alleging that he was denied accommodations in education, legal assistance, and at his disciplinary hearings. Amended Complaint [10], ¶ 237; Plaintiff's Declaration [128], ¶¶ 48, 51. "Under the ADA, public entities are obligated to make reasonable accommodations for disabled individuals to ensure that they have meaningful access to public benefits.... Similarly, the Rehabilitation Act requires that qualified disabled individuals receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations.' ... The purpose of these requirements is to ensure that services provided to non-disabled individuals are not denied to disabled individuals because of their disability". *Maccharulo v. New York State Department of Correctional Services,* 2010 WL 2899751, *3 (S.D.N.Y.2010)* (*quoting Powell v. National Board of Medical Examiners,* 364 F.3d 79, 85 (2d Cir.2004)). *See Kearney v. N.Y.S. D.O.C.S.,* 2013 WL 5437372, *6 (N.D.N.Y.2013)* ("[A] defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services' "); *Woods v. City of Utica,* 902 F.Supp.2d 273, 280 (N.D.N.Y.2012) ("A reasonable accommodation is one that gives the disabled person 'meaningful access' to the services sought"). "Despite the 'by reason of ... disability' language, a plaintiff does not have to establish a 'disparate impact' to succeed on

a reasonable accommodation claim under the ADA and Rehabilitation Act." *Woods,* 902 F.Supp.2d at 280 n. 9 (*citing Henrietta D.,* 331 F.3d at 273 79).

Defendants challenge the second prong, arguing that "[p]laintiff's claims ... fail because plaintiff is required to show that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his disability". Defendants' Memorandum of Law [126–1], p. 18.

**i. Educational Services**

In *Keitt I,* the court recognized that "[d]isabled individuals must be "provided meaningful access through reasonable accommodations ... without otherwise fundamentally or substantially altering the underlying benefit or program." *Keitt,* 882 F.Supp.2d at 453 (quoting *Leocata v. Wilson Coker,* 148 Fed.Appx. 64, 64 (2d Cir.2005) (Summary Order). *See Maccharulo,* 2010 WL 2899751 at *3 ("a claim that challenges the adequacy ... or the substance ... of services that are being provided to a disabled individual is not a valid claim under either the ADA or the Rehabilitation Act"). Although it noted that "[s]ome of the relief Keitt seeks in his Amended Complaint may substantively expand the scope of the adult basic education program", it did not agree that "all of the accommodations that Keitt has requested at Elmira including allowing him to have more time to complete a test, to circle multiple choice answers rather than fill in a corresponding bubble, to have another prisoner read material to him or to listen to an audiobook to cover the same material being taught in the adult basic education class —would 'fundamentally alter' or 'substantially expand the scope' of the adult basic education classes." *Id.* at 454.

**\*23** Defendants now argue that plaintiff's "judicial admissions ... and his pleading in this case demonstrate that defendants never denied Keitt the opportunity to participate in educational services". Defendants' Memorandum of Law [126–1], p. 19. In support of this argument, they primarily point to the fact that plaintiff did not request accommodations for large print books, a reader, and extended testing times, until February 2010, *after* he had dropped out of school. (*id.,* pp. 18–19). Even if plaintiff did not make a written request for reasonable accommodations until after he quit school, [12] he alleges that *while attending school,* his teacher, defendant Fusco, "refused to provide [him a] reasonable accommodation in the form of auxiliary aids

for educational purposes while attending class", but that defendant Fusco "instructed [him] to quit requesting such aids and accommodations because the prison do not provide such to learning disabled (dsylexic) inmates". Amended Complaint [10], ¶¶ 267–68. He further alleges that since defendants were "indifferent to his disability, willing to punish him because he could not keep up with other students, and cause him harm, [he] was compelled to sign out of [school]" (*id.,* ¶ 270).

Defendants also note that in response to his January 1, 2010 grievance for failing to provide him with reasonable accommodations (Amended Complaint [10], Ex. 4, p. 1) and to his February 2, 2010 Request for a Reasonable Accommodation (*id.,* Ex. 2, p. 2), he was invited to return to school. Defendants' Memorandum of Law [126–1], p. 19. However, none of these invitations to return to school reflect that defendants were willing to provide him with the reasonable accommodations he sought and allegedly required.

Defendants further argue throughout that plaintiff was not denied benefits "because of" the disability. Defendants' Memorandum of Law [126–1], p. 18. Although plaintiff alleges that defendants were deficient in diagnosing his dyslexia (*see, e.g.,* Amended Complaint [10], ¶ 253), liberally interpreting the Amended Complaint he also alleges that defendants knew or should have known of his dyslexia. *See, e.g., id.,* ¶ 197. Therefore, I recommend that this portion of defendants' motion be denied.

### ii. Legal Assistance/Access to Courts

Plaintiff alleges that the denial of accommodations in receiving legal assistance has led to a denial of access to courts. Amended Complaint [10], ¶ 237. Defendants have construed this as asserting claims pursuant to the ADA and Rehabilitation Act, and argue that these claims should be dismissed for the same reasons as his First Amendment access to courts claim. Defendants' Memorandum of Law [126–1], p. 20. I agree.

The requirement of an actual injury also applies to an access to courts claim under the ADA and Rehabilitation Act. *See McCauley v. Georgia,* 466 Fed.Appx. 832, 837 (11 Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 2814, 186 L.Ed.2d 873, *rehearing denied,* ––– U.S. ––––, 134 S.Ct. 46, 186 L.Ed.2d 959 (2013) ("Even accepting the allegations in McCauley's complaint as true, she fails to state an access to the courts claim because she did not allege actual injury .... Thus, ...

she has not ... stated an access to the court claim under the ADA"). Therefore, for the same reasons I recommend denying plaintiff's First Amendment access to courts claim, I recommend dismissal of his ADA and Rehabilitation Act access to courts claims.

### iii. Disciplinary Hearing

**\*24** In addition to alleging that his Fourteenth Amendment due process rights were violated when he was denied adequate assistance during the June 2, 2010 disciplinary hearing, plaintiff also alleges that this violated his rights under the ADA and Rehabilitation Act. In seeking dismissal of this claim, defendants repeat their argument that the absence of an atypical or significant hardship arising from plaintiff's seven days of keeplock confinement he served is fatal to this claim. Defendants' Memorandum of Law [126–1], p. 21. However, defendants cite no authority that only ADA and Rehabilitation Act violations arising from the denial of accommodations at a disciplinary hearing that meet *Sandin's* "atypical and significant hardship" standard are actionable. Their remaining arguments also do not compel dismissal of plaintiff's ADA and Rehabilitation Act claims. They argue that he "does not indicate when, where, and how any defendant failed to accommodate him and at which Tier hearings". Defendants' Memorandum of Law [126–1], p. 20. They argue that this claim is so lacking in detail that it is difficult to determine whether it is the same claim he asserted in *Annetts* (*id.,* pp. 20–21). These arguments ignore that plaintiff's due process allegations are based on Exhibit 3 of the Amended Complaint ( [10], ¶ 245), which includes the relevant documentation concerning the June 2, 2010 disciplinary hearing, including his June 4, 2010 appeal to defendant Bradt stating that he asked for accommodations during the hearing because of his dyslexia and was unable to defend himself, but "wasn't even afforded an assistant". This documentation sufficiently details plaintiff's claim. Therefore, I recommend that defendants' motion to dismiss plaintiff's ADA and Rehabilitation Act claim arising from the denial of accommodations during his disciplinary hearing be denied.

### c. Disparate Treatment

Defendants characterize plaintiff as alleging ADA and Rehabilitation Act claims "based on an equal rights violation". Defendants' Memorandum of Law [126–1], p. 23. Since, as discussed above, the available theories under the ADA and Rehabilitation Act are limited to intentional discrimination (disparate treatment), disparate impact, or

denial of reasonable accommodations, I will interpret this argument as challenging plaintiff's ADA claim to the extent it is based on a theory of disparate treatment.

In seeking dismissal of this claim, defendants make a number of arguments directed at a Fourteenth Amendment class of one equal protection claim. For example, they argue that "the disabled are not a suspect class for purposes of the Fourteenth Amendment" (*id* .). They also argue that plaintiff must establish that "his treatment was not reasonably related to any legitimate penological interests" (*id.*). However, "[c]laims under the ADA are unambiguously not subject to the same rational basis review as those brought under the 14th Amendment". *Disability Rights New Jersey, Inc. v. Velez,* 2011 WL 2976849, *17 (D.N.J.2011).

**\*25** The only argument defendants raise that addresses an ADA claim is that "plaintiff's allegations make clear that defendants did not discriminate against plaintiff *because* of his dyslexia". Defendants' Memorandum of Law [126–1], p. 23. In support of this argument they point to the fact that "those defendants who had even limited involvement with this issue said there was no evidence that plaintiff had dyslexia, but would check with Albany, meet with plaintiff to discuss available options, and recommended that plaintiff file for accommodations and re-enlist in school after he quit" (*id.,* pp. 23–24). As discussed above, plaintiff alleges that defendants knew or should have known that he was dyslexic and failed to provide him with accommodations for that disability, which are sufficient at this stage to support this portion of his claim. Therefore, I recommend that this portion of defendants' motion be denied.

**5. Qualified Immunity**

Defendants argue that the individual defendants are entitled to qualified immunity since "different federal court judges reached different result in addressing the legal issues raised here .... it can hardly be said that the constitutional and statutory rights at issue were well settled" and "plaintiff's judicial admission, his pleadings, and the decision in *Annetts* demonstrate that none of the defendant[s] could have had fair warning that their respective conduct violated Keitt's rights". Defendants' Memorandum of Law [126–1], pp. 32–35.

"Qualified immunity is the doctrine that shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'

" *P.C. v. McLaughlin,* 913 F.2d 1033, 1039 (2d Cir.1990) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007).

"Usually, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted". *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). In order to succeed at the pleading stage, "[t]he defense must be based on facts appearing on the face of the complaint." *Rivera v. Fischer,* 655 F.Supp.2d 235, 239 (W.D.N.Y.2009) (internal citations omitted). *See Taylor v. Vermont Department of Education,* 313 F.3d 768, 794 (2d Cir.2002) ("[A] ruling on the availability of a qualified immunity defense would be premature. The qualified immunity issue in this case turns on factual questions that cannot be resolved at this stage of the proceedings"). Therefore, "a qualified immunity defense ... faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006). *See Ramirez v. Hempstead Union Free School District Board of Education,* —— F.Supp.2d ——, 2014 WL 3547374, *13 (E.D.N.Y.2014) ("[A] 12(b)(6) motion is a mismatch for a qualified immunity defense and almost always a improper basis for dismissal"). This case is no exception.

**\*26** The contours of plaintiff's Fourteenth Amendment due process and First Amendment right against retaliation were well settled at the time of the alleged occurrences and accepting the allegations of the Amended Complaint as true, I am unable to conclude as a matter of law that defendants' conduct was objectively reasonable.

## CONCLUSION

For these reasons, I recommend that defendants' motion to dismiss [126] be granted to the extent it seeks dismissal of:

— all claims pursuant to 42 U.S.C. §§ 1985 and 1986;

— the following claims pursuant to 42 U.S.C. § 1983: Fifth and Eighth Amendment violations, denial of access to courts in violation of the First Amendment, retaliation in violation of the First Amendment against defendant Reynolds, Fourteenth Amendment due process violations arising from his May 2010 disciplinary hearing, Fourteenth Amendment due process violations against defendant Livermore arising from the alleged violation of New York Correction Law § 136, and Fourteenth Amendment equal protection violation; and

— all claims against New York State and the individual defendants in their official capacities under the ADA and Rehabilitation Act, as well as plaintiff's reasonable accommodation claims arising from the alleged denial of access to courts.

In all other respects, I recommend that defendants' motion to dismiss [126] be denied and that plaintiff's cross-motion for partial summary judgment [128] be denied in its entirety.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by January 23, 2015 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**\*27** Dated: January 6, 2015.

**All Citations**

Slip Copy, 2015 WL 2383687

Footnotes

1    As noted by defendants, plaintiff's objections were untimely. However, taking into consideration plaintiff's status as a *pro se* litigant, the Court will consider his objections as if they were timely filed.

2    Plaintiff was also given leave to renew certain claims arising from his incarceration at Attica Correctional Facility. Although plaintiff was given the opportunity to amend the complaint to add these claims, he ultimately decided to proceed only on the Amended Complaint.

3    Shortly after the instant case was transferred to this District, Magistrate Judge McCarthy appointed attorney James Greco to represent plaintiff. The Magistrate Judge later granted Greco's motion to withdraw as counsel. (Dkt.111) Magistrate Judge McCarthy also denied a motion by defendants to dismiss the amended complaint for failure to prosecute, which decision was adopted by this Court. (Dkt. Nos. 115 and 117).

4    "To accept the report and recommendation of a magistrate, to which no objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Torres v. New York,* 976 F.Supp. 249 (S.D.N.Y.1997). The Court adopts the Magistrate Judge's recommendation to dismiss plaintiff's partial motion for summary judgment.

5    The other elements supporting a finding of collateral estoppel are not in dispute.

6    Defendants do not object to the Magistrate Judge's findings as to the facial sufficiency of plaintiff's claims. The Magistrate Judge's findings in this regard were neither clearly erroneous nor contrary to law, and therefore are adopted in their entirety.

1    Bracketed references are to the CM/ECF docket entries.

2    From the unofficial chambers' transcription from the audio recording of the May 21, 2014 oral argument.

3    "While [*Khandhar*] construes New York law, there is no reason to suspect that federal common law differs." *United States v. United States Currency in Amount of $294,600,* 1992 WL 170924, \*6 (E.D.N.Y.1992).

4    "In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, and documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference." *Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1232 n. 5 (S.D.N.Y.2003).

5    Defendants characterize this claim as alleging a violation of substantive due process, rather than procedural due process. Defendants' Memorandum of Law [126–1], pp. 22, 31.

6    In his opposition to defendants' motion, plaintiff states that "defendants' misconduct did cause inaction in ... *Annetts".* Plaintiff's Declaration [128], ¶ 11. To the extent this can be construed as plaintiff's alleged injury supporting his access to courts claim, it is not alleged in the Amended Complaint, which was filed before defendants were granted summary judgment in *Annetts.*

7    Defendants recognize that a claim of retaliation may be asserted pursuant to Title V of the ADA. Defendants' Memorandum of Law [126–1], p. 29, n. 70. Nonetheless, as they argue, "District courts within the Second Circuit have consistently held that the Eleventh Amendment bars retaliation claims under Title V of the Americans with Disabilities Act". *Morales v. New York,* F.Supp.2d, 2014 WL 2158979, *7 (S.D.N.Y.2014).

8    Although no First Amendment claims are alleged against defendant Livermore, defendants argue that to the extent plaintiff is alleging retaliation against him, that claim fails since he does not allege that he was denied strength and fitness classes because of his speech, but rather because he did not attend school. Defendants' Memorandum of Law [126–1], pp. 26–27. I agree with defendants. *See* Amended Complaint [10], ¶ 274

9    The Amended Complaint can also be construed as alleging a claim against defendant Fusco for constructively discharging him from the adult basic education program by not providing him with accommodations and by threatening him with retaliation for requesting accommodations. Amended Complaint [10] ¶ 270. However, as defendants argue (defendants' Opposing Memorandum of Law [131], p. 15), "[f]reedom from discrimination on the basis of disability is a right secured by statute not by the Constitution. Thus, the plaintiff's claim that [he] was constructively discharged on the basis of [his] disability is not actionable under § 1983". *Fierro v. New York City Department of Education,* 994 F.Supp.2d 581, 590 (S.D.N.Y.2014) (internal citations and quotations omitted).

10   Although plaintiff devotes a portion of his opposition to arguing that Eleventh Amendment immunity does not bar his claims under the ADA and Rehabilitation Act (plaintiff's Declaration [128], ¶¶ 18–24), defendants did not argue in their initial motion that these claims were barred by sovereign immunity.

11   Although defendants interpret the Amended Complaint as alleging ADA and Rehabilitation Act claims based on due process violations (defendants' Memorandum of Law [126–1], pp. 20–23), plaintiff's theories under the ADA and Rehabilitation Act are limited to those set forth above.

12   Plaintiff's February 2, 2010 Request for Reasonable Accommodation (Amended Complaint [10], Exhibit 2, p. 1), appears to have been made as a result of a response he received to his January 1, 2010 grievance based on the denial of reasonable accommodations, which "suggested the grievant file for 'reasonable accommodations' " (*id.,* Exhibit 4, p. 1).

---

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1791079
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Charles WATSON, Plaintiff,

v.

M.D. Lester N. WRIGHT, et al., Defendants.

No. 08–CV–00960(A)(M).
|
March 26, 2013.

**Attorneys and Law Firms**

Charles Watson, Pine City, NY, pro se.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

## REPORT and RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate Judge.

**\*1** This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including preparation of a Report and Recommendation on dispositive motions [36]. [1] Before me is defendants' motion for summary judgment [239]. Oral argument was held on September 19, 2012[254]. Thereafter, plaintiff made post-argument submissions [255, 256]. For the following reasons, I recommend that defendants' motion be granted in part and denied in part.

## BACKGROUND

Plaintiff, an inmate, commenced this action *pro se* pursuant to 42 U.S.C. § 1983, alleging that defendants have been deliberately indifferent to his medical needs while he was incarcerated by the New York State Department of Corrections and Community Supervision ("DOCCS"). [2] Fourth Amended Complaint dated June 7, 2011[212]. Plaintiff suffers from Hepatitis C (defendants' Statement of Undisputed Facts [239–2], ¶ 11) and alleges that his symptoms include nausea and pruritus [3] (*id.,* ¶¶ 12–13).

### Lakeview Correctional Facility

Plaintiff was transferred to the Lakeview Correctional Facility on July 26, 2007 (*id.,* ¶ 27). At that time, defendant Lawrence Wilcox, N.P. reviewed his medical records (*id.,* ¶ 30), which indicated that he had been previously prescribed Vistaril for a bout of hives (also known as urticaria) which he experienced as a reaction to medications he was receiving as part of his Hepatitis C treatment (*id.,* ¶ 32). Although he was no longer receiving the Hepatitis C medication and had not had any further incidents of hives, he had continued to receive Vistaril. (*id.,* ¶¶ 32–34; Wilcox Declaration [239–10], ¶ 7). Therefore, Nurse Wilcox determined that the Vistaril should be discontinued. Defendants' Statement of Undisputed Facts [239–2], ¶ 35. [4] On July 29, 2007, plaintiff was also examined by defendant Kathleen Johnson, R.N., who found no rashes, hives or skin irritations (*id.,* ¶ 41).

During his July 29, 2007 examination plaintiff complained of nausea, itching and an inability to eat (*id.,* ¶ 40). He was offered hydrocortisone cream, but refused (*id.,* ¶ 43). The following day, plaintiff was seen by Nurse Johnson in sick call for the same complaints (*id.,* ¶ 46). During this examination, plaintiff conceded that he rubbed his skin to cause it to become red. (*id.,* ¶ 48; Zimmerman Declaration [239–3], Ex. B, p. 52). Other than this self-inflicted irritation, no rash was observed (*id.,* ¶¶ 49–50). Plaintiff was also examined by Nurse Wilcox on July 30, 2007, but he did not observe any hives (*id.,* ¶¶ 54, 58). At that time, plaintiff indicated that he needed to continue taking Vistaril to control his anxiety and to assist him to sleep (*id.,* ¶ 61). In response, Nurse Wilcox submitted a mental heath referral for plaintiff's anxiety. Wilcox Declaration [239–10], ¶ 13; Zimmerman Declaration [239–3], Ex. A, Bates No. 03020.

Although plaintiff asked to continue the low-fat, high fiber diet he had been receiving at his prior facility, plaintiff's liver functions were normal (defendants' Statement of Undisputed Facts [239–2], ¶ 11, ¶¶ 63–64). Therefore, Nurse Wilcox determined that plaintiff's special diet could be discontinued (*id.,* ¶ 66). Plaintiff was caught hoarding food on July 30 and 31, 2007, which indicated to Nurse Wilcox that plaintiff had an adequate appetite (*id.,* ¶¶ 68–70; Zimmerman Declaration [239–3], Ex. A, Bates No. 03020).

**\*2** On August 1, 2007, plaintiff was provided with Lidex, a skin ointment, by Nurse Johnson for complaints of dry skin (*id.,* ¶ 72). Despite complaints of a rash and itching,

Nurse Johnson saw no signs of redness or irritation when she examined him on August 8, 2007 (*id.,* ¶¶ 73–74). However, she did observe signs of Versicolor, and stated that she would have Nurse Wilcox evaluate that condition (*id.,* ¶ 76). That same day, plaintiff was seen by Nurse Wilcox, but he did not observe any rash (*id.,* ¶¶ 78, 80). On August 15, 2007, plaintiff requested and was given a 30–day supply of Lidex (*id.,* ¶ 81).

On August 22, 2007, plaintiff requested a referral to a gastroenterologist, but Nurse Wilcox determined that no referral was needed based on his current medical condition (*id.,* ¶ 85). Nurse Wilcox believed that this request should be addressed by plaintiff's permanent facility, to which he was scheduled to be transferred shortly (*id.,* ¶ 84). Plaintiff was transferred from Lakeview to Attica Correctional Facility on September 4, 2007 (*id.,* ¶ 151).

Plaintiff made various complaints about his medical treatment while incarcerated at Lakeview. On August 7, 2007, plaintiff submitted a complaint to defendant James Steeg, the Nurse Administrator, complaining about his medical treatment at Lakeview, including the failure to be seen by a medical doctor and the discontinuance of his special diet and Vistaril. Plaintiff's Ex. H [246–5]. In response, on August 9, 2007 Nurse Administrator Steeg advised plaintiff to contact defendant Ian Caisley, M.D., Lakeview's Facility Health Services Director ("FHSD") (*id.*). Responding to an August 16, 2007 memorandum from plaintiff to Ronald Moscicki, the Superintendent at Lakeview, by memorandum dated August 16, 2007, defendant Richard C. Moffit, the acting Deputy Superintendent for Administration ("DSA"), advised plaintiff that he had investigated the matter and found that Nurse Wilcox's August 2, 2007 memorandum to plaintiff "thoroughly and clearly" addressed his medical concerns, and reminded him that he could continue to follow the callout procedure to address his medical concerns. Moffit Declaration [239–7], Ex. A, Bates No. 01001. When plaintiff on August 19, 2007 requested to be seen by a physician and complained that his problems were being ignored, by memorandum dated August 21, 2007, DSA Moffit advised plaintiff:

> "Since arriving at Lakeview ..., you have been seen by the Health Services Unit, including the Nurse Practitioner, on at least eight separate occasions. I understand that Diagnostic Tests, Physical Therapy Consultations, and Treatments have been recommended by the Health Care Staff for you during your brief time here at Lakeview" (*id.,* Bates No. 00998).

He also advised plaintiff that his letter would be forwarded to Dr. Caisley for his review and recommendation (*id.*). In an August 24, 2007 Memorandum from Dr. Caisley to DSA Moffit, he indicated that he had completed a chart review and concluded that plaintiff's "problems [were] being adequately addressed" (*id.,* Bates No. 01005).

**\*3** Plaintiff also filed a number of grievances arising from his medical care. Moscicki Declaration [239–8], 8, Ex. B. These grievances were denied by the Inmate Grievance Review Committee ("IGRC"), and were unsuccessfully appealed to Superintendent Moscicki and to the Central Office Review Committee ("CORC"), which was coordinated by defendant Karen Bellamy, DOCCS Inmate Grievance Program Director (*id.;* Bellamy Declaration [239–4], ¶¶ 1, 4).

Plaintiff's First Cause of Action alleges that Nurses Wilcox and Johnson and Dr. Caisley "summarily discontinu[ed][his] prescriptions for non-medical reasons, refus[ed] to examine [he him], den[ied][him] access to a medical doctor for non-medical reasons" causing him "lose weight", "aggravate [his] chronic fatigue" and to "be in substantial pain and discomfort", in deliberate indifference to his "serious medical needs" and in violation of the Eighth Amendment. Fourth Amended Complaint [212], ¶ 42. His Second Cause of Action alleges that defendants Lester Wright, the Chief Medical Officer for DOCCS,[5] Superintendent Moscicki, DSA Moffit and Nurse Administrator Steeg were personally involved in the deliberate indifference alleged in the First Cause of Action by "failing to follow [DOCCS'] policy and have [him] seen by a medical doctor after numerous unresolved complaints; deferring to and allowing the determination of a Nurse Practitioner to overrule the prescriptions and orders of doctors and specialists; and failing to properly investigate [his] concerns causing [him] to suffer substantial pain and discomfort ... to lose substantial weight ... adverse effect of the Plaintiff's life activities of eating and sleeping" in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment. *Id.,* ¶ 43. His Third Cause of Action alleges that "[t]he policy of [DOCCS] to discontinue medications upon a prisoner's transfer from facility to facility, [thereby] causing a lapse in the administration of a prisoner's medication", constitutes deliberate indifference, in violation of the Eighth Amendment. *Id.,* ¶ 44.

### Clinton Correctional Facility

Plaintiff was eventually transferred to Clinton Correctional Facility on October 15, 2009. Defendants' Statement of Undisputed Facts [239–2], ¶ 152. On October 23, 2009, he was seen by Kang Lee, M.D., a physician at Clinton (*id.,* ¶ 155). [6] Accordingly to Dr. Lee, his chart revealed that plaintiff had stage IV cirrhosis, related to his Hepatis C (*id.,* ¶ 157), but did not have any symptoms of Hepatis C infection (*id.,* ¶ 162). Plaintiff was also given a blood test on September 3, 2009 that revealed normal liver functioning (*id.,* ¶ 160). Dr. Lee planned to monitor his blood levels every three months and to refer him back to a gastroenterologist, if necessary (*id.,* ¶ 164). [7]

On October 15, 2010, plaintiff's prescription for Ensure (a dietary supplement for individuals who are not obtaining adequate nutrition with a normal diet) was discontinued because his body mass index demonstrated that he was receiving adequate nutrition. Johnson Declaration [192–1], Ex. A, Bates No. 002582; Defendants' Statement of Undisputed Facts [239–2], ¶¶ 170–172. [8] He gained weight in the six-month period following the cessation of Ensure, and his blood tests showed no nutritional deficit. Defendants' Statement of Undisputed Facts [239–2], ¶¶ 173–174. While incarcerated at Clinton, plaintiff was on a therapeutic, high fiber, low fat diet (*id.,* ¶ 176). He was also prescribed Prilosec for nausea and Vistaril for his complaints of itching on January 26 and February 23, 2011 (*id.,* ¶ 184; Johnson Declaration [192–1], ¶¶ 22–23). He has also been prescribed lotion for his skin when it was medically indicated; however, even if it is not medically indicated, inmates can purchase skin lotions at the commissary (*id.,* ¶¶ 187–188).

**\*4** Plaintiff's requests for access to more frequent showers to moisturize his skin were denied because it was not medically indicated (*id.,* ¶¶ 194–196; Johnson Declaration [192–1], ¶ 13). Plaintiff's requests to see a dermatologist have also been denied as not being medically indicated (*id.,* ¶¶ 198–199).

Plaintiff's Fourth Cause of Action alleges that "[t]he refusal of defendants Koenigsmann, Johnson and Bellamy to have [him] seen by a hepatologist and authoritatively diagnose the condition of Plaintiff's liver disease and offer treatment options; the refusal of defendants to provide for treatments to ameliorate the symptoms of [his] extrahepatic manifestations such as showers and lotion for the pruritus, the Ensure for

[his] gastric and nutritional maladies" constitutes deliberate indifference, in violation of the Eighth Amendment. Fourth Amended Complaint [21], ¶ 45.

### ANALYSIS

#### A. Summary Judgment Standard

"A party moving for summary judgment bears the burden of establishing that there exists no genuine issue of material fact warranting a trial.... In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir.), *cert. denied,* 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once that burden has been established, the burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial.... To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor." *Guerrero v. Lowe's Home Centers, Inc.,* 462 F.Supp.2d 399, 406 (W.D.N.Y.2006) (Siragusa, J.), *aff'd,* 254 Fed. Appx. 865 (2d Cir.2007) (Summary Order). *See also Celotex,* 477 U.S. at 322 (Fed.R.Civ.P. ("Rule") "56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

#### B. Deliberate Indifference Standard

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs". *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include

the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** To satisfy the subjective component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id. See also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

### C. Medical Treatment at Lakeview

Plaintiff's First and Second Causes of Action relate to the medical treatment he received while at Lakeview. Fourth Amended Complaint [212], ¶¶ 42, 43. Nurses Wilcox and Johnson and Dr. Caisley argue that these claims should be dismissed as against them because they were not deliberately indifferent to plaintiff's medical needs (defendants' Memorandum of Law [239–1], Point I). DSA Moffit, Superintendent Moscicki, Nurse Administrator Steeg, and Director Bellamy argue that even if there was deliberate indifference, they had no personal involvement in this deprivation (*id.,* Points II and III).

### 1. Nurses Wilcox and Johnson and Dr. Caisley

#### a. Plaintiff's Pruritus

Defendants admit that plaintiff suffers from Hepatitis C, which they concede is a "serious illness" (defendants' Memorandum of Law [239–1], p. 18). However, they dispute whether plaintiff's Hepatitis C has resulted in a symptom that may produce death, degeneration, or extreme pain. I conclude that plaintiff's complaints of pruritus (itching) arising from

his Hepatis infection do not constitute an objectively serious condition. *See Benitez v. Ham,* 2009 WL 3486379, \*11 (N.D.N.Y.2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation"); Judge Arcara's September 29, 2011 Decision and Order [222–1], p. 7 (denying plaintiff's fourth motion for a preliminary injunction—"Plaintiff has failed to establish that his pruritus ... [is a] serious medical condition [ ]", *citing Benitez* ).

Moreover, plaintiff has not raised a triable issue of fact as to whether defendants were deliberately indifferent to this condition. While plaintiff may disagree with the treatment provided for his pruritus, he was regularly provided with Lidex, an ointment for dry skin. [9] Johnson Declaration [239–6], ¶¶ 9, 11. "Deliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Shire v. Greiner,* 2007 WL 840472, \*12 (S.D.N.Y.2007). *See Tafari v. Stein,* 2009 WL 331378, \*7 (W.D.N.Y.2009) (Scott, M.J.), *reconsideration denied,* 2009 WL 1322317, 2009 WL 1579530 ("it is well-established that a prisoner is not entitled to receive the medical treatment of his choice. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment or a different doctor does not give rise to an Eighth Amendment violation").

#### b. Plaintiff's Weight Loss

**\*6** Plaintiff also alleges nausea and other gastrointestinal issues associated with his Hepatitis infection. According to plaintiff, defendants "chose to ignore the Plaintiff's complaints of gagging, nausea, the urge to vomit and inability to eat as signs of serious gastric issues". Plaintiff's Opposition to Statement of Uncontested Material Facts [246], ¶ 8. Associated with defendants' failure to provide such treatment, plaintiff alleges that he experienced significant weight loss while at Lakeview. *Id.,* ¶ 11.

Although defendants repeatedly deny that plaintiff suffered *any* weight loss at Lakeview (defendants' Statement of Undisputed Facts [239–2], ¶ 145; defendants' Memorandum of Law [239–1], pp. 8, 9, 11; Caisley Declaration [239–5], ¶ 14; Wilcox Declaration [239–10], ¶ 32), these denials are belied by plaintiff's medical records, which demonstrate that he experienced a significant and rapid weight loss while at Lakeview, with his weight decreasing from 234 lbs. on June 11, 2007, to 219 lbs. on August 28, 2007, and to

203 lbs. on September 7, 2007. Plaintiff's Opposition to Defendants' Statement of Uncontested Material Facts [246], Ex. G. Corresponding to his precipitous weight loss, plaintiff made repeated complaints that he was nauseous, that he was gagging on his food, and that he was unable to eat. *See* Wilcox Declaration [239–10], ¶¶ 20, 21; Johnson Declaration [239–6], ¶¶ 7, 8, 10. [10]

While "[c]omplaints of abdominal pain [and] vomiting ... d[o] not constitute a serious medical need", *Ross v. McGinnis,* 2004 WL 1125177, *10 (W.D.N.Y.2004) (Schroeder, M.J.), "rapid weight loss ... may present a serious medical condition". *Anderson v. Kooi,* 2011 WL 1315721, *12 (N.D.N.Y.2011), *adopted,* 2011 WL 1256942 (N.D.N.Y.2011). [11] Whether plaintiff's apparent rapid weight loss was attributable to defendants' failure to have him seen by a gastric specialist, failure to continue his therapeutic diet, failure to prescribe Vistaril, [12] or some combination of these factors, since I must give plaintiff every favorable inference (for purposes of this motion), I conclude that a triable issue of fact exists as to whether plaintiff's weight loss—especially when coupled with plaintiff's Hepatitis C—constitutes a sufficiently serious condition under the objective prong. *See Bourgoin v. Weir,* 2011 WL 4435695, *7 (D.Conn.2011) ("The significant weight loss-more than forty pounds [in approximately 11 months]-may be objective evidence of a deterioration in the state of Mr. Bourgoin's health.... The record is such that reasonable jurors could find that Mr. Bourgoin suffered from an objectively serious medical condition"). [13]

Turning to the subjective prong, defendants argue that they did not ignore plaintiff's complaints of nausea and an inability to eat, but rather they believed that his complaints were unfounded based on the fact that he had taken his food tray (Johnson Declaration [239–6], ¶ 10) and that he was hoarding food in his cell (Wilcox Declaration [239–10], ¶¶ 13, 18). [14] They also argue that they used their professional judgment to determine that plaintiff did not require Vistaril, a therapeutic diet, or a referral to an outside specialist, and that plaintiff's claims amount to a disagreement as to the proper course of treatment. Defendants' Memorandum of Law [239–1], p. 10.

**\*7** Again, giving plaintiff every favorable inference for purposes of this motion, defendants' conduct could be viewed as more than mere negligence or a disagreement as to treatment. Any reasonable belief by defendants that plaintiff's complaints were unfounded is difficult to reconcile with

plaintiff's significant and rapid weight loss, which would have been manifest. Defendants' conspicuous failure to even acknowledge—much less address—this weight loss establishes a genuine issue of material fact exists as to whether they were deliberately indifferent to a potentially serious medical need.

## 2. DSA Moffit, Superintendent Moscicki, Nurse Administrator Steeg, Grievance Director Bellamy and Chief Medical Officer Wright

Prior to *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), it had been well settled that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in *Iqbal,* the Supreme Court clouded this issue when it rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution", concluding that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

Since *Iqbal,* some districts courts have determined that not all five of *Colon's* categories of conduct that may give rise to supervisory liability remain viable. *See e.g., Spear v. Hugles,* 2009 WL 2176725, *2 (S.D.N.Y.2009) ("only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal"* ); *Bellamy v. Mount Vernon Hospital,* 2009 WL 1835939, *6 (S.D.N.Y.2009), *aff'd,* 387 Fed. Appx. 55 (2d Cir.2010) (Summary Order) ("The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal's* active conduct standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster") [15]; *Bryant v. County of Monroe,*

[2010 WL 4877799, *3 (W.D.N.Y.2010)](Siragusa, J.) ("The Court ... is persuaded by the analysis of ... *Iqbal* ... in *Bellamy"* ). [16] However, I agree "with the apparent majority view that where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers,* 2012 WL 4477241, *10 (S.D.N.Y.2012).

### a. DSA Moffit

**\*8** Notwithstanding DSA Moffit's argument that it was "not in the realm of [his] authority ... to dictate treatment plans" (defendants' Memorandum of Law [239–1], p. 15), defendants concede that DSA Moffit "supervised the medical department" and that he "responded to plaintiff's written complaints after ... investigating the matters raised by plaintiff". *Id.* The Second Circuit has held that "[w]hen allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility". *McKenna v. Wright,* 386 F.3d 432, 438 (2d Cir.2004). DSA Moffit's conduct extended beyond merely adjudicating a grievance-he also received complaints from plaintiff, and responded in detail to his complaint that he was "being ignored". Moffit Declaration [239–7], Ex. A, Bates No. 00998. When coupled with his role as the supervisor of the medical department, these facts raise a triable issue as to his personal involvement. Therefore, I recommend that his motion for dismissal be denied.

### b. Superintendent Moscicki

Superintendent Moscicki argues that he is not a physician or medically trained, and that he relied on the opinion of the medical professionals who examined plaintiff. Moscicki Declaration [239–8], ¶ 22. Defendants further argue that Superintendent Moscicki lacks personal involvement in any alleged deliberate indifference since his "participation in plaintiff's issues was solely to uphold the denial of the plaintiff's grievances by the [IGRC]". Defendants' Memorandum of Law [239–1], p. 16. I agree. "The fact that [the] Superintendent ... affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement". *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002); *Ramos*

*v. Wright,* 2011 WL 2462482, *6 (N.D.N.Y.2011), *adopted* 2011 WL 2462472 (N.D.N.Y.2011) (dismissing claims against superintendent on personal involvement grounds where "[p]laintiff's sole factual allegation against Defendant Superintendent Smith, [was] that he affirmed the resolution of Plaintiff's institutional grievance and indicated that Plaintiff was receiving adequate medical attention"); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (Larimer, J.) ("To the extent that [Superintendent] Lempke may have, in the course of his official duties, denied or affirmed the denial of certain grievances filed by the plaintiff, 'the denial of [a] plaintiff's grievance-[where that] is all that is alleged against him-is insufficient to establish personal involvement [in a constitutional violation]' by a prison superintendent"); *Ramsey v. Goord,* 2005 WL 2000144, *8 (W.D.N.Y.2005) (Skretny, J.) ("the fact that a prison official in the prison chain of command affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"); *Vogelfang v. Capra,* 2012 WL 832440, *7 (S.D.N.Y.2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights"); *White v. Sears,* 2011 WL 2728443, *8 (N.D.N.Y.2011), *adopted* 2011 WL 2728431 (N.D.N.Y.2011) ("To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement"). [17]

**\*9** While he is uncertain whether it was ever sent, Superintendent Moscicki also acknowledges the existence of an unsigned memorandum dated August 10, 2007 from him responding to an August 6, 2007 letter from plaintiff's brother, Anderson Bernier. Moscicki Declaration [239–8], ¶ 8, Ex. A. In this correspondence, Superintendent Moscicki stated that he could not provide Bernier with any information about his brother's health care "because of privacy laws", but "assure[d] [him] that [plaintiff] is being appropriately administered to". *Id.,* Ex. A.

"The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, *4 (S.D.N.Y.2009). Nevertheless, "[a] supervisor's detailed, specific response to a plaintiff's complaint" may suffice to establish personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430–31 (S.D.N.Y.2010); *see Rosario v. Fischer,* 2012 WL 4044901, *5 (S.D.N.Y.2012), *adopted* 2012 WL 6681695

(S.D.N.Y.2012) ("a *pro forma* response to a letter or grievance" does not amount to personal involvement; *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) (Larimer, J.) ("in general personal involvement will not be found unless 'the supervisor's response is detailed and specific' "). [18]

Even giving plaintiff the benefit of every favorable inference, I conclude that Superintendent Moscicki's assurance to plaintiff's brother that plaintiff was being properly treated, without any explanation of the treatment he was receiving or the complaints at issue, is insufficient to establish Superintendent Moscicki's personal involvement. Therefore, I recommend that the claims against him be dismissed.

#### c. Nurse Administrator Steeg

Defendants likewise argue that Nurse Administrator Steeg did not have sufficient personal involvement, since his "only involvement with plaintiff's medical care was to respond to correspondence from plaintiff. The issues addressed in plaintiff's correspondence were addressed by Steeg, and nothing in plaintiff's correspondence indicated the existence of a constitutional violation". Defendants' Memorandum of Law [239–1], p. 17.

Nurse Administrator Steeg received a complaint from plaintiff dated August 7, 2007, complaining that his Vistaril and special diet had been discontinued and that these "medical regimens helped control [his] allergic reaction of ... rejection of certain foods". Plaintiff's Opposition to Defendants' Statement of Uncontested Material Facts [246], Ex. H. He responded to plaintiff's complaint by stating that "[a]ll questions directly relating to medical therapy and medication should be directed to the facility Medical Director here". *Id.*

As discussed above, a generalized response such as this to a complaint is not sufficient to establish personal involvement. *See Mateo,* 682 F.Supp.2d at 430–31. "Nor is it enough that a supervisor forwarded a complaint or grievance to another official for handling." *Id.* at 430. Therefore, I recommend that defendant Nurse Administrator Steeg be dismissed for lack of personal involvement.

#### d. Chief Medical Officer Wright

 **\*10** Without making any specific arguments, defendants appear to move for summary judgment as against defendant Dr. Wright for lack of personal involvement in the alleged

deliberate indifference to plaintiff's medical needs that occurred at Lakeview. Defendants' Memorandum of Law [239–1], p. 19. In response, plaintiff relies on his August 2, 2007 letter to Dr. Wright complaining that he "can not eat" (plaintiff's Affidavit [246], Ex. B–4, and a letter dated August 28, 2007 from Dr. Wright to Mr. Bernier, stating that "an investigation regarding [his] concern with the health care services being provided" and to "be assured that [plaintiff] is receiving necessary health care and services" *Id.,* Ex. B–9. [19]

As discussed above, such a generalized response is insufficient to establish Dr. Wright's personal involvement. Therefore, I recommend that the claims against him be dismissed.

#### e. Karen Bellamy, Grievance Director [20]

Defendants argue that Grievance Director Bellamy's involvement was limited to "uphold[ing] the denial of the plaintiff's grievances", but that he did not review them. Defendants' Memorandum of Law [239–1], p. 17. Plaintiff does not respond to this argument. Therefore, I recommend that Grievance Director Bellamy be dismissed for lack of personal involvement.

#### D. Medical Treatment at Clinton

Plaintiff's Fourth Cause of Action relates to plaintiff's medical treatment at Clinton. Fourth Amended Complaint [212], ¶ 45. Plaintiff alleges that defendants refused to have him seen by a hepatologist, to provide him with showers and lotion for pruritus, and to provide him with Ensure for his gastric and nutritional maladies. *Id.* I will address each of the allegations individually:

#### 1. Alleged Failure to be Treated by a Hepatologist

Defendants argue that plaintiff's claim arising from his failure to refer him to a hepatologist should be dismissed due to his failure to exhaust administrative remedies. Defendants' Memorandum of Law [239–1], pp. 18–19, 21–22. *See* Gregory Declaration [239–11], ¶¶ 9, 10. In response, plaintiff does not dispute that he failed to exhaust his administrative remedies with respect to defendants' alleged failure to refer him to a hepatologist. Instead, he argues, "[t]he semantics of the term hepatologist is beside the point. The Plaintiff has been seen by a gastroenterologist who specializes in liver issues and he has recommended treatment with the new triple drug therapy. Defendant Koenigsmann has yet to inform the Plaintiff of what [DOCCS] will do as to that

recommendation. This treatment is the community standard". Plaintiff's Memorandum of Law [246], p. 10.

Even assuming that plaintiff exhausted his claim concerning a referral to a hepatologist, "there is no recognized Board Certification for hepatology in New York, and the treatment of liver disease falls under the area of gastroenterology". Lee Declaration [86] ¶ 17. Moreover, plaintiff has been seen by a gastroenterologist, and Dr. Lee will request a referral in the future, if appropriate. *Id.,* ¶ 18. Thus, I conclude that plaintiff has received what his complaint seeks. Fourth Amended Complaint [212], p. 16, "Wherefore" Clause, ¶ 4 (seeking an injunction directing "that the Plaintiff be seen by a hepatologist").

 **\*11** In opposition to defendants' motion for summary judgment, plaintiff argues that defendants have failed to act on the gastroenterologist's recommendation that he be treated with a new triple drug therapy. Plaintiff's Memorandum of Law [246], pp. 10–11. However, this allegation was not raised in plaintiff's Fourth Amended Complaint.[21] "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon v. City of New York,* 705 F.Supp.2d 261, 278 (S.D.N.Y.2010). Therefore, I will not consider these allegations. *See Lyman v. CSX Transportation, Inc.,* 364 Fed.Appx. 699, 702 (2d Cir.2010) (Summary Order) ("we cannot conclude that the district court abused its discretion in failing to consider plaintiff's new theories of liability"); *Fullwood v. Association for the Help of Retarded Children, Inc.,* 2010 WL 3910429, \*7 (S.D.N.Y.2010).

Even if plaintiff had asserted a claim of deliberate indifference arising from defendants' failure to treat him with a triple drug therapy, "[t]he Eighth Amendment does not entitle plaintiff to the treatment of his choice". *Berry v. Wright,* 2011 WL 231626, \*6 (W.D.N.Y.2011) (Schroeder, M.J.).

## 2. Alleged Failure to Provide Plaintiff with Showers and Lotion for His Pruritus

As discussed above, plaintiff's complaints of itching arising from his Hepatis infection do not constitute an objectively serious condition. *See Benitez,* 2009 WL 3486379 at \*11. Even if plaintiff's pruritus constituted a serious medical condition, the record demonstrates that defendants were not deliberately indifferent to this condition. He received Vistaril for his complaints of itching (defendants' Statement

of Undisputed Facts [239–2], ¶¶ 176, 184–185; Johnson Declaration [192–1], ¶¶ 22–23) and was prescribed lotion for his skin when it was medically indicated. Defendants' Statement of Undisputed Facts [239–2], ¶ 187; Johnson Declaration [192–1], ¶ 15. Plaintiff also fails to dispute that even if his requests for lotion were denied, that he was able to purchase lotion through the commissary. Johnson Declaration [192–1], ¶ 16.

Additionally, plaintiff alleges that he was deprived of a shower pass to ameliorate his pruritus (Fourth Amended Complaint [212], ¶ 39). In response, Dr. Johnson states that "increase ... showering actually increases skin dryness, and is not medically indicated for dry skin". Johnson Declaration [192–1], 11. This amounts to a disagreement as to the proper treatment for plaintiff's pruritus. However, "disagreements over treatment do not rise to the level of a Constitutional violation", *Graham v. Gibson,* 2007 WL 3541613, \*5 (W.D.N.Y.2007) (Siragusa, J.), as "the Constitution does not require that an inmate receive a particular course of treatment". *Tafari,* 2009 WL 331378, at \*7. Therefore, I recommend that these claims be dismissed.

## 3. Alleged Failure to Provide Plaintiff with Ensure

 **\*12** Plaintiff alleges that he was prescribed Ensure "in December, 2009, per the direction of the gastric specialist", but that it was discontinued without notification. Fourth Amended Complaint [212], ¶ 40. According to plaintiff, "[d]ue to [his] gastrointestinal issues and the recurrent nausea which creates an [i]nability to eat properly, at times ... the Ensure would assist [him] with the proper absorption of nutrients and help relive [*sic* ] the fatigue that [he] experiences, consequent of the Hep C". Fourth Amended Complaint [212], ¶ 40. Defendants explain that plaintiff was taken off of Ensure in October 2010 "because his body mass index revealed that it was no longer medically indicated from [*sic* ] him" and that this was explained to him. Johnson Declaration [192–1], ¶ 25.

It is undisputed that at the time plaintiff was prescribed Ensure he weighed between 200 and 210 lbs. (Zimmerman Declaration [239–3], Ex. B, p. 42), and that when his Ensure was discontinued, he weighed 228 lbs. Johnson Declaration [192–1], Ex. A, Bates No. 02582. It is also undisputed that he continued to gain weight after his Ensure was discontinued, weighing 240 lbs on March 31, 2011. Johnson Declaration [192–1], ¶ 26, Ex. A, Bates No. 02586. His blood tests also showed no nutritional deficit. Id., ¶ 27.

The record demonstrates that defendants did not ignore plaintiff's inability to eat and the necessity for nutritional supplementation. While plaintiff may disagree with the decision to discontinue his Ensure, this again amounts to a disagreement between the parties as to the type of treatment plaintiff's condition required, which is insufficient to establish deliberate indifference. See *Graham,* 2007 WL 3541613 at *5.

**E. DOCCS' Policy of Discontinuing Medications**

Plaintiff's Third Cause of Action alleges that DOCCS has a policy of discontinuing medications upon an inmate's transfer into a new facility, in deliberate indifference to a prisoner's serious medical needs. Fourth Amended Complaint [212], ¶ 44. DOCCS concedes that it has a policy of reviewing all treatments and medications when care of a new patient is commenced, but alleges that this "is the same as that for the community at large". Defendants' Memorandum of Law [239–1], p. 20. In fact, it argues that "[t]he policy which the plaintiff desires, which is for new medical providers to simply rubber stamp the decisions of prior providers .... would amount to deliberate indifference". *Id.*

Aside from challenging the discontinuance of his Vistaril prescription and therapeutic diet at Lakeview, plaintiff does not appear to specifically respond to these arguments or to address this cause of action in his opposition to defendants' motion for summary judgment.

In any event, DOCCS' policy of having an inmate's medications reevaluated at each new facility they are transferred does not establish deliberate indifference, even if such policy permits facilities to reach different conclusions concerning what medications should be prescribed or treatment should be administered. *See Porter v. Jin,* 2010 WL 3767876, *2 (W.D.N.Y.2010)* (Arcara, J.) ("The fact that plaintiff may have received surgery after being examined by another physician at a different correctional facility does not transform what otherwise may be a medical malpractice claim to a claim of deliberate indifference in violation of the Eighth Amendment"). Therefore, I recommend that this claim be dismissed.

**CONCLUSION**

**\*13** For these reasons, I recommend that plaintiff's first cause of action be dismissed to the extent it arises from plaintiff's pruritus; that his second cause of action be dismissed against defendants Moscicki, Steeg, Wright, Bellamy; and that his third and fourth causes of action be dismissed in their entirety, but that defendants' motion otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by April 12, 2013 (applying the time frames set forth in Fed.R.Civ.P. ("Rules") 6(a)(1)(c), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1791079

---

Footnotes

1    Bracketed references are to the CM/ECF docket entries.
2    Pruritus is defined as itching. Stedman's Medical Dictionary (27th Edition 2000).

3    Pruritus is defined as itching. Stedman's Medical Dictionary (27th Edition 2000).

4    By memorandum dated August 2, 2007, from Nurse Wilcox to plaintiff, he explained his decision to discontinue plaintiff's Vistaril. Moffit Declaration [239–7], Ex. A, Bates No. 00989.

5    Carl Koenigsmann, M.D., is Dr. Wright's successor as DOCCS' Chief Medical Officer. The parties previously agreed that pursuant to Fed.R.Civ.P. ("Rule") 25(d)(1) Dr. Koenigsmann should be substituted for Dr. Wright with respect to plaintiff's official capacity claim. Zimmerman Declaration [205], ¶ 11; Defendants' Memorandum of Law [239–1], p. 4 n. 2.

6    The Lee Declaration referenced in Defendants' Statement of Undisputed Facts ( [239–2], ¶¶ 152–157; 160–164) did not accompany defendants' motion for summary judgment. It was filed [86] in response to plaintiff's second motion for a preliminary injunction and expedited hearing [77].

7    While plaintiff has not named Dr. Lee as a defendant, Vonda Johnson, M.D., the FHSD at Clinton, is a defendant.

8    The Johnson Declaration referenced in Defendants' Statement of Undisputed Facts ( [239–2], ¶¶ 169–174, 176, 179–185, 187–190, 194, 196–200, 204–211) did not accompany defendants' motion for summary judgment. It was filed [192–1] in response to plaintiff's fourth motion for a preliminary injunction and expedited hearing [183].

9    Plaintiff states that his pruritus interfered with his sleeping. Plaintiff's Opposition to Statement of Uncontested Material Facts [246], ¶ 7.

10    In opposition to defendants' motion for summary judgment, plaintiff also alleges in his Memorandum of Law [246] that he "suffered constant and chronic gastric pain during his 40 day stay at [Lakeview]" (*id.,* p. 7). However, this contention is not supported by the medical records which he references. *Id.*

11    Compare with *Hutchinson v. New York State Correctional Officers,* 2003 WL 22056997, *5 (S.D.N.Y.2003) ("the court has not been convinced that digestion problems, weight loss, and dizziness are conditions 'of urgency, ... [which] may produce death, degeneration, or extreme pain' ").

12    Plaintiff argues that "[e]ven though Vistaril is not intended for the gastric symptoms, [his] symptoms were ameliorated due to the anti-emetic and anti secretory effect on bile acids of the Vistaril." Plaintiff's Memorandum of Law [246], p. 7. He also alleges that when he was transferred to Attica, "[i]t would come to light after testing by a gastric specialist that [he] suffered from gastritis, esophagitis and H. Pylori. That was the cause of [his] nausea when eating". Plaintiff's Affidavit [246], ¶ 17; *see* Plaintiff's Memorandum of Law [246], p. 7.

13    There may be possible explanations for plaintiff's apparent weight loss, but defendants offer *no* explanation for the weight loss plaintiff's medical records depict.

14    According to plaintiff, he "was not able to eat the foods served on the regular diet", thus he "would at times keep a fruit or some milk from breakfast so that he could eat later, to starve off his hunger." Plaintiff's Affidavit [246], ¶ 14.

15    "[T]he *Iqbal* issue was not raised on appeal" in *Bellamy. Stresing v. Agostinoni,* 2012 WL 2405240, *4 (W.D.N.Y.2012) (Skretny, J).

16    Adding to the uncertainty, "[t]he Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal* ." *Jamison v. Fischer,* 2012 WL 4767173, *4 (S.D.N.Y.2012).

17    Compare with *McKenna,* 386 F.3d at 437–38 ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make [the defendant deputy superintendent for administration] liable for the conduct complained of", where the defendant was responsible for the prison's medical program and "allegations of improperly denied medical treatment come to [his] attention ..., his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly medical policies within his supervisory responsibility").

18    Compare with *Ramos v. Artuz,* 2001 WL 840131, *10 (S.D.N.Y.2001) (finding personal involvement where the defendant "defended and explained Green Haven's treatment of plaintiff, both to plaintiff and to Legal Aid Society").

19    Dr. Wright also advised Mr. Bernier that he was unable to divulge any specific health information without a release from plaintiff. Plaintiff's Affidavit [246], Ex. B–9. However, "defendant Wright's actions in telling Plaintiff's family members that Plaintiff would need to sign medical release forms is not enough to subject Defendant Wright to personal liability."*Anderson,* 2011 WL 1315721 at *8.

20    Although Bellamy appears to be named only in plaintiff's Fourth Cause of Action arising from his care at Clinton, defendants have addressed her role with respect to plaintiff's treatment at Lakeview. Defendants' Memorandum of Law [239–1], p. 12.

21    The Fourth Amended Complaint [212] merely alleges that "plaintiff has learned that Dependent on the stage of the Plaintiff's liver disease, there are interventions to help ameliorate the Plaintiff's condition" (*id.,* ¶ 36).

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2011 WL 4528931 (N.D.N.Y.)

(Cite as: 2011 WL 4528931 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Charles WATSON, Plaintiff,
v.
Dr. Lester WRIGHT, Chief Medical Officer, Docs; and
Doyon De Azevedo, Fhsd, Clinton CF, Defendants.
No. 9:08–CV–62 (NAM/ATB).

Sept. 28, 2011.
Charles Watson, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.
    **\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community
Supervision, brought this *pro se* action under 42 U.S.C. §
1983. Defendants moved (Dkt. No. 92) for summary
judgment dismissing the remaining claim in the second
amended complaint (Dkt. No. 40). Upon referral pursuant
to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c),
United States Magistrate Judge Andrew T. Baxter issued
a thorough Report and Recommendation (Dkt. No. 99)
recommending that the motion be granted and the case
dismissed. After reviewing the record and applicable law,
Magistrate Judge Baxter concludes that no reasonable jury
could find that defendants acted with deliberate
indifference to plaintiff's medical needs. Nor could a
reasonable jury find that Dr. de Azevedo's treatment of
plaintiff was based on retaliatory or discriminatory
motives, as opposed to an exercise of his medical
judgment. Moreover, Magistrate Judge Baxter finds that,
even if there were an issue of material fact, defendants
would be entitled to summary judgment based on qualified
immunity, because it was objectively reasonable for them

to believe that their treatment of plaintiff did not constitute
deliberate indifference to his medical needs.
    Plaintiff has submitted an objection (Dkt. No. 102).
The issues raised in plaintiff's objection have been
addressed in the Report and Recommendation, and the
Court does not discuss them again here. Upon *de novo*
review pursuant to 28 U.S.C. § 636(b)(1)(C), the Court
accepts the Report and Recommendation in all respects.

    It is therefore

    ORDERED that the Report and Recommendation
(Dkt. No. 99) is accepted; and it is further

    ORDERED that defendants' motion for summary
judgment (Dkt. No. 92) is granted and the case dismissed;
and it is further

    ORDERED that the Clerk serve copies of this
Memorandum–Decision and Order in accordance with the
Local Rules of the Northern District of New York.

    IT IS SO ORDERED.

N.D.N.Y.,2011.

Watson v. Wright
Not Reported in F.Supp.2d, 2011 WL 4528931
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Nurideen ISLAM Plaintiff,
v.
Glenn S. GOORD, Commissioner of New York State
Department of Correctional Services, William Mazzuca,
Superintendent of Fishkill Correctional Facility, W.
Schaller, Captain at Fishkill Correctional Facility, D.
Michaels, Lieutenant at Fishkill Correctional Facility,
M. Blaine, Sergeant at Fishkill Correctional Facility,
Guarino, Sergeant at Fishkill Correctional Facility, and
Riel, Corrections Officer at Fishkill Correctional
Facility, Defendants.
No. 05 Civ. 7502(RJH).

Sept. 29, 2006.
*MEMORANDUM OPINION AND ORDER*

HOLWELL, J.

**\*1** Plaintiff Nurideen Islam, currently incarcerated in
Fishkill Correctional Facility ("Fishkill"), brings a *pro se*
complaint under 42 U.S.C. § 1983, seeking monetary
damages and injunctive relief. He brings this complaint
against defendants Glenn S. Goord, the Commissioner of
the New York State Department of Correctional Services
("DOCS"), William Mazzuca, Superintendent of Fishkill,
Captain W. Schaller, Lieutenant D. Michaels, Sergeant M.
Blaine, Sergeant Guarino, and Corrections Officer Riel,
alleging violations of his constitutional rights. According
to a liberal reading of plaintiff's *pro se* pleadings, plaintiff
alleges (1) cruel and unusual punishment in violation of
the Eighth Amendment, (2) retaliation in violation of the
First Amendment, (3) tampering with his family and legal
mail in violation of the First and Fourteenth Amendments,
and (4) inadequate investigation of complaints in violation
of his Fourteenth Amendment due process rights.FN1 Now
before the Court is defendants' motion [12] to dismiss the
complaint in its entirety. For the reasons set forth below,
defendants' motion is GRANTED.

FN1. Plaintiff, in his opposition papers, has
expressly stated that he does not bring a claim
for inadequate investigation of his grievances in
violation of his Fourteenth Amendment rights.
Therefore the Court will not address this claim.

BACKGROUND

Plaintiff is, and has been at all relevant times,
incarcerated at Fishkill Correctional Facility ("Fishkill").
In his complaint, filed August 24, 2005, plaintiff has set
forth factual allegations that the Court shall accept as true
for the purposes of this 12(b)(6) motion.FN2

FN2. In an affidavit submitted in opposition to
defendants' motion, plaintiff has offered
allegations pertaining to post-complaint events.
Specifically, plaintiff alleges that on November
3, 2005, Riel allegedly assaulted plaintiff by
colliding into him on a walkway and injuring his
shoulder. (Pl.'s Aff. ¶ 20.) Plaintiff also alleges
an additional instance of tampering with legal
mail. (*Id.* ¶ 25.) He alleged that legal mail
received from the New York Correctional
Association was opened outside of his presence
and given to him thirteen days later. (*Id.*) Since
it "is axiomatic that the Complaint cannot be
amended by the briefs in opposition to a motion
to dismiss," *O'Brien v. Nat'l Prop. Analysts
Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989),
the Court will not consider allegations not made
in the complaint. *See also, e.g., Brown v. Wright,
04 Civ. 0462(RWS), 2005 WL 3305015, at \*7
(S.D.N.Y.2005)* ("To the extent that
[prisoner-plaintiff's] opposition seeks to amend
the complaint by adding new and mostly
unexhausted categories of claims, it is
inappropriate."); *Connolly v. Havens, 763
F.Supp. 6, 8 n. 2 (S.D.N.Y.1991)* ("The Court
will not consider the numerous factual
allegations set forth for the first time in plaintiff's
memorandum opposing the instant motions. It is
a basic principle that a complaint may not be
amended by the plaintiff's brief filed in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

opposition to a motion to dismiss."); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F.Supp. 976, 987 (S.D.N.Y.1989)* ("A claim for relief may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted). This is, of course, without prejudice to plaintiff to fully exhaust these grievances and pursue relief in the federal courts in a separate action, if he believes he has a colorable claim under § 1983.

On November 18, 2004, defendant Corrections Officer Riel allegedly affixed a magazine advertisement for a video game with the words "Kill Zone" and "Kneel Before Us" behind a desk in plaintiff's housing unit. (Compl.¶¶ 12, 31.) According to plaintiff, the display caused him and other inmates to become "terrorized and visibly upset." (Compl.¶ 12.) On November 21, 2004, plaintiff filed an employee misconduct report (the "November 21 Misconduct Report") against Riel for displaying the advertisement and allegedly repeatedly threatening and harassing him in the past. (*Id.*)

Defendant Corrections Sergeant Blaine was assigned to investigate the matter on November 22, 2004. (Compl.¶ 13.) Plaintiff alleges that Blaine retaliated against him for filing the November 21 Misconduct Report by threatening to place him in involuntary protective custody and improperly conducting the investigation by not summoning most of his witnesses, treating the two witnesses summoned in an unprofessional manner, and distorting and omitting material facts. (*Id.* ¶ 14.) Soon after, on or about November 23, 2005, plaintiff filed a grievance against Blaine for retaliation (the "November 23 Grievance").[FN3] (*Id.*) Plaintiff appealed the denial of his November 23 Grievance to the Central Office's Review Committee, which denied his claim in January 2005. (*Id.* ¶ 20.)

> FN3. In addition to filing this grievance, plaintiff also filed a report with the Inspector General's office regarding Blaine's alleged "obstruction of an investigation" and sent a letter to the Bureau of Criminal Investigation regarding Riel and Blaine's misconduct. (Compl.¶¶ 15-16.) The Inspector General's Office responded by memorandum on December 28, 2004. (Compl.¶ 19.) The memorandum advised plaintiff to file his complaint with defendant Superintendent Mazzuca (*id.*), which plaintiff had already done by way of filing the November 23 Grievance (*id.* ¶¶ 14, 18). Plaintiff alleges that the Inspector General's Office's response to his complaint was inadequate because it ignored "the unparalleled level of nepotism [at Fishkill]" plaintiff had complained of. (*Id* . ¶ 19.)

On December 2, 2004, plaintiff complained to the mail room with respect to missing family mail. (*Id.* ¶ 17.) Plaintiff believes that Riel was responsible for the incident because Riel has been "observed on several occasions tampering with inmates['] mail." (*Id.*)

**\*2** On December 9, 2004, plaintiff received a letter from defendant Superintendent Mazzuca, evidently in response to his November 23 Grievance against Blaine.[FN4] (*Id.* ¶ 18.) It informed plaintiff that defendant Lieutenant Michaels had been assigned to replace Blaine as investigator of plaintiff's complaints about Riel. (*Id.*) Plaintiff informed Michaels that Riel "possessed ... animosity toward his fellow officer Ms. C. Bean" and defamed Bean's character. (*Id.*) However, plaintiff also found Michaels' investigation unsatisfactory, and alleges that he distorted and omitted facts. (*Id.*)

> FN4. In his complaint, plaintiff states that he "received a response from the Superintendent," but does not specifically identify the superintendent as Mazzuca. However, the Court presumes plaintiff intends to refer to Mazzuca.

In January 2005, plaintiff alleges that Riel, defendant Sergeant Guarino, and an unidentified sergeant conspired to frame Officer Bean, inmate Anthony Ellison, and him in retaliation for filing complaints complaining about conditions in the housing unit. (Compl.¶ 21.) Plaintiff states that Riel, Guarino, and the unidentified person conspired to frame Bean and Ellison by recruiting inmate Antonio Smith to plant a weapon in Ellison's room. (*Id.* ¶¶ 21-22.) Smith allegedly placed a weapon in Ellison's room on January 19, 2005. (*Id.* ¶ 22.) Ellison found the weapon approximately five minutes before Riel, Guarino, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

other officers searched Ellison's room. (*Id.*) After Ellison's room was searched, Riel allegedly told plaintiff, "[Y]ou're next Islam." (*Id.*) On January 30, 2005, plaintiff sent a letter to the Dutchess County District Attorney's Office to inform them of this alleged conspiracy. (*Id.* ¶ 21.) Although plaintiff states that Guarino, Riel, and the unidentified sergeant intended similarly to frame him at some future time (*id.* ¶ 22), he does not allege that any such event ultimately took place.

Plaintiff sent additional letters to Mazzuca on February 2, 2005, lodging complaints on behalf of himself and his fellow inmates. (*Id.* ¶ 23.) Plaintiff also filed a grievance on February 24, 2005 that concerned "aforementioned violations"-presumably Ellison's alleged framing-and complained that Schaller had failed to investigate "approximately a dozen complaints [that plaintiff] filed two months earlier." <sup>FN5</sup> (*Id.* ¶ 25.)

> FN5. The complaint does not specify what conduct the "dozen complaints" complained of. (Compl.¶ 25.)

On March 21, 2005, Riel personally delivered plaintiff's "legal mail" to his cell. (*Id.* ¶ 27.) The correspondence in question allegedly concerned an ongoing investigation against Riel, and was sent by the New York State Police, postmarked March 17, 2005, and stamped "OFFICIAL BUSINESS." (*Id.*) Officer Riel indicated to plaintiff "that he was familiar with the contents of the correspondence." (*Id.*) In response, plaintiff filed a grievance on March 23, 2005 against Riel for "harassment, mail tampering, and spreading rumors about Plaintiff to other inmates and corrections officers, jeopardizing Plaintiff's safety." (*Id.*)

On or about April 1, 2005, a hearing was conducted to investigate plaintiff's grievances about the November 2004 poster incident and March 2005 mail tampering. (*Id.* ¶ 28.) The investigation, conducted by defendant Captain Schaller, established that: (1) Officer Bean (working the 6:30 a.m. to 2:30 p.m. shift) and Officer Antunovic (working the 10:30 p.m. to 6:30 a.m. shift) observed the poster with the language "Kill Zone" and "Kneel Before Us"; (2) Officer Riel (working the intervening 2:30 p.m. to 10:30 p.m. shift) denied any knowledge of the poster,;

(3) Officer Bean removed the poster; (4) the poster was an advertisement for a PlayStation video game taken from an ESPN magazine; and (5) Captain Schaller found that the treatment of plaintiff's letter from the New York State Police was the result of oversight. (Compl.¶¶ 28-29, 31.) Plaintiff's grievances about the poster incident and mail tampering were denied. (Compl.¶ 32.)

**\*3** Plaintiff appealed the findings of the April 1, 2005 hearing to the Central Office Review Committee (CORC) on or about April 6, 2005. (Compl.¶ 32.) On April 27, 2005, plaintiff received CORC's response. (Compl.¶ 33.) Plaintiff found CORC's response "fell well short of the resolution requested." (*Id.*)

STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6), the court is required to read a complaint generously, accepting all the alleged facts as true and drawing all reasonable inferences in favor of the plaintiff. *See LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Frasier v. Gen. Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). The court must deny the motion unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Additionally, "the review of such a motion is limited, and '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (citations omitted). Moreover, pro se complaints must be liberally construed and courts must apply a "less stringent standard[ ] than when a plaintiff is represented by counsel." *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996) (internal quotes and citation omitted).

Defendants have submitted material outside the pleadings to support their argument that plaintiff has not exhausted administrative remedies regarding the claim of confiscation of family mail. (Alderstein Decl. Ex. B.) Federal Rule of Civil Procedure 12(b) mandates that if "matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss] shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b). Converting defendants' motion to dismiss into one

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

for summary judgment requires a court to provide notice to the parties prior to conversion. *See* Fed.R.Civ.P. 12(b). Defendants have served on plaintiff a Notice to Pro Se Litigant Opposing Summary Judgment, as required by Local Civil Rules 12.1 and 56.2. However, because the Court dismisses plaintiff's claim regarding family mail for failure to state a claim for which relief may be granted under Rule 12(b)(6), *see discussion infra,* the exhaustion inquiry is unnecessary, and the Court declines to convert any part of this motion to one for summary judgment and excludes all matters outside the pleadings presented by both parties.

### DISCUSSION

1. Eighth Amendment Claim

Plaintiff claims that Riel's alleged posting of the video game advertisement that stated "Kill Zone" and "Kneel Before Us" constituted harassment and "psychological warfare." (Compl. ¶ 12 .) Construed liberally, these allegations may be interpreted as a claim that the advertisement violated the Eighth Amendment's prohibition on cruel and unusual punishment.

**\*4** Although inappropriate and unprofessional, the display of the poster (apparently for approximately twenty-four hours) did not rise to the level of a constitutional violation. A violation of a prisoner's federal rights under § 1983 requires an injury that involves more than mental or emotional pain. *See* 42 U.S.C. § 1997e(e) (providing that "[n]o Federal civil action may be brought by a prisoner confined in a ... correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury"). "[V]erbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997) (holding that as a matter of law, a corrections officer's calling plaintiff a racial epithet and slapping him did not constitute a violation of the Eighth Amendment).

Furthermore, it is established that "[i]n order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that 'is objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Since the poster constituted a form of verbal harassment unaccompanied by physical injury, and did not deny plaintiff the necessities of life, plaintiff does not have a constitutional claim under the Eighth Amendment. Defendants' motion to dismiss this claim is therefore granted.

2. Retaliation

Plaintiff alleges claims against Blaine, Riel, and Guarino for retaliation. It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchack,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). Courts "must approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *see also Gill,* 389 F.3d at 385.

a. Claim of Retaliation against Blaine

**\*5** Plaintiff alleges that Blaine retaliated against him for filing the November 21, 2004 grievance against Riel for displaying the "Kill Zone" poster by threatening to place him in involuntary protective custody and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

improperly conducting the investigation of plaintiff's complaint. (Compl.¶ 14.)

It is undisputed that plaintiff has satisfied the first prong of the retaliation cause of action because the filing of prison grievances is a constitutionally protected activity. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988); *Bartley v. Collins,* 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006).

However, plaintiff's allegations regarding Blaine's threat and inadequate investigation of plaintiff's complaint fail to meet the adverse action requirement. For the purposes of retaliation, an adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380 (citing *Davis v.. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The test is an objective one that applies even if the plaintiff in question was not himself subjectively deterred. *Id.* (citing *Davis,* 320 F.3d at 353-54). "This objective inquiry is 'not static across contexts,' but rather must be 'tailored to the different circumstances in which retaliation claims arise.' ' *Davis,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)). Moreover, in considering what constitutes adverse action, a court should be mindful that " '[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." ' *Id.* (quoting same) (bracketed language in original). If the action would not deter an individual of ordinary firmness the retaliatory act "is simply de minimis and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353.

The threat to place plaintiff in protective custody is de minimis and does not constitute an adverse action. "Threats made to an inmate, without more, do not rise to the level of a constitutional violation." *Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005); *see also Bartley,* 2006 WL 1289256, at *6 ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action." (citing *Dawes,* 239 F.3d at 493 ("Not every unnecessary statement of a prison guard regarding an inmate's exercise

of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful" insufficient to state a retaliation claim) (parenthetical language in original)). Plaintiff's retaliation claim with respect to Blaine's threat, therefore, must be dismissed.

**\*6** Blaine's alleged improper investigation of plaintiff's complaint against Riel (e.g., by failing to summon most of his witnesses, treating the two witnesses summoned in an unprofessional manner, and distorting and omitting material facts) similarly fails to satisfy the adverse action standard. This type of alleged conduct is not, in the Court's view, likely to "chill a person of ordinary firmness from continuing to engage" in the protected activity at issue here-the filing of grievances. While plaintiff does not have to plead a separate cognizable constitutional injury to establish an adverse action, it is worth noting that "inmate grievance programs created by state law are not required by the Constitution," and "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005). Because a prisoner would likely still choose to resort to the prison grievance procedures in order to exhaust his claims prior to seeking relief in federal court, irrespective of how seriously or professionally those grievances are treated, a lack of professionalism and failure to obtain relief at the first stage of the grievance process is unlikely to prevent a person of ordinary firmness from persisting in filing grievances. Furthermore, the conduct alleged here is qualitatively different in kind from the types of harms that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

courts in this circuit have typically considered significant enough to constitute "adverse actions." *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (transfer to a psychiatric facility); *Graham v. Henderson,* 89 F.3d 75, 80-81 (2d Cir.1996) (false misbehavior reports against plaintiff); *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995) (planted-contraband in plaintiff's cell); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (false misbehavior report resulting in 120 days of punitive segregation); *Gill v. Hoadley,* 261 F.Supp.2d 113, 124 (N.D.N.Y.2003) (false misbehavior reports resulting in keeplock confinement for almost fifty days); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297, at *4-*5 (S.D.N.Y. Nov. 12, 1993) (reassignment to less desirable job with lower pay). Plaintiff's claim that Blaine retaliated against him for filing grievances by improperly investigating those grievances therefore fails to state a claim for which relief may be granted. Furthermore, to the extent plaintiff purports to allege a claim of retaliation against Schaller for failure to adequately investigate complaints (*see* Compl. ¶¶ 25, 28-32), any such claim must be dismissed for the same reasons.

*b. Claim of Retaliation against Riel and Guarino*

Plaintiff alleges that Riel, Guarino, and an unidentified sergeant allegedly conspired to frame Officer Bean, inmate Anthony Ellison, and him, in retaliation for complaints filed about conditions in the housing unit. (Compl.¶ 21.) Plaintiff states that Riel, Guarino, and the unidentified person conspired to frame Bean and Ellison by recruiting inmate Antonio Smith to plant a weapon in Ellison's room. (*Id.* ¶¶ 21-22.) After Ellison's room was searched, Riel allegedly told plaintiff, "[Y]ou're next Islam." (*Id.* ¶ 22.) It is unclear from plaintiff's allegations, though ultimately unimportant, how the alleged set-up may have harmed Bean. Plaintiff states that Guarino, Riel, and the unidentified sergeant intended similarly to frame him at some future time (*id.* ¶ 22), but he does not allege that any such event ultimately took place.

**\*7** Plaintiff does not have standing to bring a claim of retaliation arising out of the alleged set-up on behalf of Bean and Ellison. "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 11 (2004). "The Article III limitations [of

standing jurisprudence] are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U .S. 555, 560-61 (1992)). Since plaintiff does not demonstrate that Riel and Guarino's alleged conspiracy and effort to frame Bean and Ellison caused him to suffer an injury in fact, he does not have standing to bring this claim.

To the extent plaintiff is alleging that Riel retaliated against him for filing grievances by threatening to frame him at some future time-"[Y]ou're next Islam"-as discussed in greater detail above, a mere threat without more will not satisfy the adverse action requirement of a First Amendment retaliation claim. *See Pledger,* 2005 WL 736228, at *5.

Plaintiff also suggests that Riel's alleged tampering with his family and legal mail was retaliatory. However, this is not the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Plaintiff does not allege that he suffered any injury as a result of the alleged tampering, and therefore these isolated instances of mail tampering are not "adverse actions" supporting a cause of action for First Amendment retaliation. *See Battice v. Phillip,* 04 Civ. 0669(FB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) ("Even if intentional, [defendant's failure to deliver plaintiff's mail] is 'simply de minimis and therefore outside the ambit of constitutional protection .' '); *Rivera v. Pataki,* 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (dismissing prisoner's claim that correction officers actively prevented him from sending legal mail in retaliation for a pending lawsuit because the alleged conduct did not constitute "adverse action").

3. Mail Tampering Claim

Plaintiff's claim that Riel tampered with his family correspondence and opened his legal mail outside his presence potentially alleges an actionable constitutional violation apart from his claim of retaliation.

"Interference with legal mail implicates a prison inmates rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

Constitution. To state a claim for denial to access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks, citations, and brackets omitted). Furthermore, while a prisoner has a right to be present when his legal mail is opened, *Wolff,* 418 U.S. at 574-76, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation, *Davis,* 320 F.3d at 351 (citations omitted). "Rather, the inmate must show that 'prison officials 'regularly and unjustifiably interfered with the incoming legal mail." ' *Id.* (citations omitted). Two incidents of legal mail tampering might establish a constitutional violation if (1) the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. *Id.* (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Where the incidents of tampering are few, district courts require specific allegations of invidious intent or of actual harm. *See Cancel,* 2001 WL 303713, at *6 (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.").

**8** In this case, plaintiff alleges only one instance in which his legal mail was tampered with, and one instance in which his family correspondence disappeared. There is a question whether the correspondence from the State Police is in fact "legal" mail because it did not involve attorney-client communications or litigation documents, *see Wolff,* 418 U.S. at 576; *Standley v. Lyder,* 2001 WL225035, at *2 (S.D.N.Y. Mar. 7, 2001), but assuming arguendo that the letter sent to plaintiff by the New York State Police is legal mail, plaintiff still fails to state a cognizable cause of action for interference with legal mail. Plaintiff does not allege that Riel's opening of the letter from the New York State Police in any way hindered him from pursuing a legal claim. Furthermore, taken together, and liberally construed, these alleged instances of

interference with plaintiff's mail [FN6] do not demonstrate a continuing practice or pattern of interference or an actual legal injury. Nor does plaintiff make specific allegations of invidious intent or of actual harm. Therefore plaintiff's claim of mail tampering is dismissed for failure to state a cognizable constitutional injury.

> [FN6.] It is worth noting here that plaintiff does, for the first time in his opposition to the pending motion, allege an additional instance of legal mail tampering, which the Court has declined to consider. *See supra* note 2. However, even if the Court treated this additional allegation as a motion to amend the complaint, it would have been denied as futile. In the Second Circuit, a party is generally afforded leave to amend a pleading under Rule 15(a) "unless the movant has acted in bad faith, the amendment will prejudice the nonmovant, or the amendment is futile." *Neshewat v. Salem,* 365 F.Supp.2d 508, 515 (S.D.N.Y.2005) (citing *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Posadas de Mexico, S.A. de C.V. v. Dukes,* 757 F.Supp. 297, 300) (S.D.N.Y.1991)); *see also Foman v. Davis,* 371 U.S. 178, 182 (1962). In reviewing futility under a 12(b)(6) standard, "Second Circuit caselaw makes clear ... that a district court addressing the futility of proposed amendments to a complaint should consider whether the amendments are sufficient on the merits." *Fezzani v. Bear, Stearns & Co.,* No. 99 Civ. 0793, 2005 WL 500377, *3 (S.D.N.Y. Mar. 2, 2005) (citations omitted). An amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6). *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002)). In this case, the amendment of the complaint to include this additional instance of mail tampering would not alter the insufficiency of the allegations to support a constitutional claim for mail tampering, because plaintiff cannot show that the tampering in any way prevented him from pursuing his legal claims or otherwise harmed him. Nor, taken

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

together, would the three alleged instances of tampering suggest an ongoing practice of censorship. *See Davis,* 320 F.3d at 351 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)).

### CONCLUSION

For the foregoing reasons, defendants' 12(b)(6) motion is hereby GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2006.

Islam v. Goord
Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 WL 1343649
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Deryck RHODES, Plaintiff,

v.

M. HOY, Correctional Officer; Daniels,
Grievance Supervisor; E. Carpenter,
Correctional Officer; and Gary Greene,
Warden (Superintendent), Defendants.

No. 9:05-CV-836.
|
May 5, 2007.

**Attorneys and Law Firms**

Deryck Rhodes, Attica, NY, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Stephen M. Kerwin, Assistant Attorney General, of
counsel, Albany, NY, for Defendants.

## MEMORANDUM-DECISION AND ORDER

SCULLIN, Senior Judge.

### I. INTRODUCTION

**\*1** Plaintiff commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that Defendants Hoy and Carpenter,
corrections officers at Great Meadow Correctional Facility,
where Plaintiff was housed at all relevant times, assaulted him
in violation of his Eighth Amendment right to be free from
cruel and unusual punishment. In addition, he asserted that
Defendant Daniels, a grievance supervisor, and Defendant
Greene, the prison warden, unlawfully interfered with his
efforts to pursue the matter internally through the inmate
grievance process in violation of the Due Process Clause of
the Fourteenth Amendment.

### II. BACKGROUND

Plaintiff contends that, on June 13, 2004, while he was on
his way to the dining area, Defendant Hoy directed him to
submit to a pat-frisk search. During the course of this search,
Defendant Hoy, with the assistance of Defendant Carpenter,
allegedly banged Plaintiff's head against a wall, causing him
injury. Thereafter, Plaintiff was taken to the facility's clinic
where he was treated for a laceration above his right eye and
bruises to his ribs. As a result of this incident, Plaintiff was
issued a misbehavior report, alleging several rule violations
resulting in a Tier III hearing with mixed findings.

On July 7, 2004, Plaintiff filed a grievance alleging
that Defendants Hoy and Carpenter had assaulted him.
Additionally, he filed a petition requesting that officials
take disciplinary action against these Defendants pursuant
to New York Civil Service Law § 75. Plaintiff maintains
that his grievance should have been designated as "class
forty-nine," which relates to claims of staff misconduct,
but that Defendant Daniels coded it as a "twenty-seven,"
which relates to Tier II and Tier III policies. Upon reviewing
the grievance, the Inmate Grievance Review Committee
recommended that it be forwarded to the superintendent of the
facility because it involved allegations of staff misconduct.
On July 26, 2004, Defendant Superintendent Greene denied
the grievance, stating that the investigation into the matter
failed to yield any evidence to support Plaintiff's claims. On
appeal, the Central Office Review Committee unanimously
affirmed that decision.

On or about September 8, 2004, Plaintiff submitted a second
grievance, alleging that Defendant Daniels falsified the earlier
grievance and that Defendant Greene failed to rectify the
error. After deadlocking in its consideration of this grievance,
the Inmate Grievance Review Committee forwarded the
complaint to Defendant Greene, who denied it. Upon review,
the Central Office Review Committee accepted Plaintiff's
grievance in part, stating that the earlier grievance should be
investigated in light of the allegation of staff assault. There is
no indication in Plaintiff's complaint about the result of that
investigation.

In response to Plaintiff's claims, Defendants Daniels and
Green filed a motion to dismiss on the ground that, even
if Plaintiff's allegations about their conduct are true, they
fall far short of establishing a constitutional deprivation
because a prison inmate has no constitutional right to
participate in the established grievance process. [1] On August
28, 2006, Magistrate Judge Peebles issued a Report and
Recommendation, in which he recommended that this Court
grant Defendants' motion to dismiss. On September 8, 2006,
Plaintiff filed his objections to that recommendation.

### III. DISCUSSION

**A. Standard of review**

**\*2** The district court reviews *de novo* those portions of the magistrate judge's report-recommendation and order to which a party objects, *see Singleton v. Caron,* No. 9:03-CV-00455, 2006 WL 2023000, \*1 (N.D.N.Y. July 18, 2006) (citations omitted), and for clear error those portions to which a party does not object, *see Stokes v. Artus,* No. 05 Civ.1975, 2006 WL 1676437, \*2 (S.D.N.Y. June 14, 2006) (citing *Thomas v. Arn,* 474 U.S. 140, 149 (1985)). The district court reviewing a magistrate judge's report-recommendation and order " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Everson v. New York City Transit Auth.,* No. 1:02-cv-1121, 2007 WL 539159, \*3 (E.D.N.Y. Feb. 16, 2007) (citing 28 U.S.C. § 636(b)(1)).

**B. Plaintiff's procedural due process claim**

"To state a claim under § 1983, 'a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States....' " *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). More specifically, to establish a due process claim, the plaintiff must allege that he has "been deprived of a protected liberty interest" "in order for the due process requirements of the Fourteenth Amendment to apply...." *Id.* (citation omitted). "Prison grievance procedures [, however,] do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment." *Id.* (citations and footnote omitted). [2]

Applying these principles to the present case, the Court agrees with Magistrate Judge Peebles' conclusion that Plaintiff cannot establish a due process claim against Defendants Daniels and Greene. Since state-created inmate grievance procedures do not create a protected liberty interest, the protections of the Due Process Clause of the Fourteenth Amendment are not implicated even if Defendants' conduct made it impossible for Plaintiff to receive an impartial decision within the grievance process.

This does not mean, however, that Plaintiff is without recourse to redress the alleged injuries he suffered as a result of his encounter with Defendants Hoy and Carpenter. He has

the right, which he exercised, to appeal the determination of the Tier III hearing officer and, ultimately, he has the right to have this Court review the prison officials' final determination if that decision violated his constitutional rights and the prison grievance system did not satisfactorily redress the wrong about which he complains. Therefore, Plaintiff's claims regarding the incident itself, i.e., his Eighth Amendment claims against Defendants Hoy and Carpenter, are properly before this Court for its review. However, as the court noted in *Torres,* "any alleged inadequacies or unfavorable decisions concerning the prison's internal grievance process do not give [Plaintiff] the right, as a matter of course, to have the Court consider not only the Eighth Amendment charge which was the subject of his grievance, but also due process allegations based on failures in the grievance system." *Torres,* 246 F.Supp.2d at 342 n. 1.

**\*3** Accordingly, the Court adopts Magistrate Judge Peebles' recommendation and grants Defendants' motion to dismiss Plaintiffs' claims against Defendants Greene and Daniels because Plaintiff did not suffer a constitutional deprivation as the result of their conduct.

**C. Leave to replead**

Rule 15 of the Federal Rules of Civil Procedure authorizes a court to grant leave to amend a complaint when justice so requires. *See* Fed.R.Civ.P. 15(a). If a complaint does not comply with certain standards, ordinarily, a court will grant the plaintiff leave to file an amended complaint that conforms to the requirements of the federal rules. *See Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (citations omitted). Moreover, courts should not dismiss a *pro se* litigant's complaint without granting leave to amend when there is " 'any indication that a valid claim might be stated.' " *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 795, 795-96 (2d Cir.1999) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)). If, however, the court rules out any possibility that the amended complaint will state a claim, the court should not grant the plaintiff leave to amend his complaint. *See id.* at 796.

Applying these principles to the present case, Magistrate Judge Peebles concluded that, because Plaintiff could not assert a cognizable claim against Defendants Greene and Daniels, it would be futile to allow him to replead. *See* Report and Recommendation at 14. This Court agrees. The problem with Plaintiff's claims against these Defendants is substantive and, therefore, repleading will not cure the deficiencies. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation omitted) (denying request for leave to replead because it

would be futile). Accordingly, the Court adopts Magistrate Judge Peebles' recommendation and denies Plaintiff the opportunity to replead his claims against Defendants Greene and Daniels.

## IV. CONCLUSION

After carefully reviewing Magistrate Judge Peebles' Report and Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 28, 2006 Report and Recommendation is ADOPTED IN ITS ENTIRETY; and the Court further

**ORDERS** that Defendants Greene's and Daniels' motion to dismiss is GRANTED; and the Court further

**ORDERS** that leave to amend the claims against Defendants Greene and Daniels is **DENIED AS FUTILE;** and the Court further

ORDERS that this matter is referred to Magistrate Judge Peebles for all further pretrial matters.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Deryck Rhodes, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983. In his complaint, which contains two discrete though interrelated claims, plaintiff asserts that he was assaulted by defendants M. Hoy and E. Carpenter, both corrections officers at the facility in which he was housed at the relevant times, and that the remaining two defendants including defendant Daniels, a grievance supervisor, and Gary Greene, the prison warden, unlawfully interfered with his efforts to pursue the matter internally through the established inmate grievance process. Plaintiff's complaint seeks the recovery of damages, including for mental anguish and emotional distress.

**\*4** In response to plaintiff's complaint, defendants Daniels and Greene have moved seeking its dismissal, arguing that plaintiff's allegations regarding their conduct, even if accepted as true, fall short of establishing a constitutional violation since a prison inmate has no constitutional right to participation in the established grievance process. Because plaintiff's complaint, even when generously construed, fails to allege a constitutional violation on the part of defendants Daniels and Greene I recommend that their motion be granted.

## I. *BACKGROUND* [1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the relevant times, plaintiff was confined in the Great Meadow Correctional Facility, located in Comstock, New York. *Id.*

On June 13, 2004, while in route to the facility's dining area for breakfast, plaintiff was directed by defendant Hoy to submit to a "pat-frisk" search. Complaint (Dkt. No. 1) Attachment ¶ 9. Defendant Hoy, assisted by defendant Carpenter, proceeded to conduct a search of the plaintiff, during the course of which plaintiff's head was banged against the wall, causing him to suffer injury. *Id.* ¶¶ 9-10. Plaintiff was handcuffed and taken to the facility's clinic for medical attention, where he was treated for a laceration above his right eyebrow and bruises to his ribs. *Id.* ¶¶ 11-13. As a consequence of the incident plaintiff was issued a misbehavior report alleging several rule violations, ultimately resulting in a Tier III hearing being conducted with mixed findings. [2]

In an effort to seek redress for the assault, plaintiff filed a grievance on July 7, 2004 alleging that he had been assaulted by defendants Hoy and Carpenter, and additionally filed a petition urging that disciplinary action be taken against the two corrections officers pursuant to N.Y. Civil Service Law § 75. [3] Complaint (Dkt. No. 1) ¶ 17. While plaintiff maintains that his grievance should have been designated as "class forty-nine", relating to claims of staff misconduct, when processing Rhodes' complaint defendant Daniels coded it as a "twenty-seven", which relates to Tier II and Tier I I I policies. [4] Complaint (Dkt. No. 1) ¶ 18 & Exh. 2. Upon review the inmate grievance review committee ("IGRC") recommended that plaintiff's grievance be forwarded to the superintendent, in light of the fact that it involved allegations of staff misconduct. *Id.* ¶ 19 & Exh. 1. The grievance was ultimately

denied on July 26, 2004 by Superintendent Greene, who asserted in his response that the matter had been investigated without yielding any evidence that would support plaintiff's allegations. *Id.* That determination was unanimously affirmed on appeal to the central office review committee ("CORC"). *Id.* ¶ 20 & Exh. 3.

On or about September 8, 2004 plaintiff submitted a second inmate grievance, alleging that defendant Daniels had falsified the earlier grievance and that defendant Greene had failed to rectify the error. Complaint (Dkt. No. 1) ¶ 21 & Exh. 4. After deadlocking in its consideration of plaintiff's second grievance, the IGRC forwarded it on to defendant Greene, who denied it. Complaint (Dkt. No. 1) ¶¶ 21-22. Upon review of that determination, at plaintiff's request, the CORC accepted plaintiff's grievance in part, noting that the earlier grievance should be investigated in accordance with DOCS Directive No. 4040, § VIII in light of the plaintiff's allegations of staff assault.[5] Complaint (Dkt. No. 1) ¶ 23 & Exh. 5. The CORC further directed that the matter be returned for review by that body following the completion of the required investigation.[6] Complaint (Dkt. No. 1) ¶ 23 & Exh. 5.

## II. *PROCEDURAL HISTORY*

**\*5** Plaintiff commenced this action on July 5, 2005. Dkt. No. 1. On September 30, 2005, following service, two of the named defendants-Corrections Officers M. Hoy and E. Carpenter-jointly interposed an answer to plaintiff's complaint. Dkt. No. 13. In lieu of answering, however, the remaining two defendants moved, also on September 30, 2005, seeking dismissal of plaintiff's claims against them. Dkt. No. 14. In their motion, defendants Daniels and Greene argue that plaintiff's complaint fails to implicate any participation on their parts in the constitutional violations alleged, and as such they are entitled to dismissal of plaintiff's claims against them. Plaintiff has since responded to defendants' motion in a submission filed with the court on October 21, 2005. Dkt. No. 16.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, applying a standard which is neither controversial nor rigorous in its requirements. Under that provision, a court may not dismiss a complaint unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him [or her] to relief.' " *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.) (citation omitted), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The court's determination as to the sufficiency of a complaint must take into consideration the fact that the governing rules require only that the defendant be afforded "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103; *see Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005).

When assessing the sufficiency of a complaint against this backdrop, particular deference must be afforded to a *pro se* litigant; a court must generously construe a *pro se* plaintiff's complaint when determining whether it states a cognizable cause of action. *Davis,* 320 F.3d at 350 (citations omitted). A complaint drafted by an uncounselled plaintiff should not be dismissed unless "it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations." *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (citation omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim could potentially be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B. *Procedural Due Process Violation*

**\*6** Plaintiff's claims against defendants Daniels and Greene revolve around actions taken with regard to the first grievance filed by him, complaining of the assault upon him by two prison workers, as well as their failure to rectify the error when responding to his second grievance, which focused

upon the alleged falsification of grievance documents. Defendants maintain that these allegations, even if true, would not support the finding of a constitutional violation.

The establishment and implementation of an administrative grievance procedure affords prison inmates a means for airing of concerns regarding prison conditions that can be resolved prior to commencement of formal litigation, and such a process can serve as an effective mechanism for dealing with such internal matters without having to burden the courts with potentially unnecessary litigation. Toward that end, as an encouragement for inmates to pursue this avenue of redress, the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), precludes commencement of an action brought to address prison conditions, including under 42 U.S.C. § 1983, until internal available administrative remedies are fully exhausted. 42 U.S.C. § 1997e(a).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. See Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing Mojias v. Johnson, 351 F.3d 606 (2003) and Snider v. Melindez, 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the IGRC within fourteen days of the incident.[7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. Id. § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. Id. § 701.7(c). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. Reyes v. Punzal, 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the fact that New York prison inmates are required to avail themselves of this established inmate grievance procedure as a necessary predicate to commencing an action complaining of prison conditions, and resort to that grievance process is regarded as protected activity under the First Amendment which insulates inmates against retaliation for engaging in such activity, see Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996), there is no constitutional right of access to the established inmate grievance program. Davis v. Buffardi, No. 0:01-CV0285, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted); Shell v. Brzezniak, 365 F.Supp.2d 362, 369-70 (W.D.N.Y.2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citations omitted); Cancel v. Goord, No. 00. CIV.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation fo such procedures does not give rise to a claim under § 1983") (citations omitted). While the Constitution does mandate that inmates be afforded access to the courts, see Bounds v. Smith, 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977), actions such as those alleged on the part of defendants Daniels and Greene are not tantamount to interference with that right, since under the PLRA a plaintiff whose access to the grievance process has been hindered or foiled by actions of prison officials are excused from the PLRA's exhaustion requirement and permitted to file suit without having completed that process. See Hemphill v. New York, 380 F.3d 680, 686-91 (2d Cir .2004).

**\*7** In addition to arguing that the interference by defendants Greene and Daniels with his right of access to the grievance procedure is in and of itself a constitutional violation, plaintiff maintains that their actions were tantamount to a deprivation of procedural due process. The lynchpin of a procedural due process claim is a showing that the plaintiff has been deprived of a cognizable property or liberty interest, without due process of law. See Ferrara v. Superintendent, New York State Police, 26 F.Supp.2d 410, 413 (N.D.N.Y.1998) (Kahn, J.) In this instance, plaintiff's complaint fails to disclose that he suffered any such deprivation as a result of defendants' alleged actions. I note in that regard that plaintiff's complaint fails to disclose the suffering of any injuries as a result of defendants' actions. While defendant Daniels may have miscoded plaintiff's grievance, thereby resulting in it have been improperly routed and handled, it appears that the error was remedied, with the grievance ultimately having been treated as involving staff misconduct and having been referred by the CORC for investigation.

For all the foregoing reasons it does not appear that plaintiff has suffered a constitutional deprivation at the hands of defendants Daniels and Greene. I therefore recommend that

those defendants' motion seeking dismissal of plaintiff's claims against them be granted.

## C. *Leave to Replead*

Ordinarily, a *pro se* plaintiff whose claims are found to be insufficient to withstand scrutiny under Rule 12(b)(6) should be granted leave to replead at least once to afford him or her the opportunity to cure any perceived deficiencies and assert a proper claim. *Branum,* 927 F.2d at 704-05. When, however, in reviewing the factual allegations lodged in a complaint it is clear to the court that amendment would be futile, and that no cognizable claim could be asserted based upon the circumstances presented, leave to replead may be denied. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [pro se plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") In this instance I make such a finding, concluding that the claims deemed dismissible in this motion are futile and, accordingly, recommend that plaintiff be denied the opportunity to replead.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's claims in this action against defendants Greene and Daniels are limited to their having allegedly mishandled plaintiff's grievance challenging an alleged assault upon him by two corrections officers at Great Meadow. Because plaintiff, as a prison inmate, does not enjoy a constitutional right of access to the grievance process, and in any event there is no indication that plaintiff suffered any constitutional injury or deprivation as a result of the actions of defendants Daniel and Greene, I recommend that the dismissal motion be granted and plaintiff's claims against them be dismissed.

**\*8** Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion be GRANTED, and plaintiff's claims against defendants Daniels and Greene be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties electronically and/or by regular mail.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1343649

## Footnotes

1    The other two Defendants, Defendants Hoy and Carpenter, filed a joint answer to Plaintiff's complaint.

2    *See also Davis v. Buffardi,* No. 0:01CV0285, 2005 WL 1174088, *3 (N.D.N.Y. May 4, 2005) (holding that "participation in an inmate grievance process is not a constitutionally protected right" (citations omitted)); *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-70 (W.D.N.Y.2005) (holding that "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim" (citation omitted)); *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983" (citation omitted)).

1    In light of the procedural posture of the case, the following recitation is drawn from plaintiff's complaint, which is interpreted in a light most favorable to him, with all inferences drawn and ambiguities resolved in his favor. *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    That section provides, in pertinent part, that "[a] person described in ... this subdivision shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section." N.Y. Civil Service Law § 75.

4    Implicit in plaintiff's submission is the assertion that had his grievance been properly coded to reflect that he was claiming staff misconduct, it would have been handled differently than an ordinary inmate complaint.

5    DOCS Directive No. 4040, § VIII, provides, in pertinent part, that

   (4) If it is determined that the grievance is a bona fide harassment issue, the superintendent shall either:

   (i) initiate an in-house investigation by higher ranking supervisory personnel into the allegations contained in the grievance; or

   (ii) request an investigation by the inspector general's office or, if the superintendent determines that criminal activity is involved, by the New York State Police Bureau of Criminal Investigation.

   (5) Within 12 working days of receipt of the grievance, the superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant, the IGP clerk, and any direct party of interest. Time limit extensions may be requested, but such extensions may be granted only with the consent of the grievant.

   (6) If the superintendent fails to respond within the required time limit, the grievant may appeal his grievance to the CORC. This is done by filing a notice of decision to appeal with the IGP clerk.

   (7) If the grievant wishes to appeal the superintendent's response to the CORC, he must file a notice of decision to appeal with the inmate IGP clerk within four working days of receipt of that response.

   7 N.Y.C.R.R. § 701.11

6    There is no indication in plaintiff's complaint as to the results of the ensuing investigation.

7    The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

---

**End of Document**                               © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1174088
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leanue DAVIS; Oliver King;
Dewitt Gibson; Plaintiffs,
v.
Harry BUFFARDI; Sergeant Greenwald;
Gary James; E. Jacobs; Mike Nealon;
C.O. Sheldon; Dr. Dufrense; Defendants.

No. 0:01CV0285(GLS/GJD).
|
May 4, 2005.

**Attorneys and Law Firms**

Leanue Davis, Malone, NY, pro se.

Dewitt Gibson, Auburn, NY, pro se.

James A. Resila, Carter, Conboy Law Firm, William J. Greagan, Goldberg, Segalla Law Firm, Marie Flynn Danek, Phelan, Phelan Law Firm, Gerald D. D'Amelia, Jr., Burke, Scolamiero Law Firm, Albany, NY, Brian Breedlove, Tracy M. Larocque, Pennock, Breedlove Law Firm, Clifton Park, NY, for Defendants.

MEMORANDUM AND ORDER

MAGNUSON, J.

**\*1** This matter is before the Court [1] on Defendants' Motions for Summary Judgment. Plaintiffs have not responded to this Motion within the deadlines imposed by the Court and have thus failed to create a genuine issue of material fact. Therefore, and for the reasons that follow, Defendants' Motions are granted.

BACKGROUND

Plaintiffs Leanue Davis and Dewitt Gibson were imprisoned at the Schenectady County Jail ("SCJ") in 2001. [2] They claim that their constitutional rights were violated while they were imprisoned at SCJ. Defendants are: (1) Harry Buffardi, Chief Administrator and Sheriff for SCJ; (2) Al Greenwald, Grievance Sergeant and Grievance Coordinator at SCJ; (3)

Gary James, Sergeant at SCJ; (4) Emerich Jacobs, Corrections Officer at SCJ; (5) Mike Nealon, Corrections Officer at SCJ; (6) Adam Sheldon, Corrections Officer at SCJ; and (7) Dr. Dufrense, Medical Director at SCJ.

Plaintiffs' Amended Complaint states sixteen different causes of action. [3] These causes of action argue that Defendants: (1) failed to provide sufficient access to legal and writing materials necessary to petition the Court; (2) interfered with Plaintiffs' access to the internal grievance process; (3) discriminated against Plaintiffs; (4) retaliated against Plaintiffs for exercising their legal rights; (5) physically assaulted Plaintiff Davis on various occasions; and (6) provided Plaintiff Davis with inadequate medical care. (*See* Am. Compl.) Plaintiffs bring their claims under 42 U.S.C. § 1983. Defendants Buffardi, Greenwald, James, Jacobs, Nealon and Sheldon (collectively, "SCJ Defendants") bring a collective Motion for Summary Judgment. Dr. Dufrense also brings his own Motion.

DISCUSSION

A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must resolve ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id. at 323 n. 4.* A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. SCJ Defendants

SCJ Defendants seek dismissal of Plaintiffs' claims. As noted, neither Plaintiff Davis nor Plaintiff Gibson have responded to the Motion, and therefore there are no issues of fact that remain for trial. Furthermore, 42 U.S.C. § 1983 requires Plaintiffs to demonstrate that an individual acting under color of state law deprived Plaintiffs of a constitutionally protected right. *See Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir.2004). Plaintiffs' claims fail on the merits because Plaintiffs fail to establish any violation of a constitutionally protected right.

1. *Access to the Courts*

**2** Plaintiffs contends that their constitutional rights were violated because the law library at SCJ was insufficient. (Am.Compl.¶ 19.) They also argue that SCJ Defendants allowed public defenders to remove pertinent legal materials from the law library, frustrating their right to a fair trial. (*Id.* ¶ 20.) Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (quoting *Bounds*, 430 U.S. at 825.) Thus, to demonstrate a constitutional violation, the prisoner must prove that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In this case, Plaintiffs have offered no proof that the alleged insufficiencies in the law library or the purported actions of the public defender's office frustrated their efforts to bring a legal claim. Therefore, there is no constitutional violation and Plaintiffs' claim on this point fails.

2. *Right of Visitors*

Plaintiffs claim that SCJ Defendants violated their constitutional rights because their visitors were subjected to an oral cavity search. (Am.Compl.¶¶ 5, 21.) Under 42 U.S.C. § 1983, each Plaintiff must demonstrate a real or threatened injury to himself, not to third parties. *See, e.g., Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir.1999) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Plaintiffs further allege that their constitutional rights were violated because they were not permitted to utilize the inmate grievance process in regards to the searches of these visitors. However, New York law only permits prisoners to seek redress in an individual capacity. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(b). In short, Plaintiffs have failed to show a constitutional violation and their claim on this point fails.

3. *Blankets, clothing and temperature*

Plaintiffs claim that they were denied extra blankets and clothing when SCJ's boiler went out in February 2001. Plaintiffs were pretrial detainees at that time. Challenges to prison conditions by a pretrial detainee are evaluated under the Due Process Clause of the Fourteenth Amendment. *See Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir.2003). Plaintiffs must prove that SCJ Defendants were deliberately indifferent and that Plaintiffs were subjected to actual or imminent substantial harm. *Id.* at 50-51.

The SCJ boiler broke down for a ten day period in February 2001. Plaintiffs submit no evidence that SCJ Defendants were deliberately indifferent to this condition, or that the temperature in SCJ was so cold that Plaintiffs experienced substantial harm. Because Plaintiffs fail to demonstrate a constitutional deprivation, their claim on this point also fails.

4. *Discrimination*

**3** Plaintiff Davis claims that Defendant Sergeant James discriminated against him when he referred to him as a "monkey" and told him that he did not need medical treatment. (Am.Compl.¶ 23.) However, Plaintiff Davis testified that Defendant James did not say this directly to him, that Defendant James was standing outside his hospital room when he made the remark, and that Plaintiff Davis was unaware to whom Defendant James made this statement. (Greagan Aff. Ex. H. at 23-25.) Moreover, allegations of "verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Jermosen v. Coughlin*, 878 F.Supp. 444, 449 (N.D.N.Y.1995). Plaintiff Davis's bald allegations do not demonstrate a constitutional violation, and therefore fail.

5. *Pat Frisk*

Plaintiffs claim that their constitutional rights were violated when Defendant Corrections Officer Jacobs performed a pat frisk. (Am.Compl.¶ 24.) Plaintiffs allege that Defendant Jacobs "used his two fingers to slide up and down the crevice of the buttocks." (*Id.*) As noted, the Due Process Clause of the Fourteenth Amendment protects pretrial detainees. Plaintiffs must demonstrate that SCJ Defendants were deliberately indifferent and that their actions caused actual

or imminent substantial harm. *See Benjamin,* 343 F.3d at 50-51. Substantive due process prohibits the state actors from engaging in conduct that "shocks the conscience." *See United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In similar cases, courts have evaluated "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *See Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (applying to post-trial detainee under Eighth Amendment); *see also United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999) (applying *Hudson* analysis to pretrial detainees under Fourteenth Amendment).

Plaintiffs' allegation of harassment that occurred on one isolated occasion does not arise to a constitutional violation that shocks the conscience. Indeed, "the line between a pat down and a fondle is too insubstantial" to support a constitutional claim. *Friedman v. Young,* 702 F.Supp. 433, 436 (S.D.N.Y.1988); *see also Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir.1997) (a small number of incidents in which prisoner was allegedly harassed and touched without his consent was not objectively sufficiently serious to state cognizable constitutional claim). Therefore, Plaintiffs' claim on this point fail.

### 6. *Access to inmate grievance process*

Plaintiff Davis claims that Defendants Buffardi and Greenwald discriminated against him by refusing to permit him to seek redress under the inmate grievance program. (Am.Compl.¶¶ 25, 34.) Although Plaintiff Davis has a constitutional right to access the courts, participation in an inmate grievance process is not a constitutionally protected right. *See Shell v. Brzezniak,* -F. Supp.2d-, 2005 WL 914437, at *4 (W.D.N.Y. Apr.21, 2005); *see also Cancel v. Goord,* File No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (citing *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991)). Further, there is simply no evidence in the record to support Plaintiff Davis's allegations. Therefore, absent proof of a constitutional violation, his claims on this point fail.

### 7. *Legal materials*

**\*4** Plaintiff Davis alleges that Defendant Corrections Officer Nealon locked him in his cell without due process when Plaintiff Davis asked Defendant Nealon to stop reading his legal papers. (Am.Compl.¶ 26.) To the extent that Plaintiff Davis conteds that his right to privacy was infringed, his claim fails. Prisoners have limited rights to privacy, and

Defendant Nealon's purported reading of Plaintiff Davis's legal materials, without more, does not state a constitutional claim. *See, e.g., Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998). To the extent that Plaintiff Davis claims that his due process rights were violated because he was confined to his cell, he fails to state a cognizable constitutional liberty interest. *See Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (disciplinary confinement must impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" to constitute liberty interest). Thus, Plaintiff Davis's claim fails.

### 8. *Assault*

Plaintiff Davis claims that various SCJ Defendants assaulted him on three different occasions. (Am.Compl.¶¶ 27-29.) Excessive force claims by a pretrial detainee are evaluated under the minimum standards iterated in *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). *See Walsh,* 194 F.3d at 48. The amount of force used must be more than "de minimis" or must involve force that shocks the conscience. *Id.* Assuming that Plaintiff Davis's allegations are true, the alleged use of force in this case is de minimis. Furthermore, Plaintiff Davis's deposition testimony demonstrates that the purported physical assaults occurred after he refused to follow direct orders. (*See* Greagan Aff. Ex. H at 34-38, 84-85, 91-92.) Finally, Plaintiff Davis offers no evidence that he suffered any injuries whatsoever. *See Dawes v. Coughlin,* 964 F.Supp. 652, 656-57 (N.D.N.Y.1997) (discussing excessive force claims). Therefore, Plaintiff Davis's claims fail.

### 9. *Confinement pending disciplinary hearing*

Plaintiffs allege that their constitutional due process rights were violated when they were locked in their cells while awaiting a disciplinary hearing. (Am.Compl.¶ 31.) They also allege that their due process rights were violated because they were not credited for time served while awaiting this disciplinary hearing. The record indicates that Plaintiffs were confined for one day prior to the disciplinary hearing. (Greagan Aff. Ex. H at 125-30). This confinement does not constitute an "atypical and significant hardship" sufficient to create a protected liberty interest. *Sandin,* 515 U.S. at 483-84; *see Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (confinement for 12 days while awaiting disciplinary hearing does not implicate protected liberty interest). Furthermore, Plaintiffs' complaint that they were not credited for their pre-hearing confinement does not constitute a constitutional

violation. Indeed, New York law does not require that pre-hearing time served to be credited to a disciplinary sentence. *See* N.Y.Code R. & Regs. tit. 7 § 251-5.1(a),(b); *id.* § 253.7(a); *see also Nowlin v. Selsky,* File No. 97-CV-2716, 1992 WL 196782, at *3 (S.D.N.Y. Aug.5, 1992) (discussing pre-hearing confinement and credit under New York law). Thus, Plaintiffs' claim on this point also fails.

### 10. *Retaliation*

**\*5** Plaintiffs claim that SCJ Defendants retaliated against them because they filed inmate grievances and this civil action. (Am.Compl.¶¶ 25, 32.) The Court evaluates prisoner claims of retaliation with skepticism and caution. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Retaliation claims are easily fabricated and courts evaluating such claims must avoid unwarranted intrusion into matters of prison administration. *Id.* To establish a prima facie case of First Amendment retaliation, Plaintiffs must show: (1) that the speech or conduct at issue is protected speech or conduct; (2) that Defendants took an adverse action against Plaintiffs; and (3) there is a causal connection between the protected speech or conduct and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). An act is retaliatory only if it would deter "a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id.; see also Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Plaintiffs' claims of retaliation are conclusory and without evidentiary support. Because Plaintiffs fail to prove a prima facie case or that a similarly situated individual would have been deterred from exercising a constitutional right, these claims must be dismissed.

### 11. *Commissary Prices*

Plaintiffs claim that the commissary prices were excessive, violating their constitutional rights. However, this claim does not amount to a constitutional violation, and must be dismissed. *See Chapdelaine v. Keller,* File No. 95-CV-1126, 1998 WL 357350, at *14 (N.D.N.Y. Apr.16, 1998).

### 12. *Conclusion*

Accordingly, because Plaintiffs fail to demonstrate that any of the SCJ Defendants violated their constitutional rights, Plaintiffs' § 1983 claims fail.

### C. Defendant Dr. Dufrense

Plaintiffs complain that Defendant Dr. Dufrense refused to see or treat them for various medical ailments, including chest pain, severe numbness in their finger tips, and lower back pains. (Am.Compl.¶ 30.) Each Plaintiff must establish that: (1) his medical condition was an objectively a serious one; and (2) Dr. Dufrense acted with deliberate indifference to his medical needs. *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prison official does not act with deliberate indifference unless that official "knows of and disregards an excessive risk to inmate health or safety." *Id.*

Dr. Dufrense argues that Plaintiffs' claims must be dismissed because they failed to exhaust their administrative remedies with respect to this medical treatment claim. A prisoner must exhaust his or her administrative remedies before filing a § 1983 action. *See* 42 U.S.C. § 1997e(a). However, the record reveals that Plaintiffs failed to exhaust their administrative remedies with respect to this medical treatment claim. (*See* D'Amelia, Jr. Aff. Ex. H.) Moreover, even on the merits, Plaintiffs fail to demonstrate that Dr. Dufrense was deliberately indifferent to their medical needs. To the contrary, the record is replete with medical complaints, records, and treatments. (*Id.* Ex. E.) Thus, Plaintiffs' claim on this point fails. [4]

### CONCLUSION

**\*6** Plaintiffs fail to demonstrate that a genuine issue of fact remains for trial. In fact, Plaintiffs fail to demonstrate that their constitutional rights were violated. Therefore, Plaintiffs' § 1983 claims must be dismissed. Accordingly, based on all the records, files and proceedings herein, IT IS HEREBY ORDERED that:

1. The SCJ Defendants' Motion for Summary Judgment (Clerk Doc. No. 135) is GRANTED; and

2. Dr. Dufrense's Motion for Summary Judgment (Clerk Doc. No. 132) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 1174088

Footnotes

1   This case was originally assigned to the Honorable Gary L. Sharpe. Pursuant to an inter-circuit assignment under 28 U.S.C. § 294(d), the undersigned is now the Judge of record in this case.

2   Plaintiff King was dismissed in March 2003 (*see* Clerk Doc. No. 110).

3   Only nine of the sixteen causes of action in the Amended Complaint refer to Plaintiff Gibson, while all sixteen causes of action refer to Plaintiff Davis.

4   Furthermore, to the extent that any of Plaintiffs' other claims are against Dr. Dufrense, they fail because Dr. Dufrense lacked any personal involvement in the constitutional violations alleged. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Similarly, these claims also fail because Plaintiffs failed to demonstrate any constitutional violation.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2452573
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

James R. AHO

v.

Sheila HUGHES, R.N., et al.

No. 3:03CV1552(SRU)(WIG).
|
Sept. 30, 2005.

**Attorneys and Law Firms**

James R. Aho, Suffield, CT, pro se.

Richard T. Couture, Attorney General's Office, Hartford, CT, for Sheila Hughes, R.N., et al.

*RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT*

UNDERHILL, J.

**\*1** James Aho filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915, naming Dr. Carson Wright, Sheila Hughes, R.N., Correctional Hospital Nursing Supervisor Patricia Wollenhaupt and Commissioner Theresa Lantz as defendants. He alleges *inter alia* that the defendants failed to provide him with adequate medical care for a fracture of his left hand. The defendants have moved for summary judgment. For the reasons that follow, the motion for summary judgment is granted.

I. *Standard of Review*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "

'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248), *cert. denied,* 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present significant probative evidence to create a genuine issue of material fact. A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). *See also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

**\*2** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, a "bald assertion" unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

II. *Facts* [1]

On June 23, 2003, at Northern Correctional Institution ("Northern"), the plaintiff was involved in an a fight with his cellmate. In defending himself, the plaintiff injured his left hand. The plaintiff experienced pain and swelling in his left hand. A nurse examined the plaintiff's hand and observed swelling and redness in the outer portion of the left hand and an open wound near the thumb. The nurse provided the plaintiff with ice and defendant Wright, a staff physician at Northern, prescribed an antibiotic and pain medication and referred the plaintiff for an x-ray. The plaintiff underwent an x-ray of his left hand on June 24, 2003. On June 27, 2003, the radiologist reported that the plaintiff had fractured his distal left fifth metacarpal. A nurse applied a splint to the fourth and fifth digits of the plaintiff's left hand to stabilize them until the plaintiff could be seen by a doctor on June 30, 2003.

On June 28, 2003, the plaintiff refused to accept another cellmate and prison officials placed him on in-cell restraint status. The restraints were applied to plaintiff's ankles and wrists. The medical staff checked the plaintiff's restraints periodically to make sure they were not too tight. The medical staff reported no complaints from plaintiff regarding his left hand during his confinement in in-cell restraints. Prison staff removed the plaintiff from restraints on June 30, 2003.

The plaintiff saw defendant Wright later that afternoon. Defendant Wright reported that he could not have seen the plaintiff earlier because the facility was on lockdown status that morning. After consulting with an orthopedist at University of Connecticut Health Center ("UCONN") and Dr. Blanchette, defendant Wright ordered prison officials to transport plaintiff to the emergency room of the UCONN.

At UCONN, plaintiff underwent another x-ray of his left hand which confirmed the fracture of the distal left fifth metacarpal. The medical staff attempted a reduction of the fracture, but it was not successful. Medical staff then applied a fiberglass ulnar gutter splint to the plaintiff's left hand and discharged the plaintiff to the Department of Correction.

On July 2, 2003, defendant Wright examined the plaintiff's left hand, ordered an x-ray and increased the plaintiff's pain medication. On July 6, 2003, defendant Wollenhaupt received a request for another x-ray from the plaintiff. Defendant Wollenhaupt responded that an x-ray would be scheduled in the near future. On July 8, 2003, after examining plaintiff's left hand, defendant Wright ordered an x-ray and indicated

that he would discuss the plaintiff's complaints with the medical staff at the Orthopedic Clinic. On July 15, 2003, the plaintiff underwent another x-ray. The x-ray revealed the same fracture of the fifth distal metacarpal bone. On August 6, 2003, in response to an inmate request from the plaintiff defendant Wright informed the plaintiff that the July 15, 2003 x-rays revealed the same fracture of his left hand and that he had submitted a request to the Utilization Review Committee ("URC") for an orthopedic consultation.

**\*3** On August 7, 2003, defendant Wright spoke with Ms. Livingston in the Orthopedic Clinic at UCONN regarding the plaintiff's fracture and she recommended that the plaintiff be seen in the Clinic. Later that day, defendant Wright submitted a request to the URC for an orthopedic consultation. On August 14, 2003, defendant Wright examined the plaintiff's left hand, changed the bandage and dressing on the hand and noted that he was waiting for the URC's decision. On August 19, 2003, the URC recommended that defendant Wright order more x-rays of the plaintiff's left hand to assess healing, instruct the plaintiff in range of motion exercises and restrict the plaintiff from working or playing sports.

On August 22, 2003, defendant Hughes received a Level 1 grievance from the plaintiff. That same day, defendant Hughes responded to the grievance indicating that the plaintiff had seen defendant Wright on August 19, 2003, and had discussed the URC's report at that time. On August 21, 2003, the plaintiff filed an Level 2 grievance form. On September 3, 2003, the Health Services Administrator denied the grievance because defendant Wright had addressed the plaintiff's concerns when he met with the plaintiff on August 19, 2003. The Health Services Administrator indicated that the decision could not be appealed to Level 3.

On August 27, 2003, the plaintiff underwent another x-ray of his left hand. The x-ray revealed that the fracture was healing and there was no change in the position or alignment of the bones since the previous x-ray. On September 4, 2003, defendant Wollenhaupt faxed the x-ray report to the URC and put a copy of the x-ray report in defendant Wright's box.

Sometime in August 2003, a major or captain at Northern asked Lieutenant Salius to check the status of the plaintiff's injury to his left hand. Lieutenant Salius understood that the plaintiff's father had contacted someone from the central office of the Department of Correction or the office of the warden at Northern concerning the adequacy of the treatment the plaintiff had received for his hand injury. Lieutenant

Salius spoke to one of the nurses who reviewed the plaintiff's medical file. Lieutenant Salius then informed the plaintiff that the medical staff had been monitoring his progress.

On September 9, 2003, defendant Wright examined the plaintiff and noted that the fracture was healing and ordered that an x-ray be taken with the cast/splint off. On September 11, 2003, the plaintiff underwent another x-ray of his left hand. The x-ray revealed a healed fracture of the fifth metacarpal bone. On September 15, 2003, defendant Wright spoke to a Ms. Pacelia at the Orthopedic Clinic and she recommended that the plaintiff be seen in the Clinic if he continued to complain of pain in the left hand.

On September 18, 2003, defendant Wright met with the plaintiff and informed him of the results of the x-rays. Defendant Wright opined that the splint should be removed and provided the plaintiff with an Ace bandage to use after removal of the splint. Defendant Wright reported that the plaintiff was very resistant to removing the splint. Defendant Wright recommended that the plaintiff begin range of motion exercises and ordered that the plaintiff undergo an x-ray without the splint.

 **4** On September 23, 2003, defendant Wright informed the plaintiff that he must continue to perform range of motion exercises and noted that an x-ray had been taken without the splint.

On September 25, 2003, defendant Wright discussed results of recent x-rays with the plaintiff. The x-rays showed that the fracture was healed, but there was some demineralization of the bone. Defendant Wright told plaintiff he must remove the splint and perform range of motion exercises to prevent demineralization of the bone. Later that day, Defendant Wright submitted another request to the URC for an orthopedic consultation.

On September 26, 2003, the plaintiff signed the complaint and presumably handed his complaint and in forma pauperis application to prison officials for mailing. The court received the complaint on October 10, 2003.

On October 1, 2003, defendant Wright discussed the September x-rays with the plaintiff and again informed the plaintiff that he must take off the splint and perform the range of motion exercises. The plaintiff refused to remove the splint. Defendant Wright consulted with the Orthopedic Clinic regarding the demineralization of the bone in plaintiff's

hand. The medical staff at the Clinic recommended that the plaintiff take Calcium Carbonate. Defendant Wright prescribed Calcium Carbonate tablets and pain medication.

On October 15, 2003, the URC concluded that the x-rays showed adequate healing and that the plaintiff must begin to move his hand and perform exercises to avoid long-term pain and disability. The URC recommended that the splint be taken from the plaintiff. That same day, defendant Wright discussed URC's decision with the plaintiff, encouraged the plaintiff to exercise his hand and took the splint away from plaintiff.

On October 20, 2003, defendant Wright spoke with Dr. Mazzocca in the Orthopedic Clinic. Dr. Mazzocca recommended that the plaintiff continue to perform range of motion exercises and that he need not be examined in the orthopedic clinic. Dr. Mazzocca also indicated that the plaintiff might develop a bump on his hand at the site of the fracture and might have occasional tenderness in the area.

On October 22, 2003, defendant Wright noted that the plaintiff had made progress and was able to flex and extend his fourth and fifths digits on his left hand. On January 14, 2004, the plaintiff reported that he was able to move his hand without a problem and the fracture site was not tender or painful.

### III. *Discussion*

The defendants raise three grounds in support of their motion for summary judgment. The defendants argue that: (1) the Eleventh Amendment bars any official capacity claims for monetary damages, (2) the complaint fails to state a claim under the Eighth Amendment and (3) they are protected by qualified immunity.

As a preliminary matter, the court considers the plaintiff's requests to strike some or all of the affidavits submitted by the defendants in support of their motion for summary judgment. The requests are included in his memorandum in opposition to the motion for summary judgment. He contends that the affidavits are false and relies on a Connecticut Supreme Court case in support of his request that the court strike the affidavits.

 **5** Motions to strike "are not favored." *Schramm v. Kirschell,* 84 F.R.D. 294, 299 (D.Conn.1979). In this case, the plaintiff seeks to strike all or portions of defendants' affidavits. The court has reviewed the affidavits submitted by the defendants and concludes that they were "made on

personal knowledge" and the affiants were competent to testify to the facts in the affidavits at trial. Fed.R.Civ.P. 56(e). In addition, the affidavits were not "presented in bad faith." Fed.R.Civ.P. 56(g). [2] Accordingly, the request to strike the defendants' affidavits is denied.

A. *Eleventh Amendment*

The plaintiff seeks injunctive relief and monetary damages from the defendants in both their official and individual capacities. The defendants contend that the Eleventh Amendment bars a damage award against the defendants in their official capacities.

Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment. *See Florida Dep't of State v. Treasure Salvors,* 458 U.S. 670, 684, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). Section 1983 does not override a state's Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The plaintiff's claims for monetary damages against the defendants in their official capacities are barred by the Eleventh Amendment. Defendants' motion for summary judgment is granted with respect to all claims for damages against the defendants in their official capacities.

B. *Eighth Amendment Claim*

The defendants argue that they were not deliberately indifferent to the plaintiff's fractured left hand. The plaintiff argues that there are disputed issues of fact that preclude a finding that the defendants were not deliberately indifferent to his fractured hand.

The Eighth Amendment protects inmates from deliberate indifference by prison officials to their serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104–05. Mere negligence will not support a section 1983 claim. *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988).

**\*6** The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F.Supp. at 1230–31. Thus, a claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983. *See McCabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir.1971); *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. Mcinnis,* 429 F.2d 864, 868 (2d Cir.1970); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d. Cir.1998) (citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

The defendants do not contest the fact that the fracture to plaintiff's left hand was a serious medical need. The defendants do contend, however, that they were not deliberately indifferent to that serious medical need. Thus, the court addresses only the subjective prong of the Eighth Amendment standard.

The plaintiff's medical records reflect that he sustained an injury to his left hand on June 23, 2003. Dr. Wright prescribed an antibiotic and pain medication and referred the plaintiff for an x-ray. An x-ray taken on June 24, 2003, revealed a fracture to the fifth distal metacarpal of the plaintiff's left hand. On June 27, 2003, a nurse placed the plaintiff's hand in a splint and placed him on the list to see a physician. On June 30, 2003, defendant Wright examined the plaintiff. After conferring with an orthopedist and Dr. Blanchette, defendant Wright issued an order directing prison officials to transport the plaintiff to the emergency room at UCONN for treatment.

**\*7** At the hospital, the plaintiff underwent additional x-rays which confirmed the fracture of the fifth metacarpal bone in the plaintiff's left hand. A physician attempted to reduce the fracture without success and then issued an order for a fiberglass splint to be applied to plaintiff's left hand. The plaintiff returned to Northern Correctional Institution later that day. From that day until the end of October 2003, defendant Wright examined the plaintiff on numerous occasions, issued orders for follow-up x-rays, prescribed pain medication, urged plaintiff to perform various range of motion exercises for his hand and submitted several requests to the URC for orthopedic consultations. Defendant Wollenhaupt responded to plaintiff's inmate requests for x-rays and forwarded x-rays to the URC for review. Defendant Hughes processed and responded to plaintiff's grievance concerning treatment of his left hand injury. Defendant Lantz's office responded to the inquiry from plaintiff's father concerning plaintiff's injury.

Approximately two months after the plaintiff fractured his hand, x-rays revealed that the fracture had started to heal.

Within four months of the date of the fracture, the plaintiff reported that he could extend and bend the fourth and fifth digits on his left hand.

The plaintiff principally complains that he should have been sent to the hospital sooner, should have seen Dr. Wright earlier, and should have had surgery on his broken hand. These are complaints about the appropriateness of the care he received. Inmates do not have a constitutional right to the treatment of their choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. *See Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

No reasonable jury could find that the defendants were deliberately indifferent to the fracture of plaintiff's left hand during the period of time encompassed in the complaint. [3] The motion for summary judgment is granted on the ground that the plaintiff has failed to state a claim upon which relief may be granted under the Eighth Amendment.

## C. *Grievance Procedure*

The plaintiff includes allegations in his complaint that defendant Hughes, as the Level 1 Grievance Coordinator, violated the Administrative Directive governing grievance procedures by attempting to respond to his Level 2 and Level 3 appeals. The defendants argue that any claim by the plaintiff that defendant Hughes failed to comply with the procedures set forth in Administrative Directive 9.6 is not cognizable.

This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right. *See Fernandez v. Armstrong,* Case No. 3:03–cv–583 (JCH) (D.Conn. Dec. 7, 2004); *Ruocco v. Tung,* No. 3:02cv1443(DJS), 2004 WL 721716, at *14 (D.Conn. Mar. 30, 2004); *Hunnicutt v. Armstrong,* 305 F.Supp.2d 175, 188 (D.Conn.2004) (grievance procedure).

**\*8** The court has determined that the defendants were not deliberately indifferent to plaintiff's hand injury. Thus, the plaintiff has not identified any constitutionally or federally protected right that was violated by defendant Hughes' alleged failure to comply with Department of Correction's grievance

procedures. Any claim that defendant Hughes failed to comply with administrative directives does not demonstrate the denial of a constitutionally or federally protected right. Accordingly, such a claim is not cognizable in this civil rights action. The defendants' motion for summary judgment is granted with respect to any claim for failure to follow institutional grievance procedures.

### D. *Qualified Immunity*

The defendants also argue that they are entitled to qualified immunity. Because the court has granted the motion for summary judgment on another ground, the court need not reach this argument.

### IV. *Conclusion*

The defendants' Motion for Summary Judgment [doc. # 15] is GRANTED. The Clerk is directed to enter judgment in favor of the defendants and close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 2452573

### Footnotes

1   The facts are taken from defendants' Local Rule 56(a) 1 Statement [doc. # 15–1] and the Affidavits of Carson Wright, Sheila Hughes, Augustus Mazzocca, Patricia Wollenhaupt, Scott Salius and Theresa Lantz and the exhibits attached to the Affidavits [docs.15–4, 15–5, 15–6, 15–7, 15–8, 15–9, 15–10, 15–11, 15–12, 15–13, 18–1, 18–3], as well as from the Affidavits and Responses of James R. Aho [docs.17–2, 17–3, 17–4, 17–5, 17–6, 17–10] and the exhibits attached thereto [docs.17–7, 17–8, 17–9]. Although the parties' affidavits differ on certain details, the differences do not amount to genuine issues of material fact.

2   The plaintiff contends that defendant Wollenhaupt failed to acknowledge in her first affidavit [doc. # 15–10] that she had been in contact with him after July 2003, regarding his left hand injury. In the first affidavit, defendant Wollenhaupt acknowledged two inmate requests from the plaintiff dated in July 2003. The allegations in the plaintiff's complaint cover a time period from June 2003 through September 26, 2003, the day the plaintiff filed this action. The plaintiff has not submitted any evidence that defendant Wollenhaupt had any contact with him after the end of July 2003. The new documents attached to plaintiff's response to defendant Wollenhaupt's affidavit are dated in October and November 2003. (*See* doc. # 17–10.) Thus, defendant Wollenhaupt's first affidavit appears accurate as it relates to the time period encompassed in the complaint. In addition, defendant Wollenhaupt filed a supplemental affidavit addressing the documents from October and November 2003. (*See* doc. # 18–3.)

3   In plaintiff's response to defendant Wright's affidavit, he raises for the first time, a claim that he broke his wrist as well as his hand on June 23, 2003. In support of this claim he submits an x-ray which in his opinion shows evidence of a fracture of his wrist. There are no allegations in the complaint concerning an injury to his wrist. The plaintiff cannot amend his complaint in his memorandum and or response to defendants' motion for summary judgment. *See Natale v. Town of Darien,* No. CIV. 3:97CV583 (AHN), 1998 WL 91073, at *4 n. 2 (D.Conn. Feb.26, 1998) (holding plaintiff may not amend complaint in memorandum of law) (citing *Daury v. Smith,* 842 F.2d 9, 15–16 (1st Cir.1988)); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 987 (S.D.N.Y.1989) (same). Thus, the court does not consider the claim that plaintiff broke his wrist.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Collins v. Artus, N.D.N.Y., March 9, 2009

2001 WL 303713
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frankie CANCEL and Melvin Owens, Plaintiffs,
v.
Glenn S. GOORD, Commissioner
of New York State Department of
Correctional Services, et al. Defendants.

No. 00 CIV 2042 LMM.
|
March 29, 2001.

*MEMORANDUM AND ORDER*

MCKENNA, J.

 **\*1** Frankie Cancel and Melvin Owens (collectively
"Plaintiffs"), inmates at Fishkill Correctional Facility
("Fishkill"), bring this pro se civil rights action pursuant
to 42 U.S.C. § 1983 against Defendants Glenn S. Goord,
Commissioner of the New York State Department of
Correctional Services ("DOCS"); Anthony Annucci, Deputy
Commissioner of DOCS; Jennifer Jones, Staff Attorney
at DOCS; William Mazzuca, Fishkill Superintendent;
Robert Ercole, Fishkill Deputy Superintendent; Robert
Erbert, Fishkill Deputy Superintendent, Administration;
Ada Perez, Fishkill Deputy Superintendent, Programs;
Stephan Lowry, Fishkill Captain; Lewis Goidel, Fishkill
Inmate Grievance Program ("I.G.P.") Supervisor; Christine
O'Dell, Fishkill Senior Mail Clerk; Sandie Breen, Fishkill
Mail Clerk; and John/Jane Doe[s], unknown Members of
the Fishkill Mail Room Staff (collectively "Defendants")
for unconstitutionally implementing the inmate grievance
program and for deliberately tampering and interfering with
their regular and legal mail. The Plaintiffs seek injunctive
relief as well as compensatory and punitive damages from
each Defendant individually and in their official capacities.
The Defendants filed a motion to dismiss for failure to
state a claim upon which relief can be granted pursuant to
Fed.R.Civ.P. 12(b)(6). For the reasons set forth below the
Defendants' motion is granted in part and denied in part. [1]

Statement of Facts [2]
On Friday August 28, 1998 Plaintiff Cancel received a piece
of legal mail marked as such from the Criminal Term Clerk's
Office of the Supreme Court in the State of New York which
had been opened outside his presence. (Am.Compl.¶ 22.) The
letter had been opened by Defendants O'Dell, Breen, and
unknown members of Fishkill mail room staff even though it
was clearly marked as privileged legal mail. (*Id.* ¶¶ 22–24.)

On August 31, 1998 Cancel filed a grievance with the Fishkill
I.G .P. Supervisor, Defendant Goidel, regarding the August
28 legal mail incident. (*Id.* ¶¶ 25–26.) Goidel failed to
process Cancel's grievance. (*Id.*) Subsequently, on October
5, 1998 Cancel filed a second grievance, this time against
Goidel for refusing to process Cancel's original grievance.
(*Id.* ¶¶ 27–28.) This second grievance was not processed.
(*Id.*) On October 19, 1998 Cancel wrote a letter to the I.G.P.
Director informing him of Goidel's refusal to process the
two grievances. (*Id.*) Subsequently, on November 2, 1998
both grievances were processed (*Id.* ¶ 29) and on November
19, 1998 Cancel received a grievance decision by Defendant
O'Dell who wrote that "such mistakes should not occur in the
future." (*Id.* ¶ 36.) Despite this statement both Cancel's legal
mail and regular mail were continually interfered with. (*Id.*
¶ 37.)

On December 4, 1998 Cancel put together a complaint
pursuant to New York State Civil Service Law § 75 seeking a
hearing, disciplinary action and the removal of Goidel for his
improper actions and unlawful manner of running the I.G.P. [3]
(*Id.* ¶ 33.) On December 9, 1998 the complaint was mailed
to Defendants Goord and Goidel. (*Id.* ¶¶ 33–35.) The
complaint was ignored by both of these Defendants. (*Id.*) On December
14, 1998 Cancel sent a letter with a copy of the complaint to
Defendant Annucci who also did not respond. (*Id.* at 35.)

 **\*2** On June 28, 1999 Cancel filed another grievance stating
that both his regular and legal mail were being withheld.
(*Id.* ¶ 38.) Subsequent to the filing of this grievance, but
on the same day, Cancel received sixteen pieces of regular
mail that had been withheld for several weeks by Defendants
Mazzuca, O'Dell, Breen and unknown members of the
Fishkill mail room staff. (*Id.*) Cancel filed a grievance about
this interference with his regular mail recommending there be
an investigation; however, his recommendation was denied.
(*Id.* ¶ 39.)

On December 21, 1999 Cancel received another piece of legal mail which had not been processed or handled as legal mail because it was opened outside his presence. (*Id.* ¶ 40.) Cancel filed a complaint regarding this incident and attached photocopies of the legal mail that had been opened outside his presence. (*Id.* ¶ 41.)

On April 17, 2000 Cancel notarized two documents for a personal Family Court matter concerning his son, placed the legal documents in an envelope, sealed it, placed stamps on it and placed it in the outgoing mail addressed to "the other party in the matter." (*Id.* ¶ 49.) The envelope was intercepted, opened and photocopied by Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff and the photocopies were placed in Cancel's file. (*Id.* ¶¶ 49–51.) On July 12, 2000 Cancel met with a member of the Parole board who had Cancel's file which contained a memo from Mazzuca with the Family Court documents attached. (*Id.* ¶ 51.) Defendants continue to withhold Cancel's legal and regular mail. (*Id.*)

On November 5, 1999 Plaintiff Owens picked up a piece of legal mail that had been opened and photocopied outside his presence and had been withheld for about a week. (*Id.* ¶ 45.) As a result, Owens was unable to "research and file a timely Criminal motion for which he received an adverse decision." (*Id.*) The Defendants responsible for withholding this piece of legal mail were Mazzuca, Ercole, Erbert, Perez, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Owens filed a grievance for the opening and photocopying of his legal mail denying him access to the courts, but it was denied. (*Id.* ¶ 47.)

Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all well pleaded factual allegations set forth in the complaint and must draw all positive inferences in favor of the pleader. *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 U.S. Dist. LEXIS 17913, at [*]4 (S.D.N.Y. Dec. 12, 2000). A case should only be dismissed when "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). A plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions" to

survive a motion to dismiss. *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

**\*3** Furthermore, since the Plaintiffs are proceeding pro se their submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *McNeil v. United States,* 508 U.S. 106, 113 (1993). The court must make some reasonable allowances so that a pro se plaintiff does not forfeit his rights by virtue of a lack of legal training. *Hudson,* 2000 U.S. Dist. LEXIS 17913, at [*]3. However, proceeding pro se does not altogether relieve a plaintiff from the usual pleading requirements. *Id.* at [*]4.

Plaintiffs' Civil Rights Claims

A plaintiff has a civil cause of action under § 1983 against:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiffs bring this action under § 1983 alleging that Defendants violated their rights under the First, Fourth, Sixth and Fourteenth Amendments by unconstitutionally implementing the inmate grievance programs and by deliberately tampering and interfering with their regular and legal mail thereby denying them access to the courts and impinging on their rights to free speech.

Discussion

1. Denial of Access to Grievances and the Unlawful Operation of the Inmate Grievance Program

The amended complaint alleges that Defendant Goidel failed to process Cancel's grievance complaints and that the improper and unlawful running of the I.G.P. violated Cancel's First Amendment right to petition the government

for redress and right of access to the courts. (Am.Compl.¶ 52.) Cancel also claims that Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry failed to take action to "curb the unlawful practices of Defendant Goidel" even though they were aware that his unlawful conduct proximately caused the above constitutional violation. (*Id.* ¶ 53.)

While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, *e.g* ., *Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983. *Justice v. Coughlin, III,* No. 94–CV–1287, 1996 U.S. Dist. LEXIS 15341, at [*]11 (N.D.N.Y. July 1, 1996). When an inmate sets forth a constitutional claim in a grievance to prison officials and the grievance is ignored, the inmate has the right to directly petition the government for redress of that claim. *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983. *Id.*

**\*4** Thus, Cancel's claim that the Defendants violated his First Amendment right of access to the courts and right to petition the government for redress by failing to process his grievances lacks merit and is dismissed with prejudice.

Cancel also claims that Goidel's failure to process his grievances and his unlawful and unfair running of the inmate grievance program violates New York State Correction Law § 139 which sets forth prison grievance procedures. (Am.Compl.¶ 52.) First, the failure to process a grievance in a timely manner only entitles an inmate to review at the next appeal level in the grievance process. *See Cliff v. Goodman,* 710 N.Y.S.2d 718 (App.Div.2000) (citing 7 NYCRR § 701.8 (2001)). Second, under New York law a claim generally challenging the constitutionality of the inmate grievance program does not constitute an actual controversy reviewable in an Article 78 proceeding or otherwise. *Matter of Hall v. State of N.Y. Dept. of Corr.,* 453 N.Y.S.2d 58 (App.Div.1992). When Cancel's grievances were ignored by Goidel, Cancel sought review at the next level and his grievances were subsequently processed. Further, Cancel's general dissatisfaction with the inmate grievance program does not constitute an actual controversy reviewable by the

Court. *Id.* Therefore, Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

2. Denial of Access to the Courts as a Result of Legal Mail Tampering

Prisoners have a First Amendment right of access to the courts, and where there is a deliberate and malicious interference with that right they may seek redress from the court. *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). To state a valid § 1983 claim for denial of access to the courts due to interference with an inmate's legal mail, an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action. *Lewis v. Casey,* 518 U.S. 343, 349 (1996). Therefore, in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim. *Id.* at 351. In other words "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." *Warburton v. Underwood,* 2 F. Supp .2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

Plaintiff Cancel does not state a cognizable § 1983 claim for denial of access to the courts because he has not alleged any actual injury resulting from Defendants' actions. Cancel alleges three instances where his legal mail was handled inappropriately. [4] Cancel must show that because Defendants opened his outgoing and incoming legal mail he was prejudiced in a legal action he sought to pursue. Because Cancel has not alleged such an injury, his claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations, if true, that (1) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (2) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail. [5]

**\*5** As to Plaintiff Owens' claim with respect to legal mail, the amended complaint alleges that because Owens' mail was opened and withheld for about a week he was "unable to research and file a timely response to a Criminal motion for which he received an adverse decision." (Am.Compl.¶

45.) A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). However, if Owens' adverse judgment to his otherwise meritorious Criminal motion was the result of the named Defendants' opening and withholding of his legal mail then he has stated a claim under § 1983 for denial of access to the courts. For purposes of this motion, the Court accepts all allegations as true and draws all positive inferences in favor of Plaintiff. *See Hudson,* 2000 U.S. Dist LEXIS 17913, at [*]3. Therefore, Defendants' motion is denied as to Plaintiff Owens' claim under the First Amendment for denial of access to the courts.

### 3. Violation of the First Amendment Right to Free Speech for Interference with Cancel's Mail

Cancel alleges that Defendants' continuous actions of opening and reading his incoming legal mail, the temporary withholding of his regular mail and the opening and photocopying of his outgoing legal mail impinges on his constitutional right to free speech. (Am.Compl.¶¶ 54, 60, 63.) Inmates unquestionably have a First Amendment right of free speech to send and receive mail, *Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979), and a prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the "right to be free from unjustified governmental interference with communication." *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993).

The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise. However, when analyzing such claims courts have consistently made distinctions between outgoing and incoming mail and legal and non-legal mail based on the various rights and interests at stake. *See Taylor v. Sterrett,* 532 F.2d 462, 475 (5th Cir.1976) (holding that the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail); *see also Lewis,* 518 U.S. at 353 (holding that prison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to the courts).

With respect to the first distinction, the Supreme Court has recognized that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989). Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail. *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

**\*6** As to the second distinction, many courts have held that a prisoner's legal mail is entitled to a higher degree of protection than his regular mail. *See Morgan v. Montanye,* 516 F.2d 1367, 1368 (2d Cir.1975) (holding that although prison officials can inspect an inmate's general correspondence, different procedures apply to an inmate's legal mail which should be treated as confidential material); *see also Taylor,* 532 F.2d at 475. Therefore, prison polices or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Washington,* 782 F.2d at 1139 (citing New York State Department of Corrections Directive 4421).

### A. Incoming Mail

### 1. Withholding of Incoming Non–Legal Mail

Cancel alleges that Defendants withheld his incoming non-legal mail and relies on a single instance when he received sixteen pieces of regular mail on the same day he filed a grievance about the opening of his legal mail. (Am.Compl.¶ 38.) These sixteen pieces of regular mail had been withheld for several weeks. (*Id.*) Prison regulations or practices affecting a prisoner's receipt of non-legal mail must be "reasonably related to legitimate penological interests," *Abbott,* 490 U.S. at 409 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)), and "prison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Gaines v.. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986). However, this general security interest will not justify a regular pattern and practice of such interference absent other prison concerns with regards to a particular inmate. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999).

This Court agrees with the reasoning of the Seventh Circuit in *Rowe* that in order for an inmate to state a claim for interference with incoming non-legal mail he must show a

pattern and practice of interference that is not justified by any legitimate penological concern. *Id.* Because Cancel only alleges that prison officials withheld his regular mail on one occasion, rather than showing a pattern and practice of such behavior, his First Amendment free speech claim for the withholding of his regular incoming mail is dismissed with leave to amend the complaint to include specific allegations, if true, establishing such a pattern and practice.

2. Opening and Withholding of Incoming Legal Mail
Cancel alleges two occasions upon which the Defendants opened his incoming legal mail outside his presence. (Am.Compl.¶¶ 22, 40.) Although legal mail is "privileged" and is afforded a higher degree of protection, there still must be a showing that prison officials regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

 **\*7** In *Washington,* the Second Circuit held that more than one incident of interference with legal mail could give rise to a constitutional claim if it indicated ongoing activity. 782 F.2d at 1139; *see also Bieregu v. Berman,* 59 F.3d 1445, 1452 (3d Cir.1995) (finding that an allegation that prison officials had opened an inmate's incoming legal mail on fifteen occasions was sufficient to show a pattern and practice of deliberate interference). However, in the present case Plaintiff proffers only two instances of opening incoming legal mail with no indication that such practices are ongoing. Without alleging additional facts to establish a pattern and practice that rises to the level of constitutionally impermissible censorship, Plaintiff's complaint is deficient. Therefore, Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint to include specific allegations, if true, that establish the requisite pattern and practice of interference. [6]

B. Outgoing Legal Mail
Cancel's claim that prison officials interfered with his outgoing legal mail poses a different question. As previously stated, the Supreme Court has explicitly recognized that there are "differing penological concerns with respect to outgoing and incoming mail." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson,* 694 F.2d at

54 (citing *Wolfish,* 573 F.2d at 130.). The Fifth Circuit has applied the same standard to an instance where an inmate's outgoing legal mail was opened and censored without a "legitimate penological interest" and found the practice to violate the inmate's First Amendment right to free speech. *Brewer,* 3 F.3d at 825.

In the present case, Defendants have failed to state any rational justification for opening and photocopying Cancel's outgoing legal mail. Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions. Therefore, because Defendants have interfered with Cancel's outgoing legal mail without providing any legitimate penological interest, Cancel has stated a valid claim under the First Amendment right to free speech. [7] Defendants' motion to dismiss Cancel's claim for violation of his First Amendment right to free speech is denied with respect to his outgoing legal mail.

4. Money Damages Barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act
Defendants argue that the money damages Plaintiffs seek are barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act because the complaint does not allege any physical injury. (Defs.' Mem. at 8–9.) Section 1997e(e) states, "[n]o federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in the custody without a prior showing of physical injury." *Id.*

 **\*8** The plain language of the statute does not prohibit a plaintiff's First Amendment claim. Section 1997e(e) specifically prohibits federal civil action[s] for mental or emotional injury without a showing of physical injury. In this case Plaintiffs do not allege any claim of mental or emotional distress for which they are seeking redress. Furthermore, the few courts that have addressed this issue have held that:

> the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment claims regardless of the form of relief sought.

*Reynolds v. Goord,* No. 98 Civ. 6722, 2000 U.S. Dist LEXIS 2140, at *23 (S.D.N.Y. Mar. 1, 2000) (quoting *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998)). Therefore, § 1997e(e) is not applicable to the present case and does not bar Plaintiffs from seeking recovery for First Amendment claims of denial of access to the courts and violation of free speech.

**5. Lack of Personal Involvement of Defendants**
The personal involvement of defendants in an alleged constitutional violation is a prerequisite under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A plaintiff must allege that each defendant was directly and personally responsible for the purported conduct and establish fault and causation on the part of each defendant. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987).

Defendants move to dismiss all claims against Defendants Goord, Annucci, Jones, Mazzuca, Ercole, Perez and Erbert for lack of personal involvement. Plaintiffs' amended complaint as to Owens' legal mail claim alleges that Defendants Mazzuca, Ercole, Perez, and Erbert were personally involved in the opening and withholding of his legal mail. Additionally, Mazzuca is implicated in Cancel's claim for violating his First Amendment right to free speech. Accepting these allegations as true, the Defendants' motion to dismiss for lack of personal involvement against Mazzuca, Ercole, Perez, and Erbert is denied.

As to Defendants Goord, Annucci and Jones, in a § 1983 action supervisors cannot be held liable under the theory of respondeat superior for the acts of their subordinates. *Id.* at *7. A supervisor can only be found to be personally involved if there is evidence that there was: (1) direct participation in the alleged constitutional violation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. *Id.; see also Colon,* 58 F.3d at 873. Allegations that a supervisor ignored an inmate's grievance letter of protest and request for an investigation is insufficient to find that a supervisor is personally involved in the alleged constitutional violations. *Kinch v. Artuz,* No. 97 Civ. 2419, 1997 U.S. Dist. LEXIS 13998, at *8 (S.D.N.Y. Sept. 15, 1997).

*9 Plaintiffs' amended complaint contains no allegations relating to the personal involvement of Defendants Goord, Annucci and Jones either through direct participation, maintenance of a policy or deliberate disregard for Plaintiffs' rights. Plaintiffs' sole claim against these three Defendants is that they were sent grievances and complaints by Cancel which were ignored. Plaintiffs' claims as to these three Defendants are dismissed with prejudice.

Conclusion
For the above stated reasons the Defendants' motion is granted in part and denied in part as follows:

(1) Cancel's claims against Goidel under the First Amendment right to petition the government for redress and right of access to the courts for failure to process grievances and for the unlawful running of the I.G.P. are dismissed with prejudice.

(2) Cancel's claims against Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry for failure to curb the unlawful practices of Goidel in his unlawful running of the I.G.P. are dismissed with prejudice.

(3) Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

(4) Cancel's claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations that (a) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (b) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail.

(5) Defendants' motion is denied as to Owens' claim under the First Amendment for denial of access to the courts against Mazzuca, Ercole, Perez, Erbert, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(6) Cancel's claim under the First Amendment right to free speech for the withholding of his regular incoming mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference.

(7) Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the

complaint with specific allegations that establish a pattern and practice of interference with Cancel's incoming legal mail.

(8) Defendants' motion is denied as to Cancel's claim under the First Amendment for a violation of free speech for interference with his outgoing legal mail against Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(9) Defendants' motion to dismiss the claims against Mazzuca, Ercole, Perez, and Erbert for lack of personal involvement is denied.

(10) Defendants' motion to dismiss the claims against Goord, Annucci and Jones for lack of personal involvement is granted with prejudice.

(11) The Court also considered Plaintiffs' claim that Defendants' actions violated Article 14 and 17 of the International Covenant on Civil and Political Rights ("ICCPR"). (Am.Compl.¶ 54, 55, 58, 60.) However, courts have uniformly held that the ICCPR is not self-executing and does not give rise to a private right of action. *See Beazley v. Johnson,* No. 99–41383, 2001 WL 118393, at [*]18– [*]19 (5th Cir.2001) (citing additional cases). Therefore, the Court sua sponte dismisses Plaintiffs' claims under the ICCPR.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 303713

Footnotes

1    Plaintiffs' independently move pursuant to Fed.R.Civ.P. 37(d) for an order compelling defendants to comply with Plaintiffs' interrogatories. As Defendants do not oppose this motion, and because the court has partially denied Defendants' motion to dismiss, Plaintiffs' motion is granted. Defendants are hereby required to respond to Plaintiffs' interrogatories, except those regarding the Inmate Grievance Program, within sixty days of the date hereof.

2    The facts set forth herein are adduced from a liberal reading of Plaintiffs' complaint. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

3    New York Civil Service Law § 75 provides a cause of action for civil service employees unlawfully removed. Although neither party addressed this claim in their motion papers, the Court notes that § 75 specifically delineates five categories of persons who may maintain a cause of action for removal. Because Cancel does not fall into one of these five categories he has no standing to bring suit under this provision.

4    Liberally construing Plaintiffs' complaint, the Court assumes that the Family Court documents Cancel mailed on April 17, 2000 were in an envelope addressed to a person or entity that would clearly identify the letter as legal mail or that the envelope was marked as "legal mail." Plaintiff only alleges that he sent these Family Court documents to "the other party in the matter" (Am.Compl.¶ 49) and the Court assumes for the purpose of this motion only that the envelope in question was clearly identified as legal mail.

5    "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

6    Plaintiffs' also allege that in October 1999 Defendant Lowery ordered mail sent to any inmate by the Legal Aid Society regarding contemplated litigation against the New York State Parole Board to be confiscated if seen. (Am.Compl.¶ 42.) In addition, Defendant Ercole also instructed the Fishkill mail room staff to confiscate all mail envelopes larger than regular size, to transfer the contents to a facility envelope and then forward it to the inmate to whom it is addressed. (*Id.* ¶ 43.) Plaintiffs make these allegations in their complaint without stating that they personally were to receive this letter from the Legal Aid Society or that Ercole's policy affected their mail in any way. Because there is no allegation that Plaintiffs' mail was affected by either policy they have no standing to bring a suit for these allegations and they are not addressed by the Court. Plaintiffs' are given leave to amend the complaint to allege, if that be the case, that these polices affected their personal legal mail. If such allegations are made they will be considered in establishing a pattern and practice of interference with legal mail.

7    As originally stated in footnote 4, the Court again presumes that the Family Court documents were placed in an envelope marked or addressed in such a way that it could be identified as legal mail. If in fact this document was not privileged legal mail, this First Amendment free speech claim may require a different analysis.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated
December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access to the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections <sup>FN1</sup> thereto, it is

    FN1. I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

## DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote

letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did **not** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the **length** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no **possibility** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a **Tier II** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of **substantive due process.** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994)*. Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)*. The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Salvatierra v. Connolly, S.D.N.Y., February 29, 2012

2006 WL 1289256
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark BARTLEY, Plaintiff,
v.
Todd COLLINS; Christopher Pecore;
and Timothy Bates, Defendants.

No. 95 Civ. 10161(RJH).
|
May 10, 2006.

**Attorneys and Law Firms**

Mark Bartley, Stormville, NY, pro se.

Reid Anthony Muoio, Hughes Hubbard & Reed LLP, New York, NY, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York, NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff Mark Bartley ("Bartley") brought claims pursuant to 42 U.S.C. § 1983 in his third amended complaint against several defendants employed by the New York State Department of Corrections ("DOCS"), alleging violations of his First and Fourteenth Amendment rights not to be retaliated against for the exercise of his right of access to the courts. Defendants now move for summary judgment on all claims. For the reasons set forth below, the Court grants defendants' motion.

### BACKGROUND

Unless otherwise indicated, the following facts are undisputed. [1] Plaintiff Bartley was at all relevant times a DOCS inmate at Green Haven Correctional Facility ("Green Haven") in New York. (Defs.' 56.1 ¶ 3.) Defendants Todd Collins ("Collins"), Timothy Bates ("Bates"), and Christopher Pecore ("Pecore") were at all relevant times correctional officers at Green Haven. (*Id.* ¶¶ 8-10.)

At about 2:45 a.m. on April 16, 1995, Scott Turrisi, a mentally ill inmate at Green Haven, set a fire in his cell in an apparent suicide attempt. (Defs.' 56.1 ¶ 12.) Bartley and several other inmates were injured, one of whom died three days later. (*Id.* at ¶¶ 12, 15; Pl.'s 56.1 ¶¶ 12, 15.) Shortly after the fire, Bartley, together with another inmate, Felix Diaz ("Diaz"), began to prepare lawsuits against DOCS employees for their alleged failure to properly care for inmates in the events leading up to and after the fire. (Defs.' 56.1 ¶ 42.)

Bartley, who was known as a jailhouse lawyer, asserts that prior to the fire, he had a "relatively clean" disciplinary record. (Pl .'s 56.1 ¶ 60; Bartley Dep. at 99-100.) On the morning of April 16, 1995, the day of the fire, Bartley and Diaz circulated a petition among inmates at the prison clinic in preparation for a lawsuit. (Defs.' 56.1 ¶¶ 42-43.) In his complaint, Bartley alleged that following that action, he was retaliated against by defendants. (Third Am. Compl. ¶¶ 41-49.)

#### A. *Alleged Retaliation by Collins*

Bartley testified that in the days following the fire, Collins made false charges against him on two occasions for minor infractions. (Bartley Dep. at 98-99.) Those misbehavior reports resulted in Bartley being put in "keeplock" confinement, [2] thereby denying him access to the law library for approximately ten days. (*Id.*; Schulman Decl. Ex. M at 247.) Bartley asserts that this was done to prevent him from seeking legal redress for injuries resulting from the prison fire. (Bartley Dep. at 100.)

Prior to April 18, Collins had counseled Bartley for not locking up properly, but had not, to his recollection, written a misbehavior report against him. (Defs.' 56.1 ¶ 45.) On April 18, Collins wrote a misbehavior report against Bartley for allegedly ignoring repeated orders to lock in for a count. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Collins claims that when ordered to return to his cell, Bartley stopped at two cells to talk to people, thereby delaying the count. (Defs.' 56.1 ¶ 47.) Bartley maintains that the charges were false and that any delay was the result of Bartley being in a wheelchair (Schulman Decl. Ex. Q at 5). Collins put Bartley on keeplock status pending a disciplinary hearing on the charges. (Defs.'

56.1 ¶ 47.) After an April 20 hearing that Bartley did not attend, Bartley was found guilty of two of three charges against him and was given a fifteen-day loss of package, commissary, and phone privileges. (Defs.' 56.1 ¶ 46.)

**\*2** On April 19, after Bartley was informed that he was on keeplock, he and Collins had a heated exchange. According to Collins, plaintiff called him a "cocksucker" and a "punk faggot bitch" and threatened to "kick Collins' ass and make problems for him." (Schulman Decl. Ex. Q at 2.) Collins wrote another misbehavior report, and at an April 24th hearing, Bartley admitted to using a hostile tone and calling Collins names, including "cocksucker." (*Id.* at 5.) However, Bartley denied making any threats and alleged that Collins told him he had a "big mouth" because Bartley had told Diaz to bring a lawsuit about the fire. (*Id.* at 6.) Ultimately, Bartley plead guilty to harassment, was found guilty of creating a disturbance, and was absolved not guilty of charges of threats and violent conduct. (*Id.* at 3, 8; Schulman Decl. Ex. M at 247.) For the two infractions, Bartley was given 10 days of keeplock. (Schulman Decl. Ex. Q at 8; Schulman Decl. Ex. M at 247.)

In his complaint, Bartley alleges that, in addition to having him placed in keeplock, Collins threatened him by saying that Bartley "better drop" his lawsuit. (Third Am. Compl. ¶ 48.) However, Bartley offers no evidence to support the allegation of a threat except for testimony that "all of these defendants ... [were] bothering me, saying little snide remarks, saying we going to get you, you better drop the suit, and all this other stuff," and that "they told me you better drop the lawsuit, Bartley," where Collins apparently was among the "they" to whom Bartley was referring. (Bartley Dep. at 104-07.)

### B. *Alleged Retaliation by Bates*

In his complaint, Bartley alleges that in the days following the fire, Bates filed false charges of littering and other minor infractions against him to "punish and deter" him from filing a lawsuit. (Third Am. Compl. ¶ 46.) On April 19, Bates wrote a misbehavior report against Bartley for littering and for obstructing the view inside his cell with a sheet. (Defs.' 56.1 ¶ 57.) Bartley denies the charges but did not attend the resultant disciplinary hearing, where he was found guilty of three of the four charges against him and given a thirty-day loss of privileges. (*Id.;* Pl.'s 56.1 ¶ 57.)

### C. *Alleged Retaliation by Pecore*

Also in his complaint, Bartley alleges that Pecore retaliated against him by telling him, after Bartley and Diaz began preparing lawsuits, "Pataki will have to foot the bill anyway, so he doesn't care what I do" and "you better drop the lawsuit Bartley." (Third Am. Compl. ¶ 47.) Bartley further alleges that Pecore threatened him with serious bodily harm, including death, if Bartley did not discontinue the lawsuit. (*Id.*) However, Bartley provides no evidence of the time, date, place, circumstances, or words employed in the alleged threats of physical violence, save for testimony that "two of the defendants in the present action," who Bartley does not identify, "approached me, accosted me and threatened me physically and verbally of what they would do." (Bartley Dep. at 104.) Pecore affirmatively denies having had any discussions with Bartley after the fire. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

## DISCUSSION

### A. *The Summary Judgment Standard*

**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case")

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). But an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the

suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

Moreover, to survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *Anderson,* 477 U .S. at 256-57; *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002). Where, as here, a plaintiff's case depends in part on his own statements and observations, such statements must " 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(e)).

Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123-24 (2d Cir.2001); *Quinn v. Syracuse Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Neither will "unsubstantiated speculation" suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With these principles in mind, the Court turns to the merits of the defendants' motion.

B. *Bartley's Retaliation Claims*
**\*4** Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (prisoner stated a valid claim under § 1983 by alleging that a prison official filed false disciplinary charges against him in retaliation for his exercise of a constitutional right to file a grievance); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[F]iling of a grievance and attempt to find inmates to represent the grievants ... is constitutionally protected."); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord,* No. Civ. 9:02CV00915, 2005 WL 3531464, at \*7 (N.D.N.Y. Dec. 22, 2005) ("[P]laintiff,

who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity.").

However, courts are to "approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act."); *see also Gill v. Pidlypchack,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.J ., concurring).

In order to sustain a First Amendment retaliation claim, "a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill,* 389 F.3d at 380 (quoting *Dawes,* 239 F.3d at 492). If each of the three elements of a *prima facie* case of retaliation is established, the burden shifts to the defendants "to show that the plaintiff would have received the same punishment even absent the retaliatory motivation," in which case the plaintiff's claim must fail. *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Freeman v. Goord,* 2005 WL 3333465, at \*4 (S.D.N.Y. Dec. 10, 2005) ("Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment ... if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone," as courts "employ a presumption that a prison official's acts to maintain order are done for a proper purpose.") (citations and quotations omitted).

1. *Constitutionally Protected Conduct*
**\*5** Plaintiff asserts that he was retaliated against for engaging in the constitutionally protected activity of circulating a petition in preparation for legal proceedings. Defendants counter that under the Second Circuit's decision in *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996), circulating a petition is not protected conduct.

The circulation of a petition by a prisoner is generally protected by the First Amendment. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967 (1977). However, that right "must be weighed against legitimate safety interests of the prison." *Duamutef,* 98 F.3d at 24 (reiterating the multi-factor test to determine the validity

of a regulation that impinges on inmates' constitutional rights as set forth in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).). The *Duamutef* court held that where there was an official grievance procedure available to prisoners and a plaintiff did not claim that his petition contained requests that could not be addressed through that procedure, it was "permissible for prison officials to bar the circulation of petitions." *Id.* at 24 (citing *Nickens v. White,* 622 F.2d 967, 971 (8th Cir.1980), *cert. denied,* 449 U.S. 1018 (1980); *Edwards v. White,* 501 F.Supp. 8, 11-13 (M.D.Pa.1979), *af'd,* 633 F.2d 209, 212 (3d Cir.1980). The *Nickens* court ruled similarly, relying on the affidavit of a prison superintendent who explained that petitions were banned for security concerns and that alternative means were available for communicating grievances. 622 F.2d at 970.

Courts have noted that even though *Duamutef* held that petitions *could* be banned, the ruling did not forbid petitions. *Farid v. Goord,* 200 F.Supp.2d 220, 236 (W.D.N.Y.2002). Where the defendant asserted that the plaintiff "does not have a right to circulate a petition" but did not reference a rule or regulation that prohibited petitioning, the *Farid* court held that the plaintiff, in circulating a petition, had engaged in protected conduct. *Id.* Defendants here similarly do not identify a prison regulation prohibiting petitioning by prisoners that justifies a limitation of plaintiff's First Amendment rights. In the absence of penitentiary rules proscribing petitioning, plaintiff's activity was constitutionally protected and as such, plaintiff satisfies the first element of his prima facie case of retaliation with respect to all three defendants.

*2. Adverse Action*

Plaintiff alleges that all three defendants took adverse action against him: Collins by verbally pressuring him to not bring legal action and filing misbehavior reports that put him in keeplock and caused him to lose privileges, Bates by filing false charges that cost him privileges, and Pecore by threatening him with physical violence. Defendants maintain that plaintiff's claims are conclusory and do not rise to the level of severity required for the actions to be characterized as adverse.

**\*6** In evaluating what constitutes adverse action, a court should be mindful that " 'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Dawes,* 239 F.3d at

493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)).

In the prison context, adverse action is defined objectively as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). A subjective definition is not adopted because "it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* If the retaliatory conduct would not deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights, it " 'is simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493).

With respect to his claims that Collins and Pecore issued verbal threats against him, plaintiff does not survive summary judgment. His deposition testimony that multiple defendants threatened him and encouraged him to abandon his lawsuit is conclusory because it is insufficiently specific with regard to the identification of any one defendant, and does not adequately provide the time, date, place, or circumstances of the alleged remarks. *See, e.g., Gaines v. Artus,* No. 9:04-CV-76, 2006 WL 721618, at \*5 (N.D.N.Y. Mar. 20, 2006) (prisoner's § 1983 claim for denial of proper medical care dismissed on summary judgment in part because "[d]uring plaintiff's deposition, he ... could never be specific regarding the individuals allegedly responsible for this substandard care" and therefore "makes only conclusory claims"); *Jasmin v. New York State Dept. of Labor,* No. 98 Civ. 7569, 2000 WL 194774, at \*2 (S.D .N.Y. Feb. 17, 2000) (plaintiff's "conclusory deposition testimony that co-worker 'has constantly been harassing me until last week' is utterly insufficient to create an issue of fact for the jury"); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1995) (plaintiff "cannot defeat [a summary judgment] motion by relying on the allegations in his pleading, ... or on conclusory statements") (citations omitted).

Even if plaintiff's deposition testimony were deemed sufficiently specific, verbal threats such as "we going to get you, you better drop the suit," [3] do not rise to the level of adverse action. *See Dawes,* 239 F.3d at 493 (2d. Cir.2001) ("Not every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to

plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' insufficient to state a retaliation claim).

**\*7** Plaintiff's complaint, although more particular than his testimony with regard to what each defendant allegedly said, does not defeat defendants' motion for summary judgment. Not only does the complaint, like plaintiff's testimony, inadequately plead the time, date, place, or circumstances of the alleged remarks, but because it is unverified, it cannot be relied on as evidence in opposing a summary judgment motion. *Trinidad v. New York City Dept. of Correction,* ---F.Supp.2d ----, 2006 WL 704163, at *6 (S.D.N.Y. Mar. 21, 2006) (Unsworn materials are "an insufficient basis for opposing a motion for summary judgment"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("Unsworn statements are not admissible to controvert a summary judgment motion."); *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991) (to survive summary judgment, "the nonmovant may not rest upon mere allegations in, say, an unverified complaint or lawyer's brief, but must produce evidence which would be admissible at trial to make out the requisite issue of material fact") (citing Fed.R.Civ.P. 56(e)); *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 165 (5th Cir.1991) ("Given that [defendant] has filed a properly supported motion for summary judgment, [plaintiff] cannot rely on the facts in its unverified complaint, but must point to evidence in the record sufficient to establish the alleged facts to avoid summary judgment.")

Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights. *Compare Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (correction officer's issuance of an unfavorable evaluation of prisoner and threat to place him in a Special Housing Unit did not meet the standard of adverse action), *with Gill,* 389 F.3d at 384 (plaintiff's allegation that defendants filed false misbehavior reports against him, resulting in his being sentenced to three weeks of keeplock, constituted a claim of adverse action), *and Wheeler v.. Beard,* No. Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug. 3, 2005) (prisoner plaintiffs alleged adverse action in retaliation claim by claiming that defendants, among other things, denying medical treatment and prison-issued undergarments, destroying legal mail and other legal materials, planting contraband in cell to serve as basis for bogus misconduct report, and caused one plaintiff to lose his job).

However, Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days. *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) ( "Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging an adverse action"); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (noting holdings in other cases that nine days' keeplock confinement does not necessarily as a matter of law constitute *de minimis* alleged retaliation).

### 3. Causal Connection

**\*8** Plaintiff alleges that the actions taken by defendants were in retaliation against his engagement in the protected conduct of circulating a petition, while defendants assert that the events were unrelated. To show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations. *See Dawes,* 239 F.3d at 491 ("bald allegations of retaliation" will not suffice; the causal connection must be "sufficient to support the inference that the speech played a substantial part in the adverse action"). Evidence of improper motive may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 WL 2452150, at *16 (N .D.N.Y. Sept. 30, 2005) (citing *Colon,* 58 F.3d at 872-73).

In *Gayle,* the Second Circuit overruled a district court's grant of summary judgment for defendants in a case in

which the plaintiff proffered sufficient evidence to "create a genuine issue of material fact as to whether retaliation was a substantial factor in the DOCS officials' decision to charge and punish" him. 313 F.3d at 683. The *Gayle* court came to its conclusion based on circumstances involving, *inter alia*, the prisoner's receipt of a misbehavior report shortly after filing a grievance; the report's relationship to a discussion the prisoner and a guard held regarding the grievance, the fact that the prisoner and a guard offered conflicting testimony at a disciplinary hearing regarding what prompted the report; a guard's lack of credibility when testifying at the hearing, and the fact that the hearing (at which the prisoner was found guilty of violating a rule) was administratively reversed. *Id.* at 683-84.

Plaintiff's allegation of a causal connection between his protected act and Collins' second misbehavior report is sufficient, although weaker than that in *Gayle*. The report, which caused plaintiff to be placed in keeplock, came just three days after the date of the prison fire and plaintiff's circulation of a petition, a temporal proximity that may suggest causality. *Colon,* 58 F.3d at 872 ("[T]emporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation.") (citations omitted). Plaintiff's assertion that he had a relatively clean disciplinary record prior to the fire also suggests the possibility of improper motive. *Id.* ("[E]vidence of prior good behavior also may be circumstantial evidence of retaliation.") (citation omitted). However, at the disciplinary hearing regarding the second report, plaintiff was not only found guilty of two of the charges against him but also pled guilty to one of them. In *Pledger,* the court granted a defendant's motion for summary judgment where a plaintiff did not deny the factual foundation of the criticisms made in an allegedly retaliatory negative evaluation by a prison official. 2005 WL 736228, at *4. Here, plaintiff's acknowledgement of the factual basis of one of the charges made in Collins's second report weakens his claim that the report was retaliatory, but plaintiff did contest the other three charges in the report and was found not guilty of two of them. On balance, the Court concludes that a material issue of fact has been created on the issue of causation.

*4. Defendants' Justifications for Their Actions*

**\*9** Defendants claim that even if plaintiff satisfies the three elements of a prima facie case of retaliation, as plaintiff does with respect to Collins's second misbehavior report, their actions were not unlawful because they would have engaged in them even absent the plaintiff's protected conduct.

Summary judgment should be granted for the defendants if they can show that there is no genuine issue that they would have taken the same action-here, writing a misbehavior report that caused plaintiff to be put in keeplock for ten days-even without retaliatory motivation. *See, e.g., Gayle,* 313 F.3d at 682; *Graham,* 89 F.3d at 79. In making this determination, the court should employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995), *cert. denied,* 525 U.S. 907 (1998)). "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle,* 313 F.3d at 682 (quoting *Hynes,* 143 F.3d at 657).

Collins wrote his second misbehavior report against plaintiff after plaintiff called him various epithets, which plaintiff later admitted to at a disciplinary hearing. Although Bartley was found not guilty of charges of threats and violent conduct, those charges stemmed from the same behavior for which Bartley was found guilty on two other charges. Between the presumption that Collins acted with a proper purpose and the fact that plaintiff acknowledged engaging in the conduct underlying the charges, Collins satisfies his burden of showing that he would have written the report even if plaintiff had not earlier circulated a petition.

### C. *Qualified Immunity*
Because the claims against defendants are otherwise dismissed, the Court need not address defendants' assertion of qualified immunity.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 1289256

---

Footnotes

1     The facts as herein recited are drawn from defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶ \_\_\_"), plaintiff's response to defendants' Rule 56.1 Statement ("Pl.'s 56.1 ¶ \_\_\_"), Bartley's deposition ("Bartley Dep."), and records of disciplinary

hearings stemming from Todd Collins's April 19, 1995 misbehavior report against Bartley ("Schulman Decl. Ex. M" and "Schulman Decl. Ex. Q").

2    When under keeplock confinement, an inmate is confined to his cell for 23 hours a day and loses various privileges. 7 N.Y. Comp.Codes R. & Regs. tit. 7, §§ 301.1-301.6.

3    Because plaintiff did not testify to it in his deposition, the Court excludes from consideration the allegation made only in plaintiff's unverified complaint that Pecore "on at least one occasion, threatened to kill [Bartley] if he did not discontinue this lawsuit." (Third Am. Cmpl. ¶¶ 47.) *See* discussion *infra.*

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2844408
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

William HEPWORTH, Plaintiff,

v.

SUFFOLK COUNTY, Suffolk County Correction
Officers Steven Campitello and George Campatella,
Sergeant Allen, Suffolk County Correction Officers
who worked yards 4 and 5 on the 7am to 3pm tour
and yard 1-2-3 on August 5, 2002, Defendants.

No. 2:02-CV-6473 ENV/ETB.
|
Sept. 29, 2006.

**Attorneys and Law Firms**

William Hepworth, Fishkill, NY, pro se.

John Wyman Cobb, Cobb & Cobb, Esqs., Tuxedo, NY, for
Plaintiff.

Robert A. Caccese, Suffolk County Attorney's Office,
Hauppauge, NY, for Defendants.

ORDER

VITALIANO, D.J.

*1 On May 5, 2005, defendants moved for summary
judgment on two grounds: (i) plaintiff's failure to exhaust
administrative remedies; and (ii) plaintiff's failure to state a
claim cognizable under 42 U.S.C. § 1983. By order dated
April 6, 2006, District Judge Dora Irizarry referred the motion
to Magistrate Judge E. Thomas Boyle. On August 1, 2006,
Magistrate Judge Boyle issued a report and recommendation
recommending that the Court deny defendants' motion for
summary judgment. Defendants' have not subsequently filed
objections.

When reviewing a magistrate's report and recommendation,
this Court "may accept, reject, or modify, in whole or in part,
the findings and recommendations...." 28 U.S.C. § 636(b)
(1)(C). When, as here, no timely objection has been made
to the report and recommendation, this Court "need only
satisfy itself that there is no clear error on the face of the

record." Urena v. New York, 160 F.Supp.2d 606, 609-10
(S.D.N.Y.2001) (quoting Nelson v. Smith, 618 F.Supp. 1186,
1189 (S.D.N.Y.1985)).

After careful review of all the evidence in the record, this
Court finds Magistrate Boyle's report and recommendation
to be correct, comprehensive, well-reasoned, and free of
any clear error. The Court, therefore, adopts the report
and recommendation in its entirety as the opinion of the
Court. Accordingly, for the reasons stated therein, defendants'
motion for summary judgment is denied.

Counsel are directed to submit a joint pre-trial order, in
accordance with this Court's individual motion practices and
rules, by October 29, 2006. A final pre-trial conference will
be held on November 3, 2006 at 11 a.m. in Courtroom # 6 of
the United States Federal Courthouse, located at 225 Cadman
Plaza East, Brooklyn, New York 11201.

SO ORDERED.

*REPORT AND RECOMMENDATION*

E. THOMAS BOYLE, Magistrate J.

Plaintiff William Hepworth ("Hepworth") brings this civil
rights action under 42 U.S.C. § 1983 ("Section 1983")
alleging that Corrections Officer Steven Campitello and
others used unreasonable and excessive force against him
at Riverhead Correctional Facility. Defendants now move
for summary judgment pursuant to Federal Rules of Civil
Procedure 56(c) seeking to dismiss the complaint on two
grounds: (1) failure to exhaust administrative remedies; and
(2) failure to state an actionable claim under Section 1983.

I. BACKGROUND

A. *The Alleged Assaults*
Hepworth was an inmate at the Suffolk County Correctional
Facility in Riverhead from May 25, 2002 through April
16, 2003. (Pl.'s Rule 56.1 Statement ¶ 1; Defs.' Rule 56.1
Statement ¶¶ 1, 5.) Hepworth alleges that on or about
August 5, 2002, while he was in custody, a fight broke
out among inmates in one of the exercise yards. (Pl.'s Am.
Compl. ¶ 8.) Plaintiff alleges that he was not involved in
the altercation, but was nevertheless subject to disciplinary
actions. (*Id.*) Plaintiff alleges that at the time of the fight,
he was seized and handcuffed by the correction officer

defendants. (*Id.*) According to Hepworth, defendant Steven Campitello ("Campitello"), a corrections officer, grabbed him around the throat and said "this is what happens to people who testify against corrections officers," in apparent reference to events that occurred in 1991, when plaintiff testified in federal court as a witness against other corrections officers employed by Suffolk County. (*Id.* ¶¶ 9-10.) Plaintiff alleges that he was then beaten by defendant Campitello and other officers, and as a result, suffered severe bodily injuries including bruising and contusions to the face, head, body, legs, ribs and shoulders, a wound to the right wrist, two black eyes, two broken teeth, and nerve damage to the right hand. (*Id.* ¶¶ 10-14.) Plaintiff further alleges that following the August 5, 2002 incident, he was "subject to a campaign of harassment and assault," including physical assaults by defendant Campitello on or about September 28, 2002 and October 22, 2002; verbal threats to plaintiff and his wife at the visitor's room at the Riverhead Correctional Facility on or about September 7, 2002; and threats to plaintiff that if defendant Campitello was disciplined, plaintiff would be beaten or killed. (*Id.* ¶ 14.)

**\*2** Plaintiff states that on August 6, 2002, he filled out a grievance form concerning the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.) However, according to plaintiff, when he gave the form to an officer to be submitted, the officer ripped it into pieces and threw it in the trash can, telling plaintiff that he could not file a complaint, and that if plaintiff tried to do it again, he would get another beating. (*Id.*) Plaintiff states that he was frightened by the threat so he did not attempt to file another in-house grievance, but he wrote letters of complaint to the United States Attorney General, the New York State Attorney General, the New York State Police Headquarters, the Inspector General of the New York State Department of Correctional Services, the Special Counsel of the State of Correction Executive Department, and the New York State Grievance Committee for the Tenth Judicial District. (*Id.* ¶¶ 6-7; Pl.'s Am. Compl. ¶ 16.) Plaintiff states that he also contacted the Suffolk County Correctional Facility's Internal Affairs Bureau ("SCCF Internal Affairs Bureau") to file a complaint, and that he was interviewed and photographed by the SCCF Internal Affairs Bureau. (Pl.'s Aff. ¶ 4.)

## B. *New York Department of Correctional Services Grievance Procedures*

In their motion for summary judgment, defendants contend that Hepworth failed to exhaust his administrative remedies. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Defs.' Mem. in Supp.") at 1.) In support of their motion,

defendants submitted an affidavit from Donna Ketonen ("Ketonen"), Executive Officer of the Grievance Evaluation Unit at the Suffolk County Correctional Facility, explaining the correctional facility's grievance procedures. (Affidavit of Donna Ketonen, dated March 21, 2005 ("Ketonen Aff.").) Ketonen states that prisoners who seek administrative review of a grievance are directed to follow the procedures set forth in the Suffolk County Correctional Facility Rules & Regulations book (the "Rules book"), which prisoners receive upon entering the jail. (*Id.* ¶ 3. *See also* Booking Sheet Receipt, annexed as Exh. A. to Affirmation of Arlene S. Zwilling, dated March 23, 2005 ("Zwilling Aff.").) The Rules book directs inmates with a complaint or problem to first attempt to get it resolved with the officer assigned to the inmate's housing unit. (Suffolk County Correctional Facility Rules & Regulations, annexed as Exh. B to Zwilling Aff., at 15-16.) If that effort is unsuccessful, the inmate may request and will receive a grievance form to fill out. (*Id.*) The Rules book states that the grievance will be investigated and the inmate will receive a written determination from the grievance coordinator within 5 business days. (*Id.*) If the inmate is not satisfied with the grievance coordinator's decision, the inmate may appeal to the Chief Administrative Officer, and, if still unsatisfied, to the State Commission of Correction. (*Id.*) Ketonen stated in her affidavit that Hepworth filed no grievances pursuant to the Inmate Grievance Program in the period May 25, 2002 through April 16, 2003. Defendants argue that because plaintiff submitted no evidence that he prepared the grievance, plaintiff has failed to raise a factual issue regarding his attempt to file a grievance. (Defs.' Mem. at 4.) However, plaintiff alleges that a corrections officer ripped up the grievance and threw it away. The destruction of the grievance by a corrections officer is a plausible explanation for plaintiff's failure to submit the grievance as evidence.[1] Defendants submitted no affidavits from corrections officers disavowing plaintiff's version of events.

**\*3** Regardless, plaintiff does not dispute that he did not file any grievances with the correction facility-the essence of plaintiff's claim is that when he attempted to file a grievance about the August 5, 2002 incident, he was prevented from doing so and threatened not to make another attempt to file a grievance. Plaintiff states that he heeded the threat, and instead wrote letters of complaint to government officials removed from the internal grievance process. In opposition to defendant's motion, plaintiff submitted a copy of a letter dated August 23, 2002, addressed to "To Whom it May Concern," detailing the August 5, 2002 incident. (Declaration of John Cobb, dated April 12, 2005 ("Cobb Decl."), Exh. 8.)

Plaintiff states that this is a copy of the letter of complaint he sent to the aforementioned governmental officials. (Pl.'s Aff. ¶ 7.) Plaintiff also submitted a letter dated October 1, 2002 to Sheriff Tisch of the Suffolk County Sheriff's Office from Alan J. Croce, Chairman/Commissioner of the State Commission of Correction, directing the sheriff's office to investigate Hepworth's complaint of assaults by officers on several occasions. (Cobb Decl., Exh. 9.) Plaintiff states that apart from his interview with the Suffolk County Correctional Facility's Internal Affairs Bureau, nothing resulted from his letters of complaint. (Pl.'s Aff. ¶¶ 4, 8.)

## II. DISCUSSION

### A. *Legal Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to establish the lack of any factual issues. *See id.* Summary judgment is not appropriate where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party has carried its burden, the party opposing the summary judgment motion must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id.* at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing there is a genuine issue for trial." *Anderson,* 477 U.S. at 248.

By its terms, Rule 56 does not require the district court judge to make any findings of fact. *See Anderson,* 477 U.S. at 250. The only inquiry to be performed is the determination of whether there is a need for trial. *See id.* The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

### B. *Availability of Administrative Remedies under the PLRA*

**\*4** The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under Section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement "applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). *See also Woodford v. Ngo,* --- U.S. ----, ----, 126 S.Ct. 2378, 2383, 165 L.Ed.2d 368 (2006). Accordingly, a defendant may raise "failure to exhaust" as an affirmative defense, as defendants here did. (Defs.' Answer to Am. Compl. ¶ 15.)

In 2004, the Second Circuit Court of Appeals issued a series of opinions addressing the PLRA's exhaustion requirement. *See Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (collectively, the "2004 Second Circuit exhaustion cases"). In *Hemphill v. New York* 380 F.3d 680, the Second Circuit held that in some circumstances, despite the exhaustion requirement under the PLRA, "the behavior of the defendants may render administrative remedies unavailable." *Hemphill,* 380 F.3d 680, 686 (2d Cir.2004). The court set forth a three-part inquiry to be applied in cases where a prisoner plausibly seeks to counter defendants' contention that the prisoner failed to exhaust administrative remedies under the PLRA. *Id.* When faced with such circumstances, a district court should examine: (1) whether administrative remedies were in fact "available" to the prisoner; (2) whether the defendants may have forfeited the affirmative defense of non exhaustion by failing to raise or preserve it; or (3) whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop the defendants from raising the plaintiff's failure to exhaust as a defense. *Id.* (citations omitted). Furthermore, the Second Circuit held that "[i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 686 (citing *Giano v.*

*Goord,* 380 F.3d 670). *See also Brownell v. Krom,* 446 F.3d 305, 312 (2d Cir.2006) (finding that special circumstances, specifically, prison officials' erroneous interpretation of administrative regulations, justified prisoner's failure to exhaust administrative remedies).

**\*5** Here, the defendants failed to address *Hemphill* in their memorandum of law in support of their motion for summary judgment, instead arguing simply that Ketonen's affidavit demonstrates that Hepworth never filed any grievances during the period of his incarceration, and therefore, Hepworth's failure to exhaust his administrative remedies bars his claim. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Def.'s Mem. in Supp."), at 2-3.)

In opposition to defendants' motion, plaintiff argues that he attempted to follow the established grievance procedures but was prevented from doing so by prison correction officers. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Mem. in Opp'n"), at 4-5.) Plaintiff also argues that defendants should be estopped from raising failure to exhaust as an affirmative defense (*id.* at 8), and that special circumstances justified plaintiff's failure to comply with administrative procedures (*id.* at 7-8). The standard (and consequences) of plaintiff's claims of unavailability, estoppel, and justification differ. *Hemphill,* 380 F.3d at 688. Accordingly, each argument must be analyzed separately, with the recognition that the same facts may fit into more than one of these categories. *See Giano v. Goord,* 380 F.3d at 677 n. 6 (observing that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between the three categories, i.e., unavailability, estoppel, and justification, because the facts may sometimes fit into more than one category).

1. *Whether Administrative Remedies Were In Fact Available to the Plaintiff*

Where a prison nominally provides grievance procedures that may be utilized by inmates claiming excessive force, and the inmate plaintiff argues that the procedures were effectively unavailable to him because of threats of retaliation, the court must determine whether the ordinary grievance procedures were in fact rendered unavailable. "The test for determining whether ordinary grievance procedures were available to an inmate is an objective test and asks whether a 'similarly situated individual of ordinary firmness' [would] have deemed them available." *Dukes v. S.H.U. C.O. John Doe # 1,* No. 03 Civ. 4639, 2006 WL 1628487, at \*4 (S.D.N.Y. June 12, 2006) (quoting *Hemphill,* 380 F.3d at 688) (brackets in

original). To the extent that the court finds that a plaintiff lacked "available" administrative remedies, "the PLRA's exhaustion requirement is inapplicable." *Hemphill,* 380 F.3d at 686. *See also Arnold v. C.O. A. Goetz,* 245 F.Supp.2d 527, 537 (S.D.N.Y.2003) (stating the general principle that "an inmate's technical failure to exhaust administrative remedies before commencing a § 1983 action may be excused where officials prevented him from utilizing a grievance procedure").

Here, defendants argue that the traditional grievance procedures were not rendered unavailable because plaintiff was able to file a complaint with Suffolk County Correctional Facility Internal Affairs Bureau, in addition to writing letters to state and federal government officials. (Defs.' Reply Mem. of Law at 5.) The Second Circuit explicitly rejected this line of reasoning in *Hemphill.* In *Hemphill,* a case which presented facts similar to those herein, the plaintiff, Hemphill, alleged that while he was incarcerated at a correctional facility in New York, he was assaulted and beaten by corrections officers. *Hemphill,* 380 F.3d 680 at 683-84. Hemphill alleged that he was threatened with further assaults if he reported the beating so he did not file a grievance through the facility's formal grievance program. *Id.* Instead, he wrote a letter to the facility superintendent, and subsequently brought a Section 1983 suit against the correction officers and other defendants. *Id.* The defendants argued since Hemphill sent a letter to the superintendent and subsequently filed suit, he was not sufficiently frightened so as to render normal grievance procedures unavailable. *Id.* at 688. The court rejected this argument, holding:

> **\*6** Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts. This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees.

*Id.*

Here plaintiff alleges that he was physically assaulted in retaliation for previously testifying against corrections officers, and that he was threatened with further violence if he reported anything about the assault. Assuming all inferences in a light most favorable to the plaintiff, it may be that corrections officers impeded plaintiff's attempt to use the grievance process, and that the officers' actions were such that a person of ordinary firmness would be deterred from using the facility's internal grievance process. Therefore, there exists as material issue of fact as to whether the normal grievance procedures were "available" to Hepworth. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (finding that if the allegation of physical assault and threats of violence are true, it is plausible that a person of ordinary firmness would be deterred from using the grievance process); *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005) (denying summary judgment where issue of fact existed as to whether threats rendered a prison's normal grievance process unavailable to plaintiff); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist. LEXIS 17972, at *10-11 (W.D.N.Y. Sept.2, 2004) (same); *Palmer v. Goss,* No. 02 Civ. 5804, 2003 U.S. Dist. LEXIS 18103, at *16-17 (S.D.N.Y.2003) (denying summary judgment where plaintiff took reasonable steps to vindicate his claim through formal grievance procedures, and only "desist [ed] when it appeared to him that [a corrections officer] had intentionally destroyed evidence that supported his version of the incident and significantly deprived him of any possibility of relief through the grievance procedure").

### 2. *Whether The Alleged Threats Should Estop the Defendants From Raising the Affirmative Defense of Non-Exhaustion*

In *Ziemba v. Wezner,* 366 F.3d 161, the Second Circuit held that in cases under the PLRA, "the affirmative defense of exhaustion is subject to estoppel." *Ziemba,* 366 F.3d 161, 163-64 (2d Cir.2004) (adopting holding of *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001)). To establish equitable estoppel, the party claiming estoppel must demonstrate: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005). In addition, when asserting equitable estoppel against the government, "one must also prove affirmative misconduct." *Id.*

*7 Plaintiff alleges that the officer who ripped up the grievance plaintiff filed concerning the August 5, 2002 incident told plaintiff that he could not file a grievance, and that if he attempted to do so again, plaintiff would receive another beating. This officer is unnamed in plaintiff's affidavit, and it is unclear if this officer is one of the "John Doe" defendants in plaintiff's complaint (listed in the caption as "Suffolk County Correction Officers who worked yards 4 and 5 on the 7am to 3pm tour and yard 1-2-3 on August 5, 2002"). Plaintiff also alleges that defendant Campitello and other officers told him on numerous occasions that if Campitello was disciplined, plaintiff would be beaten or killed. (Pl.'s Am. Compl. ¶ 14(c).) Based on these allegations, a factfinder might conclude that it was reasonable for Hepworth to rely on these threats by Campitello and other officers and refrain from any further attempt to file a grievance concerning Campitello's conduct. If so, Campitello and the other officers would be estopped from raising the defense of non-exhaustion. *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005) (denying summary judgment and finding that defendant may be estopped from raising exhaustion as an affirmative defense where defendant officer allegedly threatened plaintiff with assault if plaintiff filed another grievance against officer); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist. LEXIS 17972, at *10-11 (W.D.N.Y. Sept.2, 2004) (denying summary judgment and finding that defendants may be estopped from raising exhaustion as an affirmative defense where plaintiff alleged that defendant correction officers failed to properly file his grievance appeal). Thus, an issue of material fact exists as to whether defendants are estopped from raising the defense of non-exhaustion, and defendants' motion for summary judgment should be denied.

### 3. *Whether "Special Circumstances" Apply Justifying Failure to Exhaust*

Finally, the Second Circuit has held that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). The effect of such justification is that "though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Giano v. Goord,* 380 F.3d 670, 675-76 (2d

Cir.2004). If a court finds that a plaintiff's failure to exhaust his remedies was justified, the court must determine whether administrative remedies are still available to the plaintiff. *Id.* at 690. If the court finds that the remedies are available, for instance, and that the plaintiff may file an untimely grievance, then the court must dismiss the complaint without prejudice, subject to reinstatement if the remedies prove to be unavailable. *Id.* If instead the court finds administrative remedies no longer available, then the suit may proceed without recourse to administrative remedies. *Id.*

**\*8** In *Hemphill,* the court recognized that threats of retaliation for using the grievance process might qualify as "special circumstances" that justify an inmate's failure to file a grievance in the manner prescribed, even where the threats did not suffice to render the grievance process actually unavailable, and even if the defendants are not estopped from asserting the defense of non-exhaustion. *Hemphill,* 380 F.3d at 690. The Second Circuit remanded *Hemphill* to the district court for consideration of this issue, directing that "the appropriate standard for determining whether [plaintiff's] fear of retaliation justified his sending a letter to [the superintendent] rather than filing [an internal] grievance is the same as is applicable in cases of retaliation; that is, whether a 'similarly situated individual of ordinary firmness would have been deterred from following regular procedures.' " *Id.* (internal citations omitted). The Court of Appeals directed the district court to consider the interplay between alleged threats and an inmate's decision to write directly to a higher authority rather than filing an internal grievance. *Id.* As the court noted, "[g]iven [the officer's] alleged warning of retaliation, it is arguable that Hemphill may have reasonably concluded that writing directly to the Superintendent involved an acceptable level of risk, whereas filing [an internal grievance] or notifying the immediate supervisors of his purported attackers was too fraught with danger." *Id.*

The circumstances in this case are similar to those present in *Hemphill.* Here, plaintiff alleges that he was under threats that, like those in *Hemphill,* may have justified writing a letter of complaint directly to an external prison authority rather than filing an internal grievance. Upon consideration of the interplay between the alleged threats and the plaintiff's decision to write letters to the Internal Affairs Bureau and other agencies, a factfinder might conclude that a similarly situated individual of ordinary firmness would have been deterred from following regular procedures. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (finding under similar circumstances that "it cannot

be said as a matter of law that special circumstances did not exist"). Accordingly, defendants' motion for summary judgment should be denied.

### C. *First Amendment Retaliation Claim*

Plaintiff also pleads a First Amendment retaliation claim, based on his allegations that defendant Campitello and other corrections officers retaliated against plaintiff for plaintiff's attempt to file a grievance against Campitello, threatening to beat and kill plaintiff if Campitello was disciplined. Plaintiff claims that the adverse actions were the continued verbal threats by Campitello and other officers that if plaintiff filed a grievance and/or Campitello was disciplined, plaintiff would receive another beating or be killed. Defendants argue that the alleged threats, if made, do not rise to the level of retaliatory conduct. (Defs.' Reply Mem. at 6-7.)

**\*9** "[A] plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (stating that a prisoner's retaliation claim will not survive summary judgment if he does not meet the burden of demonstrating that the conduct was constitutionally protected and that the prison officials' actions were substantially improper retaliation). Only retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 493. In conducting this inquiry, the Second Circuit has advised that courts must approach prisoner claims of retaliation with skepticism and care because they are easily fabricated, and also because of the ease with which virtually any adverse action taken against a prisoner by a prisoner official can be characterized as a constitutionally proscribed retaliatory act, "even those otherwise not rising to the level of a constitutional violation." *Id.*

The first prong of *Dawes* requires a finding that the speech or conduct at issue was protected. *Dawes,* 239 F.3d at 492. An inmate's filing of a grievance is constitutionally protected, and retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth

Amendments. *Graham,* 89 F.3d at 80. The third prong of *Dawes* requires that a causal connection exist between the speech and the adverse action. Drawing all inferences in favor of the non-movant, there are sufficient allegations here to permit him to show a causal connection between plaintiff's attempt to file a grievance and the subsequent alleged threats. The real question of fact concerns the second prong of *Dawes,* which requires that the defendant took adverse action against the plaintiff, and that the action was such that it would deter a similarly situated individual of ordinary firmness from exercising his rights. *Dawes v. Walker,* 239 F.3d at 492. While Hepworth argues that the verbal threats deterred him from any further attempts to file grievances, not every unnecessary statement by a prison guard regarding an inmate's exercise of free speech rises to the level of a constitutional violation. *Id.* at 493. Assuming all inferences in favor of Hepworth, however, plaintiff raises a material issue of fact as to whether, under the circumstances plaintiff alleges, a reasonable prisoner would have been deterred from the exercise of his constitutional rights. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (holding that temporal proximity of an allegedly retaliatory act to a prisoner's filing of a grievance may serve as circumstantial evidence of retaliation). If so, the evidence is such that a reasonable jury could find that the officers unconstitutionally retaliated against Hepworth for exercising his First Amendment. Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim should be denied since there are disputed issues of material facts.

*CONCLUSION*

**\*10** Based on the foregoing, I recommend that defendants' motion for summary judgment be denied.

*OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), and 72(b); *IUE AFF-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.1992), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curium).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2844408

Footnotes

1    Defendants also note, in their effort to argue that plaintiff failed to submit evidence as to the existence of the grievance, that the statement in plaintiff's counsel's affidavit "is not evidence that there was a grievance, since his attorney has no personal knowledge of the grievance." (Defs.' Mem. at 4.) While this may be so, defendants have apparently overlooked plaintiff's own affidavit, which clearly sets forth the circumstances surrounding plaintiff's attempt to file a grievance about the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.)